William A. Gilbert, WSBA #30592
Gilbert Law Firm, P.S.
421 W. Riverside Ave, Suite 1400
Spokane, WA 99201
T: 509·321·0750
F: 509·343·3315
E: bill@wagilbert.com
Attorney for Plaintiffs

The Honorable James L. Robart

UNITED STATES DISTRICT COURT OF THE WESTERN
DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| CAROLINE ANGULO, a single person, ERIC KELLER, a single person, EBEN NESJE, a single person, KIRK SUMMERS, a single person, CHRISTINE BASH, individually and as personal representative of the ESTATE OF STEVEN BASH, RAYMOND SUMERLIN JR. and MARYANN SUMERLIN, a married couple, and MARTIN WHITNEY and SHERRYL WHITNEY, a married couple,<br><br>       Plaintiffs, individually and on behalf of others similarly situated.<br><br>     v.<br><br>PROVIDENCE HEALTH & SERVICES WASHINGTON, a non-profit Washington Corporation, also d/b/a PROVIDENCE ST. MARY MEDICAL CENTER; Dr. JASON A. DREYER, DO, and JANE DOE DREYER, husband and wife and the marital community thereof; Dr. DANIEL ELSKENS DO, and JANE DOE ELSKENS, husband and wife and the marital community thereof; and JOHN/JANE DOES 1-10, and any marital communities thereof,<br>       Defendants. | NO. 22-CV-00915-JLR<br><br>**TRIAL BY JURY REQUESTED**<br><br>**CLASS ACTION COMPLAINT (FIFTH AMENDED)** |

Plaintiffs allege:

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 1 OF 122

## I.    INTRODUCTION

1.1    This is a class action case brought under color of Washington statutory and common law to include, without limitation: Violation of the Washington State Consumer Protection Act (RCW 19.86.010 Et. Seq); Violation of the Washington State Criminal Profiteering Act (RCW 9A.82.100 and 9A.82.080); Violation of RCW 7.70.010 *et. seq.* (Actions for Injuries Resulting from Health Care); Corporate Negligence; Fraud; Unjust Enrichment; Negligent and Intentional Infliction of Emotional Distress, Breach of Fiduciary Duty, and related claims. This class action is based upon a "common course of conduct" spanning years, as further described herein. *DZ Reserve v. Meta Platforms, Inc.,* 96 F.4th 1223, 1235 (9th Cir. 2024).

1.2    This case is about corporate and individual profiteering compounded by a lack of corporate accountability and what Providence has since admitted was a breach of the necessary "sacred trust" between a patient and his or her surgical doctor and hospital. It is about a fraud perpetuated on Defendants' surgical patients resulting in significant and undeniable harm to them, a fraud played out through spine surgeries that were medically unnecessary, overly complex, or otherwise improper conducted by two neurosurgeons[1] financially incentivized by Providence to do so for its own profit, who put their own profit ahead of patient safety and their own ethical and legal responsibilities, resulting in patients' emotional and physical harm. An essential component of this fraud is the thousands of false claims filed with government and private health care insurers, *e.g.,* the subject of a Providence *qui tam* settlement with the federal and state governments in April 2022 (Exhibit 2), with other false claims being the subject of a federal and state false claim lawsuit commenced in January 2024 against the successor employer of Dr. Dreyer, MultiCare (the

---

[1] Plaintiffs reserve the right to expand the list of surgeons engaged in this scheme.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 2 OF 122

GILBERT LAW FIRM, P.S.
421 W. Riverside, Ave., Suite 1400
Spokane, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  MultiCare *qui tam*). *(See U.S. ex rel Palmer v. MultiCare Health Systems*, 2:22-cv-00068-SAB,

2  ECF26 (E.D. Wash.) complaint at https://www.justice.gov/usao-edwa/media/1335396/dl?inline).

3      1.3    For over 100 years, Defendant PROVIDENCE HEALTH & SERVICES

4  WASHINGTON (hereinafter "PROVIDENCE") has been a member of the medical community in

5  the state of Washington, including Eastern Washington. PROVIDENCE has owned and operated

6  St Mary Medical Center (SMMC), a hospital located in Walla Walla, Washington since 1880.

7  Providence St. Joseph Health is a Washington non-profit corporation which is the sole corporate

8  owner of PROVIDENCE and shares its headquarters with PROVIDENCE.

9      1.4    Providence promotes itself as providing excellent, reliable, and necessary medical

10  care.

11      1.5    Providence employed Dr. DANIEL ELSKENS DO, and Dr. JASON A. DREYER,

12  DO, the "Doctors," as neurosurgeons in its neurosurgery department at SMMC.

13      1.6    In order to increase its own profits, Providence instituted a scheme, pattern, policy

14  and practice that incentivized Dr. Jason A. Dreyer, DO and Dr. Daniel Elskens, DO to conduct

15  unnecessary and improper spine surgeries at high volumes to generate false reimbursement claims

16  and records using a productivity and compensation metric with no cap on compensation that

17  provided the neurosurgeons financial incentives to perform a high volume of surgical procedures

18  of greater complexity to generate false health care claims, all involving work Relative Value Unit

19  (RVU), also providing Providence with additional profits. *See* ¶¶ 4.21-4.25.

20      1.7    To implement this scheme, Providence used a two-tier compensation bonus

21  structure, paying a dollar-rate-per-wRVU amount for work that brought the Doctors up to the

22  median annual national production level of neurosurgeons, and a higher dollar-rate-per-RVU for

23  aggregate work greater than median national production levels.

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 3 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1.8    That is, the Doctors were incentivized to reach production levels higher than the median national annual performance thresholds for neurosurgeons.

1.9    As a result of this scheme, pattern, policy, and practice, Dr. Dreyer became the highest producing neurosurgeon in the entire Providence 51-hospital system, earning between $2.5 and $3.1 million a year for the years he was employed, well in excess of 90% of all surgeons (and, we allege, over the 99th percentile), at one point making him the second highest paid employee in all of Providence, with only the Providence CEO earning more, despite the fact that he was hired at Providence just out of residency. Courts have considered doctor compensation at or above 90% to be a red flag for false claims based upon exceeding fair market value of medical services. *U.S. ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 172 (3d Cir. 2019).

1.10    Both neurosurgeons ultimately resigned from Providence (Dr. Elskens on or about May 8, 2017, and Dr. Dreyer on or about November 13, 2018). The resignations came on the heels of, or immediately preceded, internal and Washington Department of Health (DOH) administrative investigations into allegations that the surgeons were performing medically unnecessary and otherwise improper spine surgeries, all of which is below the medical and government standards of care.

1.11    After the resignation of Dr. Dreyer and Dr. Elskens, their supervisor, another neurosurgeon employed by SMMC, Dr. David Yam, resigned and filed a sealed complaint under the False Claims Act alleging Providence, Dreyer, and Elskens were committing medical billing fraud with government funded insurance providers.

1.12    On April 12, 2022, Providence announced a settlement of the *qui tam* case with the United States Department of Justice ("DOJ") for $22.7 million, to resolve allegations that Providence fraudulently billed Medicare, Medicaid, the Washington Health Care Authority, and

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

other government health care programs for neurosurgery procedures by Drs. Dreyer and Elskens that did not meet criteria for reimbursement, were medically unnecessary, or were otherwise improper because false claims.

1.13    In the Settlement, announced on April 12, 2022, Providence admitted publicly for the first time that it was aware of concerns raised by Providence personnel about these neurosurgeons' negligent, unlawful, unethical, and fraudulent treatment practices.

1.14    The Settlement (Exhibit 2) defines the "Covered Conduct" against Providence as its claims "arising from allegedly false claims for payment submitted by Providence to Medicare, Washington State Medicaid… during the relevant time period for neurosurgery services performed by [the Doctors] that did not meet the criteria for reimbursement under the Federal Health Programs, were medically unnecessary, or were otherwise improper." Recital H.  The Covered Conduct included that Providence "failed to take appropriate action in response to those concerns," and "failed to have and/or timely implement adequate safeguards and controls with regard to [the Doctors] to timely prevent, detect, deter, and cease the performance of medically unnecessary neurosurgical procedures." *Id*. Finally, the Settlement disclosed that Providence used a wRVU-based compensation system without caps under which "the greater the number of procedures of higher complexity that the neurosurgeon performed, the greater the compensation the neurosurgeon received." *Id*, Recital C.  It noted Dreyer's wRVU numbers from 2014 to 2018 exceeded 90% percentile for doctors, yielding corresponding compensation from $2.5 to $2.9 million annually, a red flag for health care fraud. *See Bookwalter, supra.*

1.15    The Settlement identified eight patterns of activity that the Doctors routinely engaged in. *Id*., Recital D. Providence agreed that these eight patterns of activity were raised as concerns. *Id*., Recital J. The routine patterns included, without limitation, falsifying or

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 5 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. Riverside, Ave., Suite 1400
Spokane, WA 99201
(509) 321-0750 • Fax (509) 343-3315

1    exaggerating patient conditions to justify unnecessary or overly complex surgeries in order to

2    obtain reimbursement for surgical procedures; performing surgeries that did not meet medical

3    necessity guidelines; creating excessive complications; performing surgeries on inappropriate

4    candidates with comorbidities; forcing multiple surgeries; failing to document properly; and,

5    overall, placing patient safety at risk. Recital D. *See also* ¶ 4.102, *infra*, for details of allegations.

6        1.16    In January 2024, when the Justice Department filed its *qui tam* health care fraud

7    lawsuit against MultiCare Health Systems ("MultiCare") based on Dr. Dreyer's surgeries, *see* ¶

8    1.2 *supra.* The government further articulated Providence's prior admissions regarding Dr. Dreyer[2]

9    during its settlement with the DOJ back in 2022 to include claims regarding "negative outcomes,"

10   of "permanent injury," and "death" and that Dr. Dreyer:

11           knowingly and inappropriately completed billing sheets and other documentation that
             caused Medicare and other health insurance programs to be falsely and fraudulently billed
12           for medically unnecessary and inappropriate neurosurgical services.

13   2024 Complaint, ¶ 72; *see* ¶ 74 ("Providence admitted to facts including the facts alleged supra

14   at paragraphs 71 & 72").

15       1.17    The concerns listed in the Providence Settlement and the 2024 DOJ *qui tam*

16   complaint against MultiCare were not created in a vacuum but rather in the context of

17   contemporaneous reports from at least two Providence neurosurgeons,[3] namely:

18           (a) Dr. Matthew Fewel, a Providence neurosurgeon near Walla Walla who, after being
             consulted to give second opinions by Dr. Dreyer's surgical patients, began to see
19           concerning patterns and ultimately reported Dr. Dreyer to the DOH in March 2019,
             expressing concern there were "hundreds of similar cases," including the "11 most
20           egregious" examples he had compiled, see Exhibit 5;

21   _____

22   [2] Dr. Dreyer was employed by MultiCare in 2019-2021, making his background at Providence relevant.
     [3] Exhibit 5 is excerpts of Dr. Fewel's whistleblower report to the DOH, filed internally on March 4, 2019. Exhibit 6
23   is a series of emails in February 2020 between the Justice Department and MultiCare Health Systems outside
     counsel, along with an attachment sent at that time by the DOJ to MultiCare that gives details of Dr. Yam's concerns
     reported to the DOJ. Both of these exhibits have previously been filed publicly, either in *Palmer v. MultiCare*,
24   Spokane County Superior Court No. 21-2-01299-32 (e.g., Dkt. 480, Exh. H), or this case, ECF 93:87-93, 116-118.

**GILBERT LAW FIRM, P.S.**
421 W. Riverside, Ave., Suite 1400
Spokane, WA 99201
(509) 321-0750 • FAX (509) 343-3315

(b) Dr. Yam, the head of neurosurgery at SMMC, who filed the 2020 *qui tam* complaint that resulted in the Settlement and who also met with the Department of Justice in early 2020 to report his concerns that, *inter alia,* "greater than 80 percent" of Dr. Dreyer's surgeries that he reviewed between November 2017 and February 2018 contained these kinds of major issues. See Exhibit 6.  Dr. Yam claims that he ultimately reported Providence to the Justice Department because for many years his internal complaints about Dr. Dreyer's misconduct with his patients were never acted upon by Providence;

(c) These lists of Providence patient casualties were compiled by the Providence neurosurgeons who treated Dr. Dreyer's patients (Fewel) and supervised both Doctors (Yam) in order to report this pattern of misconduct to government authorities, including because of Providence's continuing refusal to address it while profiting substantially from it, a systemic response; and

(d) Notwithstanding this pattern of misconduct, Providence continues to insist that its compensation system is not responsible for the misconduct it incentivized, and this underscores the need for the remedies, including injunctive relief, authorized in the Profiteering and Consumer Protection Acts to deter and prevent such misconduct.

1.18     Thus, while this agreed-upon pattern of concerns listed in the Settlement at Recital D does not specify the number of patients affected, there is evidence to support claims that the specific list of concerns found in the Settlement would apply to "hundreds" of patients and greater than 80 percent of Dr. Dreyer's surgical patients at Providence (which, upon information and belief, number at least over 1,000 during his time at Providence according to Providence).

1.19     This was also the position of the DOJ, that the victims of these medically unnecessary or otherwise improper surgeries by the Doctors number in the "hundreds."[4]

1.20     All these identified and admitted concerns make the related billings false claims and, therefore, profiteering acts under RCW 9A.82.010(4)(hh), and specified unlawful activity under RCW 9A.83.010(7) for money laundering purposes, as further described herein.  Despite

---

[4] Hill, *Providence to Pay $22.7 Million to Settle Medicare, Medicaid Fraud Whistleblower Complaint Brought Against two Walla Walla Neurosurgeons,* Spokes. Rev. (April 13, 2022 – updated April 14, 2022) https://www.spokesman.com/stories/2022/apr/13/providence-to-pay-227-million-to-settle-medicare-m/

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 7 OF 122

GILBERT LAW FIRM, P.S.
421 W. Riverside, Ave., Suite 1400
Spokane, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  the many admissions by Providence leading to it paying $22.7 million under the Settlement

2  Agreement, it still maintains in this Court that it has admitted, and has, no liability for these claims.

3        1.21    At no time prior to the April 12, 2022 publication of the Settlement Agreement had

4  PROVIDENCE disclosed publicly or to its patients that it ever had any of these concerns about

5  the Doctors. Despite these carefully concealed concerns, Providence allowed both neurosurgeons

6  to resign from their Providence employment rather than report them to the National Practitioner

7  Data Bank ("NPDB") or Washington State Department of Health ("DOH") as required by law.

8  For example, under 42 U.S.C. § 11133(a)(1) of the Healthcare Quality Improvement Act of 1986,

9  and the NPDB guidelines, health care entities are required to report surrenders of physician clinical

10  privileges while they are under investigation. Under these laws, and pursuant to common law,

11  Providence had a statutory and common law duty to disclose, including to the members of the class

12  for their benefit in making material decisions about their healthcare.  These failures to disclose by

13  Defendants were intended to, and did, prevent discovery of their claims by Plaintiffs.

14        1.22    Providence was well aware of its duty to make such reports to the NPDB and DOH.

15  Upon information and belief, direct and circumstantial evidence will show that Providence used

16  its reporting obligations to control the Doctors' behavior toward Providence and that the Doctors

17  learned, through these actions, that Providence was willing to negotiate away its obligation to

18  report doctor conduct to the NPDB, including using money, concealment, RVUs, improperly

19  labelled RVU payments (compensation for work not performed), in order to conceal Doctor

20  absences while on administrative leave/under investigation and to conceal their reportable conduct.

21        1.23    Dr. Dreyer and his colleague and friend from their Michigan residency Dr.

22  Sandquist further corroborated Defendants' concerted concealment plan when Dr. Sandquist filed

23  a false employment referral with MultiCare on Dr. Dreyer's behalf, pursuant to Dr. Dreyer's

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 8 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  instruction that Providence's position in its severance agreement with him was that its ongoing

2  review of him need not be reported to prospective employers. *See also* ¶¶ 4.89 & 4.94, *infra*. These

3  coordinated and concerted failures to disclose by Defendants were intended to, and did, prevent

4  Plaintiffs' discovery of, and investigation of, the legal claims against the Defendants.  They were

5  also intended to prevent creating a record that would hinder the Doctors from becoming employed

6  elsewhere, including at MultiCare, to maintain the ongoing concealment for Defendants' benefit.

7      1.24    This occurred despite Providence's knowledge of the Doctors' wrongdoings. The

8  internal complaints from doctors and staff are relevant not only to establish Defendants'

9  knowledge but also to prove willful blindness or recklessness, both of which are sufficient to

10  establish health care fraud under 18 U.S.C. § 1347. *United State v. Walter-Eze*, 869 F.3d 891, 909

11  (9th Cir. 2017) (defendant "deliberately failed to investigate while being aware of a high probability

12  of the" health care fraud).[5]

13     1.25    Defendants acted at all relevant times with knowledge, deliberate ignorance, or

14  recklessness in committing their false healthcare claims

15     1.26    An example of Providence's actual knowledge is a full-page Providence

16  advertisement in the Walla Walla Union Bulletin newspaper to Providence patients, paid for by

17  Providence and published on June 5, 2022. See Exhibit 4.

18     1.27    Of note in this June 5, 2022 full page advertisement is Providence's apology to

19  Plaintiffs for violating the sacred trust they placed in Providence, see Exhibit 4:

20

21  _____

22  [5] There "is no requirement [for federal false claims] of 'specific intent to defraud,' and liability can be found even in 'the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted.'" *United States v. Sutter Health*, 2024 WL 4112315, at

23  *5 (N.D. Cal. Sept. 6, 2024) (quoting *Godecke ex rel. v. Kinetic Concepts*, 937 F.3d 1201, 1211 (9th Cir. 2019)). Reckless disregard of the truth in a claim is separately sufficient. *United States ex rel. Schutte v. SuperValu, Inc.*,

24  598 U.S. 739,750 (2023) ("actual knowledge, deliberate ignorance, or recklessness will suffice").

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 9 OF 122                                    **GILBERT LAW FIRM, P.S.**
                                                421 W. RIVERSIDE, AVE., SUITE 1400
                                                SPOKANE, WA 99201
                                                (509) 321-0750 • FAX (509) 343-3315

We deeply regret the damage these events have caused to the sacred trust many patients place in us. The actions of these former employees were not in keeping with our values, and we are doing everything in our power to make sure nothing of the sort happens again.

1.28    While admitting "regrettable" doctor conduct betraying its patients' sacred trust, Providence continued its campaign to conceal its role and responsibility by describing the misconduct as limited to the aberrant and isolated misconduct of the Doctors which "led to a thorough" investigation "resulting in the surgeons leaving the organization" in 2017 and 2018.

1.29    Conspicuously absent from this patient communication was any disclosure that: (i) the "thorough internal investigation" allegedly initiated in 2017 was only after repeated internal complaints by its neurosurgeons and staff; (ii) despite its allegedly "thorough investigation" and discovery in 2017, Providence permitted both Doctors to leave its employ without making any patient or public disclosure, much less the legally required disclosures, about any of this "regrettable" misconduct at Providence; and (iii) the Doctors' conduct was incentivized and rewarded by Providence's compensation system that promoted the Doctors' false claims for which Providence was legally accountable despite multiple continuing warnings that its financial incentives. were inducing unnecessary and otherwise improper surgeries by the Doctors.  The notice fails to disclose the role of Providence's compensation system in inducing the misconduct, or Providence's resulting profits.

1.30    Providence's direct communication to patients is further evidence of Providence's effort to conceal its involvement in, and profit from, the misconduct for which it had just paid $22.7 million to settle with the government, by limiting responsibility to the Doctors.

1.31    At all relevant times, including in the publication of this post-hoc message of alleged concern for its patients' health, as well as solicitation of contacts about their health, Providence owed a fiduciary duty to its patients, including the duty of candor.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 10 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1.32    In contrast to this June 2022 public admission by Providence of a breach of patient sacred trust and claim discovered during its "thorough internal investigation" in 2017 resulting in the Doctors' employment termination, Providence claimed in this Court in January 2024 that it correctly had not admitted any liability in the DOJ Settlement Agreement, and instead it would show that in 2017 it conducted an "outside review" of medical necessity in SMMC's neurosurgery program, concluding "the program was well-run and provided care consistent with applicable standards." ECF 136:12.

1.33    Upon information and belief, Providence was aware, or should have been aware at or near the time of hiring these neurosurgeons and throughout their credentialing and privileging procedures that they consistently put patients' health and safety at dire risk while making decisions based upon personal financial recovery, as promoted and profited by Providence, rather than medical necessity or standards; yet Providence actively concealed that information up to and including failing to report them to the NPDB or the DOH and allowing the neurosurgeons to depart their employ with a publicly clean record. MultiCare would later defend its hiring of Dr. Dreyer in part by claiming it repeatedly checked the NPDB's records in May 2019 and found no report on Dr. Dreyer from Providence. *U.S. ex rel. Palmer v. MultiCareHealth* Systems, No. 22:-cv-00068-SBB, ECF 46:355 (E.D. Wash. May 6, 2024) (MultiCare Statement of Material Facts Not in Dispute).

1.34    Despite being placed on administrative leave at Providence, Dr. Dreyer was successfully recruited by MultiCare in Spokane, Washington, where he continued his pattern and practice of negligent, violative, unethical, and fraudulent treatment practices to generate false claims, national productivity ranking in the late 90 percentile, and false health care claim reimbursement to generate unlawful proceeds for MultiCare and compensation for himself,

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 11 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    immediately eclipsing the compensation of every non-management MultiCare employee in its 13

2    hospital network.

3        1.35    Likewise, when Dr. Elskens was allowed to resign in 2017 without being reported

4    to the NPDB, he secured employment in Ohio, where, *inter alia*, a patient death occurred.

5        1.36    Although MultiCare knew or should have discovered concerns related to Dr.

6    Dreyer's gross misconduct at Providence through the extensive background investigation that is

7    required before hiring/retaining a surgeon and providing privileges to practice in its medical

8    facilities, it was reasonably foreseeable that:

9        (a) Providence's failure to report Dr. Dreyer, to the NPDB or DOH would prevent, hinder,
     or delay discovery of the substandard, fraudulent, and faulty medical care that Dr.
10       Dreyer had provided previous patients to the financial benefit of Providence;

11       (b) Providence's concealment of the results of its allegedly thorough investigation of Dr.
     Dreyer's surgeries upon its patients, including by agreeing not to disclose them to
12       prospective employers of Dr. Dreyer, would result in continued harm to future patients,
     including those of his future employer MultiCare;

13
         (c) Providence's effort to restrict and control referrals of Dreyer patients to his known
14       associate Dr. Sandquist would impact the care that his previous patients received in
     follow-up to Dr. Dreyer's faulty and fraudulent medical care; and
15
         (d) Providence's concealment from its patients of the fact and details of Providence's
16       betrayal of its patients' trust, including its profiteering from it, would cause severe
     anxiety in Dreyer's prior and future patients once it was disclosed to them.
17
         1.37    In response to this pattern of negligent, unlawful, unethical, and fraudulent
18
     treatment practices of the Doctors under the direct authority and supervision of Providence, and
19
     fraudulent concealment thereof by all Defendants, this cause of action is brought by the class of
20
     Providence surgery patients of the Doctors whose lives have been forever changed as a result of
21
     the actions or omissions of the Defendants herein named, and by the class of MultiCare patients
22
     of Dr. Dreyer who should never have become MultiCare patients because he would not have been
23
     hired.
24

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1.38    Filed as a Class Action, this Cause is brought on behalf of the classes of surgical patients adversely affected by the Defendants' course of unlawful conduct – the group of patients impacted by the negligent, unlawful, unethical, and fraudulent treatment practices and false claims of Dr. Dreyer and Dr. Elskens under the direct supervision, authority, and incentive of PROVIDENCE, and along with the fraudulent concealment thereof by all Defendants, and seeks redress on behalf of those named and unnamed class members.

## II.    PARTIES

2.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference paragraphs 1.1 through 1.38 as if fully set forth herein.

2.2    Plaintiff CAROLINE ANGULO, a single person, representing herself and the Providence Class, was at all times relevant hereto residing in Walla Walla County, Washington.

2.3    Plaintiff ERIC KELLER, a single person, representing himself and the Providence Class, was at all times relevant hereto residing in Union County, Oregon.

2.4    Plaintiff EBEN NESJE, a single person, representing himself and the Providence Class, was at all times relevant hereto residing in Columbia County, Washington.

2.5    Plaintiff KIRK SUMMERS, representing himself and the Providence Class, was at all times relevant hereto residing in Columbia County, Washington.

2.6    Plaintiff CHRISTINE BASH, individually and as personal representative of the ESTATE OF STEVEN BASH, is the surviving wife of STEVEN BASH and the personal representative of the ESTATE OF STEVEN BASH with probate pending in Walla Walla County, representing herself and the ESTATE, is a member of the Providence Class and was at all times relevant hereto a resident of Walla Walla County, Washington. STEVEN BASH was also a resident of Walla Walla County at the time of his death at the age of 51.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 13 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1      2.7    Plaintiffs RAYMOND SUMERLIN JR. and MARYANN SUMERLIN,

2  representing themselves and the MultiCare Class, were at all times relevant hereto a married

3  couple, residing in Walla Walla County, Washington.

4      2.8    Plaintiffs MARTIN WHITNEY and SHERRYL WHITNEY, representing

5  themselves and the MultiCare Class, were at all times relevant hereto a married couple, residing

6  in Stevens County, Washington.

7      2.9    Plaintiffs, on behalf of themselves and those similarly situated, bring claims against

8  DEFENDANTS as pled herein, separately and, where necessary, are pled in the alternative,

9  including for violations of

10     • RCW 9A.82.080 and 9A.82.100 (Criminal Profiteering)

11     • RCW 19.86 et seq. (Unfair Business Practices/Consumer Protection) ("CPA")

12     • RCW 7.70 et seq. ("Actions for Injuries Resulting from Health Care"), including the lack of informed consent, and

13

14     • Corporate negligence (under both RCW 7.70 and under common law), by, *e.g.*, negligent hiring and supervision as more fully alleged below, *see e.g., M.N. v. MultiCare Health Systems*, 2 Wn.3d 655, 541 P.3d 346 (2024) for Providence class members,

15

16     • Negligent and intentional infliction of emotional distress, including as authorized in *M.N. v. MultiCare Health Systems*, 2 Wn.3d 655, 541 P.3d 346 (2024),

17

18     • The other common law tort and statutory actions alleged below, including, without limitation, breach of fiduciary duty, unjust enrichment, failure to provide or obtain informed consent, fraud, misrepresentation, and other unlawful conduct as set forth below.

19

20      2.10   At all relevant times, each Plaintiff, named and unnamed, was "a person who

21  sustain[ed] injury to his or her person, business, or property by an act of criminal profiteering that

22  is part of a pattern of criminal profiteering activity, or by an offense defined in" RCW 9A.82.080

23  and RCW 9A.82.100(1)(a).

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 14 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

2.11    At all relevant times, each Plaintiff, named and unnamed, was a "person who was injured in his or her business or property" by a violation of the CPA. *See* RCW 19.86.090.

2.12    At all relevant times, each Plaintiff, named and unnamed, was a person to whom Defendants owed duties, including a fiduciary duty, under RCW 7.70, under corporate negligence, and/or through common law/statute, including RCW 70.41.210, which requires hospitals to report to the Department of Health, any restriction or termination of the practice of a health care practitioner while the practitioner is, *inter alia*, under investigation or in return for the hospital not taking action.

2.13    Defendant PROVIDENCE HEALTH & SERVICES WASHINGTON also d/b/a PROVIDENCE ST. MARY MEDICAL CENTER (hereinafter PROVIDENCE) is a Washington nonprofit corporation with its primary place of business located 1801 Lind Avenue, Southwest, Renton, WA 98057, which is geographically located in King County, Washington.  Providence has offices to conduct business, regularly conducts business, and manages medical facilities across the state of Washington.

2.14    At all relevant times hereto, Defendant JASON A. DREYER, DO was a licensed physician, and citizen of Washington residing in, and practicing medicine in Walla Walla County or Spokane County, Washington, as an employee or ostensible agent of either Providence or at MultiCare Health System D/B/A MultiCare Deaconess Hospital / Rockwood Clinic (collectively MULTICARE). At all times relevant hereto, Jason A. Dreyer held himself out to be a medical care provider whose services were offered to the public for compensation. Jason A. Dreyer is married to LAURA DREYER and all acts or omissions committed by JASON A. DREYER, DO were done both for, and on behalf of, the community composed of JASON A. DREYER, DO and his wife, LAURA DREYER.

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    2.15    At all relevant times hereto, Defendant DANIEL ELSKENS, DO was a licensed

2    physician, and citizen of, *inter alia,* Washington, Michigan, and Ohio, and did reside in, and

3    practice medicine in, Walla Walla County, Washington, as an employee or ostensible agent of

4    Providence. At all times relevant hereto, Daniel Elskens held himself out to be a medical care

5    provider whose services were offered to the public for compensation. Daniel Elskens is married to

6    JUDITH CLARK and all acts or omissions committed by DANIEL ELSKENS, DO were done

7    both for, and on behalf of, the community composed of DANIEL ELSKENS, DO and his wife,

8    JUDITH CLARK.

9    2.16    Upon information and belief, JOHN / JANE DOE employees or agents of

10   Providence (and any spouses/marital communities thereof) reside and/or work in the State of

11   Washington and include but are not limited to those listed in the 2020 *qui tam* action that resulted

12   in the 2022 settlement between Providence and the DOJ (*i.e.*, Providence's Chief Medical Officer

13   and key Providence administrators in Walla Walla, Spokane, and Renton, WA). See *United States*

14   *ex rel. Yam v. Providence Health & Services Washington*, Case No. 4:20-cv-05004-SMJ (E.D.

15   Wash.), Settlement Agreement dated March 2022 (unsealed April 11, 2022).

### III.    JURISDICTION AND VENUE

17   3.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and

18   incorporate by reference paragraphs 1.1 through 2.16 as if fully set forth herein.

19   3.2    The State of Washington has subject matter jurisdiction over this action pursuant

20   to RCW 2.08.010 because most alleged acts occurred in this State. In addition, upon information

21   and belief, a majority of the members of the proposed class are citizens of Washington.

22   3.3    Jurisdiction and venue are proper in and for the Superior Court of Washington for

23   King County because at all times relevant hereto, Defendant Providence's controlling business

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 16 OF 122

1  offices were located in King County, Washington and removal to federal court is not authorized

2  or justified under 28 U.S.C. § 1453.

### IV.    TIMELINE AND FACTS

4      4.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and

5  incorporate by reference paragraphs 1.1 through 3.3 as if fully set forth herein.

6      4.2    Medically unnecessary services include any surgical intervention that is either not

7  needed, not indicated, or not in a patient's best interest when weighed against other available

8  options, including conservative measures.[6]  While medically unnecessary services fall below the

9  medical standard of care, they can independently violate federal and state law when they are

10  presented or certified for a claim for government or private insurer reimbursement.  *See e.g.,*

11  *Winter ex rel. United States v. Gardens Regional Hospital and Medical Center*, 953 F.3d 1108,

12  1119  (9th Cir. 2020) (certification of medical necessity not honestly held); *United States v.*

13  *Solakyan*, 2024 WL 4341365, *3 (9th Cir. Sept. 30, 2024) (fraud offense for medically

14  unnecessary testing);  42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 412.46(a)(2); RCW  48.80.030(2)

15  (false claim of medical necessity). In addition, such surgeries generate false records to

16  implement and conceal the fraudulent reimbursement claims.  These false records complicate

17  further medical care because their false nature is undisclosed. Separately, presentation of claims

18  to federal programs require certifications not only of medical necessity but also that the records

19  used to make claims are themselves truthful and not false. *United States v. United Healthcare*

20  *Insurance Co.*, 848 F.3d 1161, 1172 (9th Cir. 2016) ("'makes, uses, or causes to be made or used,

21

22  _____

23  [6] AlAli, *Unnecessary spine surgery: can we solve this ongoing conundrum?* Front Surg. 2023 Aug 25.  *See* link: 10.3389/fsurg.2023.1270975. Stahel and Kim, *Why do surgeons continue to perform unnecessary surgery? Patient*

24  *Saf Surg.* (2017) Published 2017 Jan 13. See link: 10.1186/s13037-016-0117-6.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 17 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. Riverside, Ave., Suite 1400
Spokane, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  a false record or statement material to a false or fraudulent claim,'" quoting 31 U.S.C. §

2  3729(a)(1)(B)). Cf. MultiCare *qui tam* complaint, ¶6 (alleging MultiCare used "accompanying

3  false records and statements that that MultiCare knowingly made and sued, material to [Dryers'

4  false and fraudulent claims")

5       4.2     Performing unnecessary surgery on a patient without that patient's knowledge that

6  the surgery is unnecessary is a deviation from the standard of care that requires physicians to

7  possess and apply the degree of skill, knowledge and care that a reasonably qualified physician in

8  the same or similar community would apply.[7]  It also violates the fiduciary duty of disclosure, and

9  the federal and state standards for making health care insurance claims. *See, e.g.*, *Winter v.*

10  *Gardens Regional Hospital and Medical Center*, 953 F.3d 1108, 1118 (9th Cir. 2019) (false

11  certification of medical necessity a false claim).

12       4.3     Here, unnecessary procedures were, at a minimum, motivated by financial gain,

13  and revealed that Providence has oversight or supervision problems and/or deliberately promoted

14  the financial scheme of the Doctors for its own profit.[8]

15       4.4     Every Providence surgery conducted by the Doctors (1,750, per Providence) was a

16  part of the scheme; every surgery conducted was the subject of the Settlement Agreement reached

17  between Providence and the DOJ in 2022 (*e.g.*, are described as part of the "covered conduct"

18  under Recital H therein); and every surgery conducted resulted in damage to the person creating,

19  at a minimum, severe emotional distress for having been a part of the unlawful scheme.

20       4.5     Providence also dba SMMC knew, designed, incentivized and/or promoted, or, in

---

[7] *Walsh v. Barry-Harlem Corp.*, 272 Ill. App. 3d 418, 423, 208 Ill. Dec. 558, 561, 649 N.E.2d 614, 617 (1995); (See *Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867, 95 Ill. Dec. 305.)

[8] DuBois JM, Chibnall JT, Anderson EE, Walsh HA, Eggers M, Baldwin K, Dineen KK. *Exploring unnecessary invasive procedures in the United States: a retrospective mixed-methods analysis of cases from 2008-2016.* Patient Saf Surg. 2017 Dec 18;11:30. See link: 10.1186/s13037-017-0144-y.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 18 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  the exercise of reasonable care, should have known that Drs. Dreyer and Elskens were performing

2  unnecessary surgeries during this period pursuant to a financial scheme that harmed each and every

3  surgery patient and ignored and/or concealed and/or otherwise acted improperly with regard to the

4  issue because the income from the surgeries was increasing profit margins for Providence SMMC.

5    4.6    As a result of these surgeries, the lives of every surgical patient of the Doctors have

6  been permanently altered through, *inter alia,* emotional distress and economic damage, as well as

7  surgical and post-surgical changes and related pain and suffering.

8    4.7    At no time was any patient adequately informed of the risks associated with surgery

9  by the Doctors, including without limitation that no patient was informed that a surgery by the

10  Doctors involved the high risk of having a medically unnecessary procedure performed for which

11  the motive was financial gain and not proper medical treatment.

12  **A. COMMON GENERAL FACTS[9]**

13    4.8    Between July 1, 2013, and November 13, 2018, Providence employed Dr. Dreyer

14  as a neurosurgeon at SMMC in Walla Walla.

15    4.9    Providence employed Dr. Elskens between November 2015 and May 2017 as a

16  neurosurgeon at SMMC in Walla Walla.

17    4.10    Providence encouraged Dr. Dreyer and Dr. Elskens to perform a high volume of

18  surgical procedures of greater complexity to increase Providence profits.

19    4.11    Upon information and belief, Providence encouraged Dr. Dreyer and Dr. Elskens

20  to conduct spine surgeries at high-volume rates by applying a productivity bonus metric scheme

21  that provided the surgeons financial incentive to perform a high volume of surgical procedures of

22

23

---

24

[9] Plaintiffs have reserved the right to expand the list of surgeons involved in this scheme. *See* Fn. 1.

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  greater complexity.

2      4.12    Upon information and belief, Dr. Dreyer and Dr. Elskens did conduct complex

3  spine surgeries at high-volume rates with intent and purpose of collecting productivity incentive

4  money.

5      4.13    Defendants' actions resulted in the performance of medical treatments that did not

6  meet criteria for health care insurance reimbursement, that were medically unnecessary, or that

7  were otherwise improper, for which improper submissions for payment to health insurance entities

8  occurred, and were paid, including to *e.g.*, Medicare and Medicaid, all for Defendants' financial

9  benefit.

10     4.14    At all relevant times, Defendants concealed and otherwise failed to disclose to

11 Plaintiffs their negligent and/or illicit activity with regard to the unnecessary and/or otherwise

12 improper medical treatments of Dr. Dreyer and Dr. Elskens including Defendants' failure to report

13 the neurosurgeons to proper authorities as legally required.  At all relevant times, Defendants had

14 a duty to disclose material information to Plaintiffs as a result of their fiduciary duties to Plaintiffs.

15 *Youngs PeaceHealth*, 179 Wn.2d 645, 659-60 (2014) (citing *Lockett v. Goodill*, 71 Wn. 2d 654,

16 656 (1967)). *Accord, United States v. Solakyan*, 2024 WL 4341365, *5 (9th Cir. Sept. 30, 2024)

17 (physician-patient relationship is fiduciary for federal fraud offense purposes).

18     4.15    At all relevant times, the first possible notice that any Plaintiff, named and

19 unnamed, received regarding Defendants' misconduct was April 12, 2022 – the day the DOJ

20 announced its settlement of the sealed *qui tam* proceedings with Providence for restitution for false

21 health care payments, and the agreed-upon upon facts elicited thereto. This notice, however, was

22 followed by, *inter alia,* Providence's misleading "message" to its patients in the Walla Walla

23 Union Bulletin on June 5, 2022, falsely representing that only the Doctors engaged in misconduct,

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 20 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1     followed by Providence's steadfast denials of any misconduct by it.

2         4.16     Throughout the employment of the Doctors, Providence had a nondelegable duty

3 (and, we allege, a heightened duty because the wRVU bonus payment structure inherently creates

4 a financial incentive for medical providers and institutions to place profits over patient safety) to

5 ensure that the Doctors performed surgeries that were not medically unnecessary, overly complex,

6 or otherwise improper, or engaged in such a scheme. Providence failed in its duty to ensure the

7 oversight and supervision required to ensure the Doctors did not perform medically unnecessary

8 or otherwise improper surgeries and that they did not place patients' safety at risk.

9         4.17     In fact, the opposite was true. Upon information and belief, significant and detailed

10 direct and circumstantial evidence will show that Providence encouraged and/or did not stop the

11 Doctors in their earning of wRVUs and in their improper surgeries, despite the red flags that should

12 have been raised due to the concerns discussed throughout this complaint, beginning in 2013 and

13 continuing throughout the Doctors' employment, especially given high earnings. *See Bookwalter,*

14 *supra.*

15         4.18     **As to chronological history**: Dr. Dreyer was hired by Providence (SMMC) on June

16 20, 2013. On July 1, 2013, Dr. Dreyer signed the required compliance acknowledgment for

17 treatment, care, and billing under Medicare/Medicaid.

18         4.19     On July 15, 2013, Dr. Dreyer was given provisional privileges to perform surgeries

19 at SMMC.  Provisional privileges are typically granted to allow a surgeon to perform certain

20 procedures under the supervision of a proctor until such time that the surgeon demonstrates a

21 certain level of competency and is deemed capable of performing such procedures safely without

22 supervision. As is standard protocol, Dr. Dreyer was a salaried employee at the time of hiring.

23         4.20     Direct and circumstantial evidence will show that in 2013, Providence allowed Dr.

24

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    Dreyer to become an RVU earner rather than just a salaried employee, even though his provisional

2    employment status did not terminate until September 15, 2014.

3        4.21    In this RVU pay structure, as acknowledged by Providence in the Settlement at

4    Recital C (*see* Exhibit 2), the "RVU" system is a compensation system based on a personal

5    productivity metric known as Work Relative Value Units (wRVUs), which were calculated based

6    on a value assigned under the Medicaid and Medicare Physician Fee Schedule to the services

7    personally furnished by the individual neurosurgeon. *Id*. Work Relative Value Units (wRVU) were

8    values assigned to coded medical services under the Medicaid and Medicare Physician Fee

9    Schedule for personal services provided by individual surgeons.

10       4.22    Two other categories of RVUs were similarly assigned to the coded medical

11   services, one for practice expenses such as medical equipment and realty expenses (peRVUs), and

12   the other for malpractice insurance costs (mRVUs).  These other RVU types were cumulative, *i.e.*,

13   surgical procedures that generated wRVUs would generally create additional reimbursement for

14   Providence in the form of additional claims and payments for peRVUs and mRVUs.

15       4.23    The more complex the medical treatment, the higher the associated wRVU coding

16   created for filing reimbursement claims with health insurers.  Similarly, the more frequently certain

17   medical equipment was used, the higher the RVU totals generated per patient billing. Providence

18   created its specified RVU system.

19       4.24    Dr. Dreyer (and later, Dr. Elskens) were paid compensation for each wRVU that

20   they generated, with no cap on the wRVU-based compensation that could be earned. Recital C.

21   Per Dr. Fewel, Providence's RVU system was known to be "high reimbursement" of over $80 per

22   unit. Exhibit 5, p. 9. Direct and circumstantial evidence will show that Providence's wRVU system

23   included layers of bonus payment, all uncapped, once certain thresholds were met.

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 22 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

4.25    All of this means that the greater the number of procedures of higher complexity that Dr. Dreyer and Dr. Elskens performed, the greater the compensation they would receive.

4.26    During his employment at Providence, Dr. Dreyer also entered into a consulting agreement with the largest manufacturer of medical equipment, Medtronic, to promote the use of its surgical equipment and, upon information and belief, used this equipment to increase his RVU totals, to his financial benefit and that of Providence.

4.27    During this time period, Dr. Dreyer, Dr. Yam, and anesthesiologist Dr. Robert Rice discussed what the "record" was at SMMC for the amount of money a neurosurgeon had been paid under the wRVU productivity bonus structure.

4.28    Upon information and belief, Providence and Dr. Dreyer submitted bills for reimbursement beginning in 2013 (a complex process outlined in section IV(C)) for surgeries performed by Dr. Dreyer that were falsely designated as medically necessary or otherwise proper.

4.29    Direct and circumstantial evidence will show that Dr. Dreyer was well aware of his high earnings in relation to RVU production and that he intended to continue unabated, with Providence's encouragement and accord. For example (and this is just one example), in August 2014, Dr. Dreyer boasted to his friend Dr. Lee Sandquist that he was on target to make $2.5 million by year's end under the wRVU pay scheme.

4.30    On September 15, 2014, Dr. Dreyer was awarded full privileges, transitioning his status from provisional to an active medical staff member by Providence/SMMC.

4.31    Direct and circumstantial evidence will also show that, in 2014, staff at SMMC was expressing concerns about Dr. Dreyer's surgery choices and actions, and as it related to patient safety and hospital protocol, but that, upon information and belief, no action was taken by Providence.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 23 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

4.32    Upon information and belief, Providence and Dr. Dreyer submitted bills for reimbursement during 2014 (a complex process outlined in section IV(B)) for surgeries performed by Dr. Dreyer that were falsely designated as medically necessary or otherwise proper.

4.33    2015 was Dr. Dreyer's second full year with SMMC.

4.34    In April 2013, SMMC allegedly put the neurosurgeons on notice that the focus should be on value versus volume of care. This was either ignored by Dr. Dreyer, or went unenforced by SMMC, as Dr. Dreyer continued to process patients through the OR at a high-volume rate.

4.35    Significant, detailed direct and circumstantial evidence will also show that, in 2015, staff at SMMC was continuing to express concerns about Dr. Dreyer's surgery choices and actions, including as it related to RVU billing and as it related to patient safety concerns and hospital protocol, and that Dr. Dreyer was exceeding his 2014 financial earnings while actually complaining about not being paid the full wRVU compensation he was due. Upon information and belief, no action was taken by Providence directly with regard to Dr. Dreyer.

4.36    Upon information and belief, Providence and Dr. Dreyer submitted bills for reimbursement during 2015 (a complex process outlined in section IV(B)) for surgeries performed by Dr. Dreyer that were falsely designated as medically necessary or otherwise proper.

4.37    In September 2015, Dr. Elskens signed a letter of intent for employment with SMMC. Dr. Elskens was well-known to Dr. Dreyer as he was on staff with Michigan State University when Dr. Dreyer was in his neurosurgery residency program at MSU.

4.38    Just before Christmas, 2015, Dr. Sandquist, who was seeking employment in Richmond, WA, advised Dr. Dreyer that fellow Providence Neurosurgeon, Dr. Matthew Fewel, had expressed concerns about Dr. Dreyer's surgical practices at SMMC.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 24 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    4.39    As to Dr. Dreyer, 2016 started the same as 2015 ended – with complaints about

2    insurance billing and patient care concerns which continued unchecked.

3    4.40    In a discussion with Dr. Yam, Dr. Dreyer mocked Dr. Fewel for opting out of the

4    wRVU production pay scheme on morality grounds.

5    4.41    Dr. Fewel did not believe spine surgeons should be paid based upon productivity –

6    he felt it raised ethics concerns and encouraged surgeons to perform unnecessary surgeries to

7    increase hospital profits and thereby increase their own salary.

8    4.42    Dr. Elskens started with SMMC on or about February 15, 2016.

9    4.43    Dr. Dreyer's patient counts continued to be high – as did his complication rate and

10    rising number of bad or questionable post-surgery outcomes.

11    4.44    Through the summer and fall of 2016, Dr. Dreyer continued with his volume

12    practice of performing unnecessary and overly complex surgeries on patients.  At one point he

13    asked to schedule surgeries on Saturdays to increase his volume even further.

14    4.45    Significant detailed direct and circumstantial evidence will also show that, in 2016,

15    staff at SMMC continued to express concerns about Dr. Dreyer's management of surgery choices

16    and actions, including as it related to RVU billing and as it related to patient safety concerns and

17    hospital protocol, and that Dr. Dreyer was exceeding his 2014 financial earnings while actually

18    complaining about not being paid his full wRVUs, but that, upon information and belief, no action

19    was taken by Providence directly with regard to Dr. Dreyer. Upon information and belief, direct

20    and circumstantial evidence will also show that staff at SMMC was expressing concerns about Dr.

21    Elskens' management of surgery choices and actions as it related to patient safety concerns and

22    hospital protocol as well as to whether surgeries were medically necessary or otherwise proper.

23    4.46    According to publicly-filed IRS documents, Dr. Dreyer's 2016 earnings reached

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 25 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  nearly $2.9 million, similar to his IRS-listed 2015 income of just over $3 million. *See* ECF 119-1.

2      4.47   Upon information and belief, Providence, Dr. Dreyer, and Dr. Elskens submitted

3  bills for reimbursement during 2016 (a complex process outlined in section IV(B)) for surgeries

4  performed by Dr. Dreyer and Dr. Elskens that were falsely certified as medically necessary or

5  otherwise proper.

6      4.48   By the close of 2016, Dr. Dreyer's pattern of performing an excessive number of

7  surgeries on patients who did not need the surgery, or the extent of the surgery, had become

8  commonplace.  Providence was clearly aware of the issue and concerns raised about Dr. Dreyer

9  but did not take proper action. Dr. Dreyer's high-volume practice was increasing the profitability

10  for SMMC as much as, or more than, it was increasing Dr. Dreyer's income.

11      4.49   In January 2017, billing code changes reduced the value of certain procedures for

12  the spine surgeons.  Dr. Dreyer complained that cage placement was now only worth 4.7 RVUs.

13  At the end of January 2017, Dr. Dreyer complained about an insurance company asking for a

14  medical necessity letter before it would authorize surgery for a Dreyer patient.

15      4.50   While all of this is going on, Dr. Elskens continued to have problems in the OR.

16  His rate of surgical errors was up, and Dr. Yam was increasingly concerned.

17      4.51   In February 2017, Dr. Yam and Dr. Dreyer were provided with the SMMC 2016

18  profit and loss statement to discuss with the finance committee, reflecting the high importance of

19  their production to the financial health of SMMC.

20      4.52   Dr. Elskens resigned from Providence on or about May 8, 2017.

21      4.53   Dr. Elskens's resignation was triggered, at least in part, by pressure from

22  Providence to resign or be terminated as a result of performance concerns and concerns he was

23  performing unnecessary surgeries in order to capitalize on the Providence productivity bonus

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 26 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  metric scheme.  Subsequently, Providence would claim in its June 5, 2022 Walla Walla Union

2  Bulletin advertisement, that it conducted a "through internal investigation" of the two doctors in

3  2017 "resulting in the surgeons leaving the organization in 2017 and 2018."

4      4.54    Direct and circumstantial evidence will show events occurring around and during

5  this time regarding Providence's reporting, or lack thereof, of Dr. Elskens to the NPDB that are

6  consistent with the allegations made previously in Paragraph 1.22, *supra*.

7      4.55    Upon Dr. Elskens' resignation, the two remaining neurosurgeons at SMMC were

8  Dr. Yam and Dr. Dreyer.

9      4.56    Significant, detailed direct and circumstantial evidence will also show that, in 2017,

10  staff at SMMC continued to express concerns about Dr. Dreyer's management of surgery choices

11  and actions, including as it related to RVU billing and as it related to patient safety concerns and

12  hospital protocol, but that, upon information and belief, no action was taken by Providence directly

13  with regard to only Dr. Dreyer. Upon information and belief, direct and circumstantial evidence

14  will also show that, in 2017, staff at SMMC had also expressed concerns about Dr. Elskens'

15  management of surgery choices and actions as it related to patient safety concerns and hospital

16  protocol as well as to whether surgeries were medically necessary or otherwise proper, which

17  ultimately did lead (as discussed above) to Dr. Elskens' resignation, but, we allege, only due to

18  pressure felt by Providence to take some action.

19      4.57    An example: on June 7, 2017, Dr. Christopher Hall received an email from Dr.

20  Marc Haugen, raising the concern to Dr. Hall that he had received a call from Dr. Dreyer's office

21  noting that Dr. Dreyer had prescribed narcotics to a patient at a level over the amount allowed by

22  state law, and that Dr. Dreyer subsequently refused to continue prescribing the narcotic but instead

23  "dumped" the patient back to the outpatient providers. Dr. Hall responded suggesting a possible

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 27 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  need for education about narcotic prescribing. But there is no documented evidence that Dr. Hall

2  responded to or followed up on the unprofessional and unsafe practices of 1) overprescribing and

3  2) leaving the patient with no plan and no personal follow up.

4      4.58    Upon information and belief, Providence, Dr. Dreyer, and Dr. Elskens submitted

5  bills for reimbursement during 2017 (a complex process outlined in section IV(B)) for surgeries

6  performed by Dr. Dreyer and Dr. Elskens that were falsely designated as medically necessary or

7  otherwise proper.

8      4.59    In July 2017, communication from Providence / SMMC Chief Medical Officer

9  Christopher Hall indicated that the neurosurgery group at SMMC (Drs. Dreyer and Yam) was

10  under a program review. Dr. Hall mentioned Dr. Burak M. Ozgur, MD. Additional reviewers of

11  Dr. Dreyer's patient files included Dr. Nicholas Theodore, MD, and Dr. Estrada Bernard, MD.

12      4.60    Upon information and belief, and in response to the program being under scrutiny,

13  Dr. Yam began paying closer attention to questionable conduct in the neurosurgery department

14  and threatened providers with MQAC (state quality-care) reporting on what he perceived to be

15  ethics and substandard care issues.

16      4.61    As explained in his *qui tam* lawsuit, filed January 20, 2020, Dr. Yam had reported

17  both Dr. Elskens and Dr. Dreyer in 2017 without adequate response from Providence. Exhibit 1,

18  p. 4. With regard to Dr. Dreyer, Dr. Yam scrutinized his medical records after Dr. Elskens resigned.

19  *Id.*, p. 4-5. He found that Dr. Dreyer was fabricating patient diagnoses and treatments to justify

20  complex operations and to increase the billing for himself and Providence. *Id.* Dr. Yam reported

21  his concerns in 2017 and was assured Providence would take proper action, but that did not occur.

22  *Id.,* p. 6. Dr. Yam believed that Providence took no proper action so it could continue to obtain the

23  windfall of profit from Dr. Dreyer's medically unnecessary and otherwise improper surgeries. *Id.*

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 28 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    According to Dr. Yam, no action was taken until April 2018, when he used the words "fraud,"

2    "malpractice," and "harm" in emails to key Providence administrators in Walla Walla, Spokane,

3    and Renton, Washington. *Id.*

4        4.62    As explained in a DOJ email with the subject line of "patient safety" to MultiCare's

5    outside counsel in February 2020, a whistleblower (now known to be Dr. Yam) was reporting

6    "credible evidence of unnecessary surgeries, []resulting patient harm, and evidence of Dr. Dreyer

7    creating false and fraudulent medical records (primarily his op notes apparently mischaracterizing

8    what had occurred during his surgeries as well as false and fraudulent diagnosis supposedly

9    justifying the unnecessary surgeries in the first place"). Exhibit 6 at p. 2.

10        4.63    Attached to this email was a 35-page summary which, upon information and belief,

11    summarized Dr. Yam's concern about Dreyer's surgeries. *See* Exhibit 6 (pp. 5-40).

12        4.64    This patient summary, labelled a "Misconduct Summary," included reference to

13    Dr. Yam conducting a three-month evaluation of all Dr. Dreyer's surgical files between November

14    6, 2017 and February 6, 2018.

15        4.65    Per this attachment to these DOJ emails, Dr. Yam's report about this three-month

16    review of Dr. Dreyer surgical files can be summarized as follows:

17            4.65.1  Dr. Dreyer was exaggerating and overstating patients' medical conditions,

18            as well as charting patient conditions that the patient did not have;

19            4.65.2  Dr. Dreyer was performing surgeries that were not medically necessary;

20            4.65.3  Dr. Dreyer was over-operating – that is, performing a surgery in greater

21            complexity and charting patient conditions and symptoms that the patient did not have;

22            4.65.4  Dr. Dreyer caused "harm" to patients by performing overly complex or

23            unnecessary surgeries, which harm could increase later;

24

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

4.65.5  Dr. Dreyer created potential for "harm" because of, e.g., "re-operations that will likely occur" to the same group of patients in the future;

4.65.6  The "harm" caused by Dr. Dreyer included "suicide attempts, death, permanent nerve injury, increased cancer risk, and severe chronic irreversible pain for a large number of Dr. Dreyer's patients;"

4.65.7  Dr. Dreyer performed surgeries to maximize billing;

4.65.8  Dr. Dreyer performed surgeries on certain patients who were not proper candidates for surgery, given their medical histories; and

4.65.9  Complications caused by Dr. Dreyer surgeries resulted in increased hospital stays and extended care, all of which financially benefitted Providence.

4.66    Per this report from Dr. Yam, Providence did not conduct reviews of "most" of these cases cited by Dr. Yam and "even the death result that I told Providence about was attributed falsely to an 'enlarged heart,' not to the massive operation performed on him unnecessarily." *Id.,* p. 40.

4.67    Per Dr. Yam, that three-month review of Dr. Dreyer's surgical files resulted in a finding that "greater than 80% of his operations over that time contain major issues." *Id.*, p. 34.

4.68    Dr. Fewel made a similar report in March 2019 to the DOH. *See* Exhibit 5.

4.69    Dr. Fewel, who reviewed many of Dr. Dreyer's surgical files post-surgery (usually to give second opinions) stated that, over time, "themes" began to emerge in his review of these files, including that "imaging studies were reported as showing dynamic instability when in fact they do not" with the motive for such a false report being "to secure insurance approval and justification for fusion surgery and to generate large numbers of RVUs." *Id.* at 8. He also expressed concern about billing for procedures not performed and for an excessive use of templates. *Id.* He

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 30 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    stated, "[T]hese cases go beyond being surgically aggressive or mere coincidences. Many of these

2    cases represent fraud, deception, and a blatant disregard for the truth. The patients are the ones to

3    suffer as a result." *Id.* at 9. He outlined the "11 most egregious cases" for the DOH and indicated

4    his belief that "there are likely hundreds of similar cases." *Id.* at 7. Two of the cases were Eben

5    Nesje and Kirk Summers, who are both plaintiff representatives here.

6        4.70    After Dr. Yam sent his April 2018 email (later referenced in his 2020 *qui tam*

7    action), Dr. Dreyer became concerned about the lack of transparency on the review of his cases.

8    He reached out to Providence counsel, Betsy Vo, and complained that the process seemed

9    adversarial and that he was unaware that attorneys were involved in the review.

10       4.71    Also during this period, Dr. Dreyer continued to push for his Providence RVU

11   bonus pay.

12       4.72    Also during this period, problems with Dr. Dreyer's charting and patient care

13   continued to arise.

14       4.73     On May 22, 2018, Providence placed Dr. Dreyer on administrative leave.

15       4.74    Dr. Dreyer reached out to former colleague Dr. Perry Camp and informed him

16   Providence had forced him to take a "safety pause."

17       4.75    Providence has stipulated in the Settlement Agreement with the DOJ that this

18   "safety pause" preventing Dreyer from performing surgeries at Providence was termed by

19   Providence as placing him on "administrative leave." Exhibit 2, Recital F.

20       4.76    This "safety pause" should have itself triggered a report to the DOH and the NPDB.

21   But Providence did not report the forced leave for patient safety concerns to the DOH and NPDB.

22       4.77    Dr. Dreyer remained on administrative leave through the month of June as the

23   investigation and review of files continued to ramp up. Providence was prioritizing its own defense

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 31 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1   over the provision of adequate notice rather than to those who needed it to protect patient health.

2      4.78   Also during this period, Dr. Dreyer communicated with Dr. Elskens who advised

3   Dr. Dreyer that both he and Dr. Yam were "fucked" and that Dr. Dreyer needed to get out of the

4   situation immediately.

5      4.79   By September 1, 2018, Dr. Dreyer was still on the Providence-directed

6   administrative safety pause.  He allegedly hadn't performed a surgery or seen a patient in his

7   capacity as an employee of Providence since May 22, 2018.

8      4.80   Moving into the late fall 2018, Dr. Dreyer began seeking *locum tenens* work (*i.e.,*

9   temporary replacement work) with other hospitals or neurosurgery groups.  One such hospital or

10   group was located in Michigan and was managed by a friend of Dreyer's from his residency

11   program. Dr. Dreyer also engaged a staffing representative to assist him in locating locums work

12   in Washington.  Providence took no action to ensure the facilities for whom Dr. Dreyer was

13   performing *locums* work became aware of its ongoing administrative leave and patient safety and

14   ethics concerns with Dreyer's patient care.

15      4.81   Direct and circumstantial evidence will show events occurring around and during

16   this time in the fall of 2018 regarding Providence's reporting, or lack thereof, of Dr. Dreyer to

17   authorities that are consistent with the allegations made previously in Paragraph 1.22, *supra.*

18      4.82   On November 18, 2018, Dr. Dreyer submitted his resignation from his employment

19   with Providence to CEO Blackburn, indicating it was effective immediately. Providence accepted

20   the resignation but did not then or thereafter report Dr. Dreyer to the DOH or NPDB as required.

21      4.83   At this point, despite all that had occurred, Providence still had taken no formal

22   action on Dr. Dreyer's credentials/privileges. Nor had they communicated concerns about Dr.

23   Dreyer to the public to assure transparency in respect to public safety.  Nor had they contacted

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 32 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    patients to notify them of the fraud that had been perpetrated upon them, or concerns about the

2    surgery that they had undergone, and complications, nor ongoing or future issues related thereto.

3        4.84    In January 2019, Dr. Dreyer reached out to Providence/SMMC administration

4    personnel and advised that he was looking for employment and wanted to know what his current

5    standing was with Providence.  He was told his medical staff privileges were in good standing,

6    that SMMC was not going to note a gap or anything negative on his affiliation reports, and any

7    request for information on Dr. Dreyer would be deferred to the online verification system.  In other

8    words, SMMC and Providence intended to continue to perpetuate the fraud – not only on the

9    public, but also on any prospective employer of Dr. Dreyer. Providence benefited from this course

10   of action by continuing to conceal its complicity in the pattern of false claims.

11       4.85    This agreement between Providence and Dreyer to conceal Dreyer's records at

12   Providence to prospective employers continued and reaffirmed their ongoing agreement to conceal

13   Dreyer's misconduct at Providence.

14       4.86    On February 25, 2019, Dr. Yam submitted his resignation with Providence SMMC,

15   indicating his intent to take a position with Oregon Health Sciences University.

16       4.87    On March 13, 2019, a termination notice was finally entered by Providence for Dr.

17   Dreyer.

18       4.88    On April 23, 2019, Providence SMMC administrative personnel advised and

19   reassured Dr. Dreyer that nothing negative would be reported to inquiring prospective employers.

20       4.89    In texts sent in May 2019 between Dr. Dreyer and his friend Dr. Sandquist, Dreyer

21   coached Dr. Sandquist that, when filling out Dreyer's MultiCare referral recommendation form,

22   Dr. Sandquist should not report Providence's suspension of him and that Dreyer's lawyers

23   counseled him that that was "Providence's position" as part of Dreyer's "severance deal" with

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 33 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  Providence. Dr. Sandquist responded, "perfect, will do" and subsequently failed to report to

2  MultiCare, in response to its referral form inquiry, knowledge of any disciplinary action taken by

3  Providence against Dreyer.  Dr. Sandquist had been in residency with Dreyer in Michigan and

4  worked there with both Dr. Elskens and Dr. Dreyer, before he moved to Washington State to

5  perform neurosurgeries at Confluence Health. After Dr. Dreyer's hiring by MultiCare, Dr. Dreyer

6  recommended Dr. Sandquist for employment at MultiCare, where Dr. Sandquist was then hired.

7        4.90    According to MultiCare, to consider hiring Dreyer, it formed a hiring committee

8  led by three senior MultiCare managers: Laureen Driscoll, MultiCare's President of Deaconess

9  Hospital; Mark Donaldson, MultiCare's Regional Administrator of its Neuroscience Institute; and

10  John Demakas, MultiCare's Department Head of Neurological Surgery.

11        4.91    These high-level managers were responsible for MultiCare's decision to hire Dr.

12  Dreyer.  If Providence had notified any of them directly of Dr. Dreyer's known misconduct at

13  Providence during his recruitment process, they would have had the authority not to hire Dr.

14  Dreyer and to prevent exposing MultiCare's patients to the dangers and risks of continued

15  misconduct by Dr. Dreyer, notwithstanding the money that would generate for MultiCare.

16        4.92    During his recruitment by MultiCare, Dr. Dreyer sought and obtained assurances

17  from Providence personnel by confirming they would not disclose his suspension, or resulting

18  months of no surgical work, to prospective employers.  To Plaintiffs' knowledge, those Providence

19  personnel complied with Dr. Dreyer's request to conceal information from prospective employers,

20  including MultiCare.

21        4.93    When the DOJ and the Washington Attorney General later sued MultiCare for Dr.

22  Dreyer's surgeries at MultiCare in January 2024, *see* ¶ 1.2, *supra*, MultiCare defended in part by

23  claiming that it had not been given notice by either Providence or Dr. Dreyer about the concerns

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 34 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    raised at Providence regarding Dr. Dreyer's surgeries or patients at Providence prior to

2    MultiCare's decision to hire Dr. Dreyer in 2019.

3        4.94    In a further concerted effort by Defendants to conceal the fact and results of the

4    Providence investigation during Dr. Dreyer's months of suspension at Providence, upon

5    information and belief, Providence and Dr. Dreyer referred Dr. Dreyer's patients to a doctor at a

6    different medical facility -- Dr. Lee Sandquist. Upon information and belief, an objective of

7    Defendants routing Dr. Dreyer's patients to Dr. Sandquist during Dr. Dreyer's suspension at

8    Providence was to retain control over the associated patient RVU opportunities and the patient

9    confidentiality prerogatives associated with their care. Upon information and belief, Dr. Sandquist

10   would have been willing to participate in that plan, given his relationship to Dr. Dreyer as a close

11   personal friend (¶1.23) and his later willingness to misrepresent facts about Dr. Dreyer's "safety

12   pause" when recommending Dr. Dreyer to MultiCare (at the behest and instruction of Dr. Dreyer,

13   including that Providence promoted such a misrepresentation, *see* ¶4.89), all of which ultimately

14   resulted in his own employment at MultiCare due to Dr. Dreyer's recommendation of him to

15   MultiCare (*id*).

16       4.95    Providence intentionally or negligently: (i) failed to follow NPDB and DOH

17   regulations governing reporting requirements for physicians on administrative leave with restricted

18   patient access triggered by patient safety or ethics concerns; and (ii) failed to advise prospective

19   employers that Dr. Dreyer was inactive on administrative leave in a forced safety pause from May

20   22, 2018, through his resignation on November 13, 2018, and forward through his termination on

21   March 13, 2019. These concealment efforts were intended to keep Dr. Dreyer's known dangerous

22   propensities from entities who had a right to know and the professional ability to understand the

23   significance of a "safety pause" to patient safety. These efforts facilitated Dr. Dreyer's ability to

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 35 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  obtain employment at MultiCare in May 2019, where his unethical and dangerous propensities

2  continued.

3      4.96    On January 10, 2020, Dr. David Yam, M.D., as Relator, and on behalf of the United

4  States and Washington State, filed a complaint (the 2020 *qui tam* complaint) in the Eastern District

5  of Washington, alleging violations of the False Claims Act against PROVIDENCE.  See *United*

6  *States ex rel. Yam v. Providence Health & Services Washington*, Case No. 4:20-cv-05004. (*See*

7  Exhibit 1).

8      4.97    The allegations in the 2020 *qui tam* complaint were based upon the fraudulent

9  billing for medically unnecessary and otherwise improper care provided by Providence via its

10  agents / employees Dr. Dreyer and Dr. Elskens.

11     4.98    As statutorily required, this 2020 *qui tam* complaint was filed under seal.

12     4.99    By notice dated January 13, 2022, the United States Justice Department intervened

13  in the 2020 *qui tam* complaint. This also was done under seal and not made public, per statute. The

14  sealed nature of these court proceedings, coupled with the requirement that *qui tam* lawsuits be

15  brought using non-public information, 31 U.S.C. § 3730(e)(4)(A), prolonged the effect of

16  Defendants' concealment campaign in preventing discovery by patients.

17     4.100   As discussed previously, *see* ¶¶ 1.12-1.20, the 2020 *qui tam* complaint alleged, and

18  Providence later admitted salient facts showing Providence was billing the federal and state

19  governments for these neurosurgeons' medical services that did not meet criteria for

20  reimbursement, were medically unnecessary, and/or were otherwise improper.

21     4.101   As detailed previously, *see* ¶¶ 1.12-1.20, on or about March 17, 2022, Providence

22  entered into a Settlement Agreement (SA) with the United States Government and the State of

23

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 36 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

Washington.[10] The agreement calls for Providence to pay a total of $22,690,458 ($10,459,388 of which is specified as restitution) along with remedies and protocols to ensure, *inter alia*, patients' future safety. The SA does not require any payment from Drs. Dreyer or Elskens.

4.102   As noted previously (¶¶ 1.15-1.19 & 4.62-4.69), Drs. Dreyer and Elskens were accused of patterns of activity that were supported by reports from Dr. Yam and from Dr. Fewel. The eight specific patterns of activity (with Dr. Dreyer accused of all eight and Dr. Elskens accused of the last four) are at Recital D of the SA.[11] In total, Recital D alleges the Doctors engaged in:

(a) Falsifying, exaggerating, and/or inaccurately diagnosing patients' true medical conditions in order to obtain reimbursement for surgical procedures;

(b) Performing surgical procedures that did not meet the medical necessity guidelines and requirements set forth by Medicare and other governmental health insurance programs;

(c) "Over-operating" – i.e., performing a surgery of greater complexity and scope than was indicated and medically appropriate;

(d) Jeopardizing patient safety by attempting to perform an excessive number of overly complex surgeries;

(e) Endangering patients' safety;

(f) Creating an excessive level of complications, negative outcomes, and necessary additional operations as a result of their surgeries;

(g) Performing surgical procedures on certain candidates who were not appropriate candidates for surgery given their medical histories, conditions, and contraindications; and

(h) Failing to adequately document certain procedures, diagnoses, and complications.

4.103   This pattern of concerns outlined in the 2022 Settlement, mirrors the reports made

---

[10] *See* Settlement Agreement Attached as Exhibit 2.

[11] In its January 26, 2024 *qui tam* complaint against MultiCare, the DOJ further alleged that Providence's admissions in 2022 included the admission that there were claims of Dr. Dreyer's surgeries causing permanent injury and death and of Dr. Dreyer "knowingly and inappropriately complet[ing] billing sheets and other documentation that caused Medicare and other health insurance programs to be falsely and fraudulently billed for medically unnecessary and inappropriate neurosurgical services." *See also* ¶ 1.16, *supra* (with citations therein).

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 37 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

by Dr. Fewel and Dr. Yam (*see e.g.*, Exhibits 5 and 6) and thus is consistent with the typical kinds of pattern and consequent harm that "hundreds" of patients suffered (per Dr. Fewel and the DOJ), potentially impacting "over 80 percent" of Dr. Dreyer's surgical files (per Dr. Yam).

4.104   As detailed in the SA, Providence accepted payments from federal and state health care sources (*e.g.*, Medicare, Medicaid, the FEHBP, TRICARE, and VA Community Care) while being aware of these allegations against these neurosurgeons.

4.105   As detailed in the SA, as a result of this pattern and practice of Providence, Dr. Dreyer was one of the highest producing neurosurgeons in the entire 7-state Providence system, earning between $2.5 and $2.9 million a year for the years where he was employed (per the SA, with income over $3 million in some years, per IRS filings).

4.106   According to the SA, despite knowledge of these neurosurgeons' misconduct, and despite placing them each on administrative leave due to concerns listed above (*see e.g.,* ¶ 4.102), Providence allowed Dr. Elskens and Dr. Dreyer to resign instead of terminating their employment.

4.107   According to the SA, despite having knowledge of these neurosurgeons' misconduct, Providence reported neither neurosurgeon to legal authorities (*e.g.,* NPDB or DOH). This occurred despite the legal obligation to report, *see* 42 U.S.C. § 11133(a)(1) and RCW 70.41.210, and would later be the basis for a finding by the DOH substantiating a violation of this reporting obligation.

4.108   According to the SA, despite having knowledge of these neurosurgeons' misconduct, Providence took no action to refund Medicare or Medicaid for surgical procedures performed by either Dr. Elskens or Dr. Dreyer for which Providence had previously sought and received reimbursement.

4.109   Upon information and belief, Providence also:

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 38 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

4.109.1     accepted payments from private insurance health care sources using similar or the same criteria for payment/non-payment of surgeries (including requirements that medical treatment be necessary or be otherwise proper);

4.109.2     did so while being or becoming aware of the allegations against these neurosurgeons as outlined above and in the 2020 *qui tam* complaint and the SA; and

4.109.3     did not refund any private insurance health care source or any self-funded patients for any surgical procedures performed by either Dr. Elskens or Dr. Dreyer for which Providence had previously sought and received reimbursement.

4.110   Upon information and belief, Providence was aware or should have been aware at or near the time of hiring these neurosurgeons that the neurosurgeons put patients at dire risk and performed these kinds of medically unnecessary or otherwise improper procedures, yet Providence presumably concealed that information and any and all of its knowledge regarding this unprofessional conduct until April 12, 2022, when the SA was made public.

4.111   Historically, repeatedly, and currently, Providence sets itself out to the public in its promotional material as a caring, moral, health care provider with integrity that puts patients' needs first (not its own financial gain). For example, it has made the following public statements:

4.111.1     "We strive to do what's right for people, all people, but especially the poor and vulnerable."

4.111.2     "We don't take the easiest answer, we look for the right answer."

4.111.3     "Integrity means you are always approaching things with a moral viewpoint.  In our case, a moral viewpoint that is adjusted for the benefit of the many, and not the few."

4.111.4     "At Providence we see more than patients, we see the life that pulses

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

through us all. That's why we're dedicated to a holistic approach to medicine that employs not only the most advanced treatments to improve outcomes, but also puts compassion and humanity at the heart of every interaction."

4.111.5    "We use our voice to advocate for vulnerable populations and needed reforms in health care. We are also pursuing innovative ways to transform health care by keeping people healthy, and making our services more convenient, accessible and affordable for all. In an increasingly uncertain world, we are committed to high-quality, compassionate health care for everyone, regardless of coverage or ability to pay. We help people and communities benefit from the best health care model for the future – today."

4.111.6    "As a comprehensive health care organization, we are serving more people, advancing best practices, and continuing our more than 100-year tradition of serving the poor and vulnerable. Delivering services across seven states, Providence is committed to touching millions of more lives and enhancing the health of the American West to transform care for the next generation and beyond."

4.111.7    "We set the highest standards for ourselves and our ministries. Through transformation and innovation, we strive to improve the *health* and quality of life…"

4.112    These representations were and are designed to entice the public to rely upon Providence for medical care without reservation or concern about Providence's care and protection of their best and highest health.

4.113    Rather than inform Plaintiffs and the public of the scheme at SMMC of, *inter alia,* medically unnecessary surgeries for financial gain (described herein), Providence concealed the scheme and maintained secrecy, to the extent of failing to report the neurosurgeons, including

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 40 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  those under investigation, to proper authorities, and did so to maintain at all costs its squeaky-clean

2  public persona, thus engaging in deceptive and unfair acts in order to market its health care services

3  to new patients.

4       4.114   Even today, Providence continues to engage in deceptive and unfair acts by publicly

5  minimizing the SMMC situation (including the $22.7 million settlement and the safety precautions

6  it now must implement across all its facilities) by falsely calling it an "isolated incident in Walla

7  Walla" on April 12, 2022, despite the extensive damage done to its patients, despite its fiduciary

8  obligations to those patients, and despite the fact that senior administrators from Walla Walla,

9  Spokane, and Renton headquarters were informed about Walla Walla as early as 2018. A true and

10  correct copy of this April 12, 2022 Statement is attached as Exhibit 3.

11       4.115   Since the filing of the Class Action Complaint on May 16, 2022, and as discussed

12  previously, *see* ¶¶ 1.26-1.32, Providence continued to engage in its deceptive and unfair acts by

13  publishing a full-page advertisement on June 5, 2022, in the Walla Walla Union Bulletin that

14  minimizes, misleads, and/or inaccurately describes the aforementioned events and Providence's

15  responsibility therein, including its fiduciary duties to patients. *See* Exhibit 4.

16       4.116   The success of Providence's concealment campaign (*see* ¶¶ 1.22, and ¶¶ 4.88-4.95)

17  is shown by Dr. Yam's successfully-filed sealed *qui tam* lawsuit against Providence, which

18  required Dr. Yam to provide *non-public* information to the federal government about Providence's

19  false claims in order to succeed. *See* 31 U.S.C. § 3730(e)(4)(A) (suit upon publicly disclosed

20  information subject to dismissal).   This is evidence that Providence's concealment campaign

21  worked to prevent any public disclosure even to its largest and most medically sophisticated payor

22  (the federal government). When then confronted by the state and federal governments about this

23  breach of trust in the sealed *qui tam* litigation, Providence denied any liability to its patients up

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 41 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

through settlement in April 2022. Providence has continued to conceal Defendants' misconduct by maintaining to this day that no medically unnecessary surgery was performed by the Doctors at Providence.

4.117  In December, 2022, the Washington DOH completed an investigation into Providence SMMC's violations of Washington Administrative Code (WAC) Chapter 246-320 and RCW 70.41.21 regarding their failure to report Dr. Dreyer and Dr. Elskens to the DOH for patient care standard of care violations and ethics violations.

4.118  The allegations included that

- The hospital (SMMC) failed to implement safeguards to prevent, deter, and cease medically unnecessary procedures as required under WAC 246-320-131, which required SMMC to establish and review requirements, including requirements for reporting practitioners according to RCW 70.41.210; and

- The hospital (SMMC) failed to adopt proper bylaws, rules and regulations that address assessment of a credentialed practitioner's performance under RCW 70.41.210 (such as practitioners like Dr. Dreyer or Dr. Elskens).

4.119  Based on the above, and after finding violations of RCW 70.41.210 mandatory reporting requirements, the DOH ordered, and Providence agreed to, corrections to include:

4.119.1    "PSMMC will contract with independent consulting group for a period of no less than 5 years to identify and work through processes of medical staff quality control to include timely and thorough reporting."

4.119.2    Education on management of provider issues and appropriate reporting will be completed by Medical Staff Leadership.

4.119.3    A document summarizing definitions of unprofessional conduct requiring reporting as defined by RCW 18.310.180 will be included in all Medical Staff Committee Attendee Packets for a minimum of 12 months.

4.120  Ultimately, on April 20, 2023, Dr. Dreyer entered into a settlement agreement with

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

the DOJ wherein the DOJ agreed to release Dr. Dreyer for conduct covered in its investigation that violated federal law in exchange for payment of $1,174,849 and agreement that he be excluded from Medicare, Medicaid, and all other Federal health care programs, as defined in 42 U.S.C. § 1320a-7b(f), for nine (9) years with national effect, making him ineligible for reimbursement for any services provided to any patient covered by any federally funded insurance program.[12]

4.121   The Dreyer settlement agreement specifically references allegations of misconduct and substandard care by Dr. Dreyer AFTER he left Providence in April, 2018, and was hired by MultiCare Health System – whereafter he continued to take advantage of yet another capless wRVU productivity pay metric used by MultiCare and continued to perform surgeries that were medically unnecessary, or were otherwise improper in order to increase his wRVU bonus; becoming the highest paid employee in the entire MultiCare Health System in his first full year of practice with MultiCare.

4.122   On November 16, 2023, the DOH and Dr. Dreyer entered into a disposition in which Dr. Dreyer agreed to permanently surrender his license to practice medicine in Washington. The stipulation was born out of factual allegations of substantial misconduct dating back to Dr. Dreyer's employment with Providence and were based upon the complaint filed by Providence neurosurgeon Dr. Matthew Fewel as well as a review by a Board of Osteopathic Medicine and Surgery Health Systems Quality Assurance (HSQA) retained expert, Dr. Abhineet Chowdary, M.D. FAANS, Diplomat American Board of Neurological Surgery.[13]

4.123   The patterns noted in reviews by Dr. Chowdary and Dr. Fewel (which include false or exaggerated symptoms, improper use of the term instability, performing invasive multi-level

---

[12] Exhibit 7.
[13] Exhibit 8.

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  surgeries on a patient with minor spine abnormalities, unsupported diagnoses, and the like)

2  corresponded with the patterns of ethical misconduct and standard of care violations reported to

3  the SMMC CEO and CMO by Dr. Yam in 2017, and again in April, 2018, and ultimately to the

4  DOJ. (*See also* ¶¶ 1.15-1.19, 4.62-4.69, & 4.102-4.103, *supra*) (*see also* Exhibits 1 and 6).

5      4.124  The allegations set out of substandard patient care include two of the named

6  plaintiff representatives herein, Mr. Eben Nesje (Patient C) and Mr. Kirk Summers (Patient E).

7      4.125  Providence SMMC's failure to implement policies and practices set forth above –

8  or in the alternative to actively enforce those policies and practices – has resulted in Defendants

9  causing emotional damage as well as permanent, life-changing injuries and damages to

10  Defendants' surgical patients, for financial gain.

11      4.126  As noted herein, by and because of Providence's profit over patient safety practices,

12  patients of Providence and MultiCare suffered permanent, debilitating harm as a result of

13  neurosurgeons Dr. Elskens and Dr. Dreyer's negligent, unlawful, unethical, and fraudulent

14  treatment practices; the value of which will be set forth fully at trial.

15      4.127  By and because of Defendants' fraudulent, unlawful, unethical, and negligent

16  practices, Providence's continued profit over patient safety practice resulted in actual financial loss

17  to the named Plaintiffs and associated class of Plaintiffs as set forth herein in dollar amounts that

18  will be set forth fully at trial.

19      4.128  By and because of Defendants' fraudulent, unlawful, unethical, and negligent

20  practices, the plaintiffs are entitled to disgorgement of the unlawful proceeds obtained by the

21  Defendants.

22

23

24

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

## B. COMMON FACTS TO IMPROPER BILLING[14]

4.129   Providence was well aware, or should have been well aware, of the false and fraudulent billing taking place with regard to the Doctors' surgeries due to its billing system.

4.130   In a hospital system where the hospital employs a surgeon (in this case, the Doctors in question), the hospital will bill the payor for the surgeons' services (typically a private or government insurance company) and then pay the surgeons on some sort of system.

4.131   Upon information and belief, the billings at SMMC would have been generated via a combination of the Doctors reporting their services provided and the billing department generating codes.

4.132   This is a highly complex process without a specific checks-and-balances system in the day-to-day billing process. Individuals in the billing department who are generating the bill may not themselves have sufficient knowledge to challenge or refute the billing claimed. To ensure that appropriate bills and codes are used, a hospital such as SMMC provides oversight and audits.

4.133   For example, physicians have complexity ratings, known as "intensity" criteria, that they use within their charting both in the patient's medical records and in the back-end billing records that are sent to billing department coders for bill creation. Sometimes there is a discrepancy between what a physician (in this case, a Doctor) writes in chart notes and the "intensity," or the complexity assigned to what he or she sends to the coder. This potential anomaly between services provided compared with the higher complexity billed requires internal audits of the complexity billed versus services rendered to make sure the medical records support the level of complexity ("intensity"). Audits should occur periodically in order to ensure that the billing sent out is correct.

---

[14] This Section derives primarily from the Declaration of hospital expert Dr. Susan Abookire, see ECF 119-4.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 45 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    4.134   This means that every hospital must have some type of internal audit program and

2  give feedback to medical providers regarding their billing and whether their documentations

3  support the complexity of the procedure for billing purposes.

4    4.135   To avoid and analyze billing errors (inadvertent or deliberate), a hospital such as

5  SMMC will have extensive internal controls in place, including with the use of a compliance

6  officer (sometimes called a chief operations officer) whose job includes reviewing and analyzing

7  billing.

8    4.136   Failure to have such controls, or audit processes, in place will allow improper

9  billing to flourish.

10    4.137   In addition, when a bonus system is in place (such as the uncapped wRVU program

11  that was in place here), it is imperative that there be a checks and balances system in place to

12  ensure that a medical provider (here, a spine surgeon) is not reducing the standard of care or

13  providing less than quality care. This involves an integrated program that includes leadership. If

14  bonus programs (like the wRVU program) is in place, there must be a strong peer review and

15  regulatory review process in place to protect patients.

16    4.138   If a medical provider is generating wRVUs at a rate higher than average, there must

17  be a billing or compliance process in place to ensure quality, safe care within the standard of care.

18  A physician or surgeon who is the top earner in a hospital system, second only to the hospital

19  system's CEO, will raise the kind of red-flag profile requiring an audit of records. *See also*

20  *Bookwalter, supra.*

21    4.139   It is a breach of the standard of care for a hospital such as SMMC to provide

22  medically unnecessary and/or overly complex surgeries, and certainly it is a breach to do so for

23  the purpose of generating funds.

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 46 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

4.140   It is also a breach of the standard of care for a hospital such as SMMC not to have an audit compliance program sufficient to ensure that these kinds of anomalies are detected and stopped.

4.141   It further is a breach of the standard of care for a hospital such as SMMC to reimburse, in a timely fashion, any wrongfully-earned funds due to billing errors or overbilling (inadvertent or deliberate).

4.142   As described above, adherence to proper billing and audit processes will result, on a more likely than not basis, in the removal of a medical provider who engages in medically unnecessary, overly complex, or other improper surgeries as a part of his or her ongoing practice.

4.143   Here, upon information and belief, because removal of either Doctor did not occur in a timely manner, even after reports of misconduct, either Providence / SMMC did not have appropriate audit and billing review processes in place (which is below the standard of care) or it failed to adhere to those processes (which is also below the standard of care), or it deliberately chose to overlook and/or encourage the improper billings for financial purposes (which is both below the standard of care and unlawful), or some combination of the above.

4.144   All of this points to a financial incentive system that was driving higher volumes of surgery at higher claim reimbursement levels that were resulting in medically unnecessary, overly complex, or otherwise improper spine surgeries. The repeated, and continuous, nature of these results should have been obvious to hospital managers. Yet Providence continued approving claims for submission to government and private health care insurers. Upon information and belief, this pattern confirms that the hospital system was performing below the standard of care, either inadvertently or on purpose.

4.145   A material condition for reimbursement for neurosurgery services and procedures

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 47 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  under each federal health care program is that the services be medically necessary.  42 U.S.C. §

2  1395y(a).  As a material condition for payment of a claim, Providers must certify they have or will

3  provide medically necessary services, that meet professional health care standards which are

4  supported by evidence of medical necessity, including to the government's standards of necessity.

5  42 U.S.C. 1320c-5(a); 42 U.S.C. § 1395f(a). Making a false certification constitutes a false claim.[15]

6  A false claim of medical necessity is a crime under RCW 48.89.030(2), as is knowingly causing

7  the presentation of a false claim "for a health care payment" under 48.89.030(1), and knowingly

8  making "a false statement or false representation of a material fact to a health care payer for use

9  in determining rights to a health care payment" under RCW 48.80.030(3).

10      4.146  The ongoing, detailed failure of Providence / SMMC to undertake a review of the

11  source of Dr. Dreyer's national outlier wRVU numbers, his nationally high resulting

12  compensation, his disproportionate generation of overall SMMC revenue, and his insurance

13  denials demonstrates, at a minimum, Providence's reckless disregard, willful ignorance, and lack

14  of caution for patient safety and for clinical integrity. For its part, Providence has both admitted

15  knowledge of the doctors' misconduct (*i.e.*, the Walla Walla Union Bulletin notice to its patients)

16  and denied any such knowledge. ECF 136:12.   The sustained internal evidence of Providence's

17  notice of the doctors' ongoing false claims, however, demonstrates, at a minimum, Providence's

18  willful blindness to the false claims it was incentivizing, processing, and profiting from.  *United*

19  *States v. Walter-Eze*, 869 F.3d 891, 909 (9th Cir. 2017) (claimant's alleged ignorance of healthcare

20  fraud warrants willful blindness instruction). *See United States ex rel. Schutte v. SuperValu, Inc.,*

---

22  [15] *Winter v. Gardens Regional Hospital and Medical Center*, 953 F.3d 1108, 1118 (9th Cir. 2019).  For purposes of

23  false claims liability, "'[i]t is possible for a medical judgment to be 'false or fraudulent' as proscribed by the" false
claims statute. *Id.* (quoting *U.S. ex rel Polukoff v. St. Mark's Hospital*, 895 F.3d 730, 742 (10th Cir. 2018) ("'claims
for medically unnecessary treatment are actionable under the FCA'") (quoting *U.S. ex. Rel. Riley v. St. Luke's*

24  *Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004)).

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

598 U.S. 739, 751 (2023) ("'deliberate ignorance' encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity").

4.147   Given the escalating information known by Providence management with regard to both the Doctors, including via concerns expressed by SMMC staff, the evidence is that Providence's participation in the fraudulent scheme was also knowing and willful, and also constituted a ratification and adoption of this misconduct for Providence's financial benefit.

## C. COMMON FACTS TO THE SCHEME TO DEFRAUD

4.148   The overall pattern of conduct is outlined at ¶¶ 1.15-1.19, 4.62-4.69, & 4.102-4.103, and is credibly alleged to have occurred to hundreds of patients (potentially over 80 percent, per the Yam misconduct report, *see* Exhibit 6). Those allegations are incorporated by reference as if fully set forth herein.

4.149   Further, the billing scheme itself is outlined at Section IV(B) above and involves all surgery patients.

4.150   Further, the potential for harm – including but not limited to Providence's public admission in its full-page, June 5, 2022 advertisement in the Walla Walla Union Bulletin that it violated the sacred trust of the Doctors' patients, *see M.N. v. MultiCare Health Systems*, 2 Wn. 3d 655, 541 P.3d 346 (2024)[16] – also involves all surgery patients.

4.151   As to additional patterns, upon information and belief, the Doctors engaged in the

---

[16] As noted in *M.N.,* where corporate negligence claims were upheld on a classwide basis with regard to a risk of endangerment even if no endangerment occurred: "MultiCare and the Court of Appeals improperly focused on the notification letter. The General Treatment Class learned of the outbreak through the letter but was harmed by the allegedly negligent acts revealed in the letter. If MultiCare had properly hired, supervised, and monitored potential drug diversion by employees, notification likely would not have been necessary. The General Treatment Class's damages are not too remote from MultiCare's acts to impose liability." *M.N.,* 541 P.3d at 355.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 49 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

following activity as a pattern, not as isolated occurrences, done in order to secure patients' consent for surgery, increase the potential for insurance coverage, and maximize profit by maximizing RVUs:

    a.  Overreading or misreading imaging studies;

    b.  Exaggerating, misrepresenting, or falsifying subjective symptoms and/or patient reports to bolster their surgical recommendations;

    c.  Exaggerating, misrepresenting, or falsifying potential outcomes (such as threatening patients with paralysis if surgery did not take place);

    d.  Exaggerating the seriousness of objective findings;

    e.  Confidence building with patients by exaggerating or misrepresenting the Doctors' skills;

    f.  Promoting unrealistic results of the surgeries;

    g.  Engaging in bait-and-switch (promoting one surgery but conducting another surgery of higher complexity);

    h.  Labeling conditions serious or urgent when they were not; and

    i.  Labeling conditions unstable when they were not.

    4.152  In contrast, what the Defendant surgeons and Defendant Providence did NOT do in the pre-surgical relationship and informed consent discussions with patients was, *inter alia*:

- Inform patients that there was a substantial probability that the Doctors would not perform proper diagnosis or analysis of their condition but, instead, would perform a surgery where all or part of the surgery was medically unnecessary, for which the motive was financial gain and not proper medical treatment;

- Inform patients that both before and after surgery, Providence either directly or through its agents, servants, and/or employees, including but not limited to the Doctors, would make intentional, non-accidental and non-inadvertent false representations in their medical records exaggerating their need, and minimizing their risks, for surgery, for which the motive was financial gain and not proper medical treatment;

- Inform patients that the false information placed in their medical records could adversely affect their future medical care by doctors who relied on these false records and that the false records could influence future treatment decisions for the rest of their lives;

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

- Inform patients that Providence exercised the control or supervision over the methods by which the Doctors performed their work or conduct any review of the Doctors to ensure the patients would receive the best treatment which was promised to them;

- Inform patients that the Doctors' financial incentive to perform a high pattern of medically unnecessary procedures was due to Providence's incentivized wRVU bonus program, which profited all Defendants;

- Inform patients that they were unwitting participants in the scheme to defraud, with their surgeries being the impetus behind either the improper billing or the coverup for the improper billing for purposes of carrying out the scheme, all in violation of RCW 48.80.030 and 48.80.030(4) as well as in violation of, e.g., theft by deception and money laundering;

- Inform patients that, rather than correct the Doctors' actions, even as reported by their medical supervisor, Providence was working to conceal the actions, for which the motive was financial gain and not proper medical treatment.

### D. COMMON FACTS TO PROVIDENCE'S FAILED OVERSIGHT

4.153   The overall pattern of Providence's failure in its oversight and supervision duties is outlined throughout this Complaint, as well as in Section IV(B) above (with regard to billing). Those allegations are incorporated by reference as if fully set forth herein.

4.154   Standards of care for hospital accountability and hospital oversight of quality of care, peer review, credentialing, management of grievances, patient safety, and corporate integrity are governed by national standards, state laws, and hospital bylaws and policies. National regulatory and accreditation bodies, including Center for Medicare and Medicaid Services (CMS) Conditions of Participation, The Joint Commission, and Det Norske Veritas, establish national, government standards and provide oversight applicable to hospitals throughout the United States. In the State of Washington, under Washington State Revised Code of Washington (RCW) 70.41.120, the Washington Department of Health is responsible for determining compliance with hospital standards and regulations. Washington state RCW 70.41.122 Exemption from 70.41.120 for hospitals accredited by other entities states that for hospitals accredited by other entities,

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 51 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

surveys conducted on hospitals by the Joint Commission shall be deemed equivalent to a department survey for purposes of meeting the requirements for the survey specified in RCW 70.41.120. SMMC is accredited and surveyed by the Joint Commission. Joint Commission and CMS national standards are applicable under state law to Providence SMMC.

4.155   The standard of care requires healthcare organizations to develop and implement a robust process for addressing patient complaints and grievances. The standard of care requires responses to patient complaints and grievances to protect patients. In addition, both federal and accreditation regulatory requirements demand appropriate follow up by healthcare organizations to be compliant. The Centers for Medicare and Medicaid Services (CMS) outlines requirements for addressing grievances in its Conditions of Participation (CoPs), and therefore these apply to patients for whom Providence submitted claims to Medicare and Medicaid. They are also appropriate recommendations for handling complaints and grievances from all patients-regardless of payment source.

4.156   A hospital must protect and promote each patient's rights. This federal regulatory standard requires that the hospital establish a process for prompt resolution, and that the hospital governing body is responsible for the effective operation of the grievance process. The Joint Commission and other accreditors' Complaint Resolution and Medical Staff standards also require that accredited facilities address and resolve complaints from patients and their families, to protect patients from harm.  This complaint required immediate referral to a quality improvement or related committee and should have been subject to a clear hospital process to ensure this occurred.

4.157   Detailed and significant direct and circumstantial evidence will show that Providence / SMMC failed in meeting these intricate, detailed standards as early as 2013 and on through the entire time of the Doctors' employment, culminating in a failure to report the Doctors

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 52 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    to the proper authorities; to warn other prospective employers; and to repay the ill-gotten gains.

2        4.158   Providence Compliance officials conducted annual TENS chart audit of physicians.

3    These audits compare documentation in the chart, CPT coding, ICD 10 codes, and billing for

4    alignment and compliance. Audits for Providence SMMC for Dr. Dreyer were found for 2013 and

5    2014, but there is no indication audits were done through 2015 through 2018.

6        4.159   In 2018, the first quarter PEPPER (The Program for Evaluating Program Payments

7    Electronic Report) reports were sent to Wanda Paisano (Director of Quality, Compliance, Integrity,

8    Privacy, and Patient Safety Officer for Providence SMCC) and Becky Cameron, among others.

9    The PEPPER report highlighted in red that the percentage of discharges with spinal fusion

10   documented had continued to range from 89% to 98.6 % between Q2 2015 and Ql 2018. This 'red

11   flag' was annotated to include a warning and suggestion of intervention.

12       4.160   There is no indication that there was ever any meaningful intervention by

13   Providence SMMC to address this red flag. But there is evidence of continuing Extreme Exceeding

14   of Benchmarks.

15       4.161   Data were available to Providence SMMC Dr. Dreyer's wRVUs and compensation

16   compared to benchmarks for each year between 2013 and 2018. This is simple and unsophisticated

17   data that tells us how much volume a surgeon is running through the OR, and what he is billing

18   for. High wRVU = high salaries.  This can be, and was, an incentive to commit fraud.

19       4.162   Overworked surgeons are a risk for patient safety. Surgeries performed for financial

20   benefit are a clear and present danger to patient safety. Providence's subsequent imposition of a

21   secret "safety pause" on Dr. Dreyer for what it would much later label a breach of "sacred trust"

22   with its patients, reflects its awareness of the patient risks associated with false claims.

23       4.163   Providence SMMC would know that high wRVUs as seen with Dr. Dreyer (being

24

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    one of the highest paid employees in the entire Providence system) should prompt a review of the

2    coding correlation with the documentation. It did not – nor did it prompt a quality review.

3        4.164  This is so despite the fact that this financial review would not necessarily also

4    include a review of quality or safety concerns related to improper documentation (or inadequate

5    correlation between documentation and other clinical data). Although medical necessity is a

6    foundational component of quality, this aspect of care was neither audited nor reviewed by

7    Providence despite consistent exceeding of national averages in wRVUs.

8        4.165  Dr. Dreyer has advised that he was never alerted or provided any feedback of any

9    reviews or concerns about the appropriateness of his clinical care, his complication rates, or his

10    behavior after 2014.

11        4.166  Providence has asserted affirmatively that nothing was done in respect to reviewing

12    the details of Dr. Dreyer's practice specifically until the spring or summer of 2018.

13        4.167  As pleaded earlier, *see* ¶¶ 4.73-4.82, on May 22, 2018, Dr. Dreyer was placed on

14    "administrative leave" or, as Providence has described it, a "practice" (or "safety") "pause." This

15    administrative leave was ordered by executive leaders at Providence / SMMC. Despite the fact

16    that Providence / SMMC determined that Dr. Dreyer was required to cease clinical practice at that

17    time out of patient safety concerns, nobody at Providence / SMMC reported this restriction to the

18    NPDB or the DOH.

19        4.168  This failure on Providence SMMC's part has been improperly justified (and

20    rejected by the DOH, *see* ¶¶ 4.117-4.119) by suggesting that the educated administrators of the

21    Providence system believed that, since this was "administrative," it did not require the suspension

22    of Dr. Dreyer's privileges at SMMC and therefore did not require reporting. Upon information and

23    belief, the same was said with regard to Dr. Eskens. This tactical approach to avoiding mandatory

24

1  reporting requirements was rejected by the DOH and Providence is now on a corrective plan with

2  the DOH with regard to complying with those requirements in the future. See *id.*

3      4.169  As noted earlier, on November 13, 2018, Dr. Dreyer "voluntarily" resigned from

4  Providence Medical Group.

5      4.170  On April 22, 2019, Dr. Dreyer sent a response to an email request for his

6  reappointment application stating that: "Well, today is the day, and it sounds like Providence

7  (Renton) is not interested in having me back. So I will allow my hospital privileges to lapse."

8      4.171  On May 8, 2019, MultiCare performed its due diligence to verify Dr. Dreyer's

9  affiliation with Providence SMMC. Providence Health & Services responded to MultiCare with

10  the statement: "No adverse professional review action as defined in the Health Care Quality

11  Improvement Act has been taken regarding this practitioner. That means that there has been no

12  reduction, restriction, suspension, revocation, denial, or involuntary relinquishment of the

13  practitioner's staff membership or clinical privileges."

14      4.172  This was false, and its falsity was uniquely known to Defendants Providence and

15  Dreyer who, together with Dr. Sandquist, had continued to conceal the true state of affairs about

16  the origins, purpose, and significance of Providence's secret "safety pause" on Dreyer's surgeries.

17      4.173  Providence SMMC failed to have an adequate process to monitor and evaluate the

18  competency of the Doctors to hold clinical privileges and/or deliberately chose not to monitor and

19  evaluate that competency. Providence / SMMC's failure to conduct and/or have a process in place

20  to conduct such a process would have prompted a proficient review that would have revealed the

21  conduct alleged herein.

22      4.174  Providence SMMC failed to adopt and/or implement effective policies and

23  procedures for quality reviews and responses to staff or patient concerns. Had they had such

24

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  effective policies, or had they implemented such policies, the allegations made herein, including

2  the financial red flag data warranting quality reviews, and the concerns raised (including by the

3  practice manager and neurosurgery chief) would have resulted in focused quality reviews which,

4  in turn, would have revealed the exaggerated clinical findings and overdocumentation of medically

5  unnecessary procedures.

6     4.175   Providence SMMC failed to have an effective Peer Review Process and/or failed

7  to implement an effective Peer Review Process. Although some cases appear to have been referred

8  to the surgery subcommittee over time, there is no evidence that the numerous concerns raised by

9  Dr. Yam and/or others, or flagged by excessive wRVUs, made their way into an appropriate peer

10  review process with corrective feedback to Dr. Dreyer.

11     4.176   Had Providence / SMMC had an effective Peer Review Process and Patient Safety

12  Program, or implemented such a process or program, the identified concerns about overuse of

13  diagnosis, of "urgent" classifications, and of excessive wRVU's would have led to an investigation

14  of medical appropriateness and likely would have resulted in a prompt suspension of privileges

15  and investigation of fraud.

16     4.177   Although Providence / SMMC executive leadership determined that Dr. Dreyer

17  should cease his clinical practice (at least temporarily) in May 2018, and that Dr. Elskens do the

18  same in 2017, they failed to report these significant events to the NPDB or the DOH. Providence

19  / SMMC effectuated summary suspension of the Doctors' privileges, and their attempt to obscure

20  this fact by calling it (in Dr. Dreyer's situation) a "practice pause" or an "administrative leave"

21  only supports allegations of concealment, coverup, accomplice liability and guilty knowledge on

22  the part of Providence. The purpose of reporting is to protect patients. Providence's efforts to

23  conceal, rather than report, exhibited an egregious disregard for patients and patient safety as well

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 56 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    as an egregious disregard of their duties and responsibilities under the law.

2        4.178   As late as May 2019, Providence SMMC continued to exhibit reckless disregard

3    for patient safety. In their response to verification requests by MultiCare, Providence invoked the

4    Health Care Quality Improvement Act. A significant purpose of the Health Care Quality

5    Improvement Act is to protect patients. Providence was denying that any of their professional

6    review activities adversely affected the clinical privileges of Dr. Dreyer. This egregious stance of

7    Providence appears to protect itself by substituting the truth with an effort to avoid accountability

8    with semantics. This behavior showed a reckless disregard for the safety of future patients of Dr.

9    Dreyer as well as a reckless disregard for the former surgical patients of the Doctors who were

10   unaware of the circumstances under which their surgeries had taken place.

11       4.179   The facts as set forth herein tell us that during the relevant period Providence

12   SMMC either did not have an active quality verification oversight program in place to effectively

13   monitor spine surgeons to assure quality control and patient safety, or that Providence SMMC did

14   not follow the policies and practices in place.

15       4.180   In respect to the facts above, Providence / SMMC violated the standards of care in

16   a sequence of failures that systemically and repeatedly put patient safety at risk and allowed the

17   Doctors to continue to practice when abundant evidence suggested their surgeries were improper.

18   Based on the facts provided, had such a necessary rigorous review been conducted in a timely

19   manner (instead of a refusal to address the issues), a considerable number of patients would not

20   have had an improper surgery by Dr. Jason Dreyer.

21   **E.  DEFENDANTS' Aiding and Abetting and Accomplice Liability**

22       4.181   Due to their actions and inactions as described herein, Defendants are liable for the

23   harms to plaintiffs under common law aiding and abetting and pursuant to RCW 9A.08.020.

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 57 OF 122

4.182   Under Washington law, a defendant is liable "[f]or harm resulting to a third person from the tortious conduct of another" and one is subject to liability if he:

(a) does a tortious act in concert with another or pursuant to a common design by him; or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself; or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.[17]

4.183   All three types of aiding and abetting common law liability apply here to render Defendants liable for their concerted actions, and their substantial assistance or encouragement of the tortious conduct of each other.

"(a) a person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable;" which includes where "(2)(b) )He or she is made accountable for the conduct of such other person by this title or by the law defining the crime; or (2)(c) "He or she is an accomplice of such other person in the commission of the crime." RCW 9A.08.020(1) & (2).

4.184   Liability as an accomplice apples if: " (3) With knowledge that it will promote or facilitate the commission of the crime, he or she: (a) Solicits, commands, encourages, or requests such other person to commit it; or (b) Aids or agrees to aid such other person in planning or committing it; or (c) His or her conduct is expressly declared by law to establish his or her complicity. RCW 9A.08.020(3).

4.185   Washington law also provides for liability for complicity in offenses under RCW 9A.08.020.

4.186   Defendant's conduct, as alleged herein, renders them liable under Washington

---

[17] *Perkumpulan Inv. Crisis Ctr. Dressel--WBG v. Regal Fin. Bancorp, Inc.,* 781 F. Supp. 2d 1098, 1114–15 (W.D. Wash. 2011) (quoting RESTATEMENT (SECOND) OF TORTS § 876 (1979) (cited with approval in *Martin v. Abbott Laboratories,* 102 Wash.2d 581, 689 P.2d 368, 378 (1984)).

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 58 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  common and statutory law for the crimes and torts alleged herein as aiders and abettors,

2  accomplices, and persons legally accountable for each other's tortious and criminal conduct.

### V.    INDIVIDUAL PLAINTIFFS / CLASS REPRESENTATIVES

4  5.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and

5  incorporate by reference paragraphs 1.1 through 4.186 as if fully set forth herein.

6  5.2    All surgery patients of the Doctors at Providence who were subject to the RVU

7  compensation scheme in connection with their treatment are proposed Class Members, whether or

8  not they also were victims of an unnecessary or otherwise improper surgery.

9  5.3    This means that all surgery patients of the Doctors at Providence are potential class

10  members due to the fact that they either (a) had surgeries with associated RVU billing or (b) had

11  surgeries in which the Doctors were auditioning to be a candidate for RVU bonuses.

12  5.4    Providence agrees with this definition of proposed class members. In its first

13  Opposition to Plaintiffs' Motion for Remand, Providence examined the complaint allegations and

14  characterized them as "putting at issue—all surgeries performed by these doctors" because it

15  alleged that "such unnecessary or improper procedures were 'part of a pattern and practice,' thus

16  potentially calling into question" all surgeries performed by the Doctors.  ECF-42:11.

17  5.5    All surgery patients of Dr. Dreyer at MultiCare are also proposed Class Members,

18  whether or not they also were victims of unnecessary surgeries. This is so because Providence

19  failed to report Dr. Dreyer, actively concealing the financial scheme, improperly allowing Dreyer

20  to conduct surgeries at MultiCare after Providence, which makes all those surgeries improper.

21  Providence failed to report Dreyer in order to protect itself, to protect against scrutiny of its

22  incentive compensation system, to protect its financial relations with government and private

23  health insurers, to protect against patient lawsuits, and to conceal its profiteering.

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 59 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1   5.6    All surgery patients of the Doctors at Providence and MultiCare suffered violation

2   of their person with the surgery incision as part of the fraudulent scheme.  All of these surgery

3   patients of the Doctors suffered anxiety, emotional injury, economic damage, and physical damage

4   as a result of being subjected to the fraudulent scheme of the Defendants.

5   5.7    Because the financial scheme was broad and repeated, done with the purpose of

6   conducting medically unnecessary, improper surgeries for financial benefit, the vast majority of

7   proposed class members are also victims of unnecessary surgeries, including the Plaintiffs listed

8   below, whose experiences, and surgeries, are typical of those experiences, and surgeries, listed in

9   this Complaint.

10  5.8    Each of the below-listed Plaintiff Representatives was targeted in the fraudulent

11  scheme and practice of profit above patient safety conspiracy that is the subject of the claims pled

12  herein below.

13  5.9    As a result of being victimized by Dr. Dreyer and/or Dr. Elskens in the care of

14  PROVIDENCE WASHINGTON HEALTH AND SERVICES, specifically, ST. MARY'S

15  MEDICAL CENTER, as set forth and supported by the factual allegations above and claims pled

16  herein below, the below-listed Plaintiffs suffered permanent damages, to include, without

17  limitation: emotional distress, economic loss, disfigurement, bone structural damage, pain,

18  suffering, and loss of enjoyment of life.

19  5.10   Where the below-listed Plaintiffs have spouses, and/or where a proposed class

20  member has a spouse, their spouses have suffered damages in the form of the loss of consortium,

21  love, compassion, and companionship as a result of their spouse being victimized by Defendants.

22  5.11   Where the below-listed Plaintiffs (and/or where proposed class members) are

23  representatives of the estate and/or have a survivor action due to having lost a loved one who was

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 60 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1   a victim of the Doctors' surgeries, they also have suffered damages as a result of their loved one

2   being victimized by Defendants.

3                        **PROVIDENCE / SMMC PLAINTIFFS**

4         5.12    In addition to the named plaintiffs below (Ms. Angulo, Mr. Keller, Mr. Nesje, Mr.

5   Summers, and Ms. Bash per Mr. Bash's estate), the Plaintiffs have notified the Court of about 100

6   Providence patients, currently unnamed per Court order, *see* ECF 223:7, many of whom are listed

7   in the stricken Fourth Amended Complaint currently filed under seal. ECF 189.

8         5.13    These additional Providence patients are currently putative class members, as are

9   all the Doctors' surgical patients who have yet to receive notice and come forward.

10        5.14    Neurosurgical medical experts have been reviewing, and will continue to review,

11  medical files of Defendants' patients. From this review thus far, Plaintiffs' experts have identified

12  multiple patients, including all named Plaintiffs, as having undergone medically unnecessary or

13  otherwise improper surgeries that fit the pattern, and are typical of, the pattern contained within

14  the 2022 SA, ¶ D (Exhibit 2) and patterns identified by Dr. Yam (*e.g.*, Exhibit 6), all of which is

15  supported by credible evidence that these were repeated patterns affecting hundreds of patients

16  and potentially greater than 80 percent of Dreyer's surgical patients. *See* ¶¶ 1.15-1.19; 4.62-4.69.

17        5.15    None of the below Plaintiffs, and none of the currently-identified known, but still

18  putative, class members listed above (and, upon information and belief, none of the Doctors'

19  Providence surgical patients, which number at least 1,750), gave informed consent to any surgery

20  conducted because none were informed that a surgery by one of the Doctors was part of a pattern

21  of false claims by the Doctors and, as a result, involved a high risk of having a medically

22  unnecessary procedure performed upon them for which the motive was financial gain and not

23  proper medical treatment, and other deficiencies (as alleged in Paragraph 4.152, *supra*).

24

**GILBERT LAW FIRM, P.S.**
                                    421 W. RIVERSIDE, AVE., SUITE 1400
                                    SPOKANE, WA 99201
                                    (509) 321-0750 • FAX (509) 343-3315

5.16   **CAROLINE ANGULO**. Female. 61 years old.  53 years old at the time of her first surgery (4/25/2016); 54 years old at the time of her second surgery (11/18/2017). Hospital: SMMC. Surgeon: Dr. Daniel Elskens and Dr. Jason Dreyer. Insurance: Medicare or Medicaid.

5.17   <u>Surgery 1</u>: April 25, 2016. Dr. DANIEL ELSKENS, DO.

5.17.1  Ms. ANGULO reported lower back pain.  Dr. ELSKENS recommended cervical surgery instead of, or prior to, lumbar surgery;

5.17.2  Ms. Angulo had numerous concerning or disqualifying comorbidities;

5.17.3  Trusting Dr. Elskens, and in reliance of his advice and stated opinion, Ms. Angulo agreed to the cervical surgery;

5.17.4   The procedure performed by Dr. Elskens included cervical fusion at levels C5 through C7 and was performed using the anterior approach only.  He also did a carpel tunnel surgery during the same surgery;

5.17.5   The cervical surgery went poorly. Ms. Angulo had to remain in the hospital for over a month. Her vocal cords were damaged, and she could not speak. She has never recovered from this surgery. Moreover, during her follow-up treatment, Dr. Elskens, was suddenly unavailable, leaving Ms. Angulo without a neurosurgeon.

5.17.6  The surgery was medically unnecessary or otherwise improper and was performed for the purpose of financial gain for Dr. Elskens and Providence.

5.18   <u>Surgery 2</u>: November 18, 2017. Dr. JASON DREYER, DO.

5.18.1   After her continued reported concerns of low-back pain, Dr. Dreyer informed Ms. ANGULO he saw a "big problem" with her neck that required more surgery.

5.18.2   Trusting Dr. Dreyer, and in reliance of his advice and stated opinion, Ms. Angulo agreed to the recommended cervical surgery.

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

5.18.3    The surgery performed was a cervical/thoracic fusion, with both anterior and posterior approach. According to what the hospital provided her, the fusion ranged from either levels C3 through C7, or C3 through T2 – she was provided with medical ID cards for both.

5.18.4    Ms. Angulo had even more comorbidity concerns before this surgery than before the last one. She was still struggling with inability to speak, and constant pain.

5.18.5 The surgery was medically unnecessary or otherwise improper and was performed for the purpose of financial gain for Dr. Dreyer and Providence.

5.19    Prior to no earlier than April 12, 2022, Ms. Angulo was unaware of Providence's admission of salient facts as outlined herein and in its settlement with the DOJ; or that the procedures conducted on her by Dr. Dreyer were unnecessary or otherwise improper acts that constituted a part of an unlawful financial scheme and a breach of the standard of care.

5.20    Upon information and belief, Providence, Dr. Elskens and Dr. Dreyer submitted billing that falsely stated the surgeries were medically necessary and otherwise proper.

5.21    As a result of these unnecessary or otherwise improper surgeries, CAROLINE ANGULO has suffered emotional distress, economic damage, and permanent debilitating harm, including job loss; disability designation; inability to walk; difficulty sitting, standing and laying; nerve problems; choking when she eats; high pain levels daily; and failed treatments resulting in an inability to breathe, requiring paramedic-transported emergency trips to the hospital; is on pain medication daily, and suffers from fatigue, anxiety, and depression.

5.22    **ERIC KELLER.** 58 years old. Two surgeries conducted by Dr. Dreyer at SMMC: cervical spine, August, 2017; lumbar spine, January 2018.

5.23    Surgery 1: August, 2017. DR. JASON DREYER, DO

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 63 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

5.23.1 Mr. KELLER reported low back pain. Following his typical, common practice of encouraging patients to undergo cervical surgery first, Dr. DREYER recommended cervical surgery instead of, or prior to, lumbar surgery, which would revise a prior, successful cervical fusion that was causing Mr. KELLER no pain or difficulty;

5.23.2 When Mr. Keller advised Dr. Dreyer, "my neck isn't the problem," Dr. Dreyer informed him he had more wrong with his neck than he thought he did, and that it was so unstable that he risked paralysis during any proposed lumbar surgery if he did not agree to the cervical surgery first;

5.23.3 Mr. Keller had concerning or disqualifying comorbidities;

5.23.4 Trusting Dr. Dreyer, and in reliance of his advice and stated opinion, Mr. Keller agreed to the recommended cervical surgery;

5.23.5 Mr. Keller's cervical surgery took place in or around August 2017. Following this procedure, Mr. Keller was not able to return to work. He has never significantly improved from this surgery;

5.23.6 The surgery was medically unnecessary or otherwise improper and was performed for the purpose of financial gain for Dr. Dreyer and Providence.

5.24    Surgery 2: November 18, 2017. Dr. JASON DREYER, DO

5.24.1 Mr. Keller reported with concerns of continued lumbar pain. Dr. Dreyer told Mr. Keller that if he allowed him to conduct lumbar surgery, he would be relatively pain free and would be able to return to work.

5.24.2 Trusting Dr. Dreyer, and in reliance of his advice and stated opinion, Mr. Keller agreed to the cervical surgery.

5.24.3 When his insurance declined the request for this elective surgery that did

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 64 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

not have sufficient conservative care options exhausted, Dr. Dreyer transformed the elective procedure into an emergent procedure, via the emergency department, thereby bypassing the need for clearance for the elective procedure, telling Mr. Keller that the insurance company would have to pay for the surgery since it would now be termed an "emergency procedure;"

     5.24.4  Mr. Keller was admitted to SMMC through the emergency department, and on or about January 18, 2018, Dr. Dreyer performed the lumbar surgery.

     5.24.5  The lumbar surgery caused permanent and debilitating nerve damage from which Mr. Keller has never recovered, and never will recover.

     5.24.6  The surgery was medically unnecessary or otherwise improper and was performed for the purpose of financial gain for Dr. Dreyer and Providence.

     5.25  Prior to no earlier than April 12, 2022, Mr. Keller was unaware of Providence's admission of salient facts as outlined herein and in its settlement with the DOJ; or that the procedures conducted on him by Dr. Dreyer were unnecessary or otherwise improper acts that constituted a part of an unlawful financial scheme and below the standard of care.

     5.26  Upon information and belief, Providence and Dr. Dreyer submitted billing that falsely stated the surgeries were medically necessary and otherwise proper.

     5.27  As a result of these unnecessary or otherwise improper surgeries, Eric Keller has suffered emotional distress, economic damage, and permanent debilitating harm, including, without limitation, job loss; disability designation; constant pain and discomfort; constant groin sensitivity and pain; pain radiating down both legs into his feet; muscle lock-ups (making him bedridden for days); significant difficulty walking; inability to sleep, sit or stand for any period of time; is on pain medication daily, and suffers from fatigue, anxiety, and depression.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 65 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1      5.28    **EBEN NESJE**. 44 years old.  Lumbar surgery conducted by Dr. Dreyer at SMMC.

2  Insurance: Labor & Industries Washington State.

3      5.29    <u>Surgery</u>: August 14, 2014. Dr. JASON DREYER, DO.

4          5.29.1    Mr. NESJE reported lower back pain.  Dr. DREYER recommended three-

5      level fusion surgery (L3 to L4, L4 to L5, and L5 to S1), stating he could fix him without a

6      problem and that, within six months, Mr. NESJE would be back to work functioning at a

7      one hundred percent capacity;

8          5.29.2    Mr. NESJE had numerous concerning or disqualifying comorbidities, and

9      he was only 34 years at the time;

10         5.29.3    Trusting Dr. DREYER, and in reliance of his advice and stated opinion,

11     Mr. NESJE agreed to the three-level fusion surgery;

12         5.29.4    The surgery was unsuccessful. Mr. NESJE was unable to return to work

13     and he has never recovered from the surgery.

14         5.29.5  The surgery was medically unnecessary or otherwise improper and was

15     performed for the purpose of financial gain for Dr. Dreyer and Providence.

16     5.30    On or about July 12, 2016, Mr. NESJE consulted with Dr. Matthew Fewel, a

17  neurosurgeon in Richland, Washington working for Providence Kadlac Medical Center. Dr. Fewel

18  recommended a possible revision surgery as a result of placement of unnecessary failed hardware

19  by Dr. Dreyer, but only after further workup, after Mr. Nesje stopped tobacco use and other pain

20  medications used for pain management.  Other consultations done after weight loss and quitting

21  tobacco placed chances for successful revision surgery very low.

22     5.31    Mr. Nesje was one of many former patients of Dr. Dreyer and Providence who

23  sought a second opinion from Dr. Fewel to obtain relief from these medically unnecessary, overly

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 66 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  complex or otherwise improper surgeries. Dr. Fewel ultimately began to track the patients who

2  came to him as a result of failed surgeries done by Dr. Dreyer and ultimately reported Dr. Dreyer's

3  pattern of conducting unnecessary or otherwise improper surgeries for profit as substandard care

4  to the DOH.

5      5.32    Per Dr. Fewel's report, it had become clear to him that these improper surgeries

6  were not an "isolated occurrence" and he had begun to keep a record of patients he encountered

7  from Providence / SMMC and that he was limiting his report to DOH to the 11 most egregious

8  cases.

9      5.33    Eben Nesje's file was among the 11 patient cases that Dr. Fewel reported – and one

10  of the files that the DOH expert in review, Dr. Abhineet Chowdhary, found to be below the

11  standard of care, which supported the suspension and ultimate permanent surrender of Dr. Dreyer's

12  license to practice medicine.

13      5.34    Dr. Chowdhary's conclusion, based on the records he reviewed, was that there had

14  been a "departure from the standard of care for performing extensive spine surgery without clear

15  indications" for Mr. Nesje's surgery.

16      5.35    Dr. Fewel's report resulted in the restriction of Dr. Dreyer's medical license in

17  March 2021, and ultimately Dr. Dreyer's lifetime ban to practice medicine in Washington State,

18  as well as other restrictions.

19      5.36    Prior to no earlier than April 12, 2022, Mr. Nesje was unaware of Providence's

20  admission of salient facts as outlined herein and in its settlement with the DOJ, or that the DOH

21  was looking into his care by Dr. Dreyer, or that the procedure conducted on him by Dr. Dreyer

22  was unnecessary or otherwise improper, constituting a part of an unlawful financial scheme and

23  resulting in substandard care.

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 67 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

5.37    Upon information and belief, Providence and Dr. Dreyer submitted billing that falsely stated the surgeries were medically necessary and otherwise proper.

5.38    As a result of these unnecessary or otherwise improper surgeries, Eben Nesje has suffered emotional distress, economic damage, and permanent debilitating harm, including, without limitation, job loss; disability designation with a designation of depression and anxiety due to surgery; a diagnosis of Failed Back Surgery Syndrome; constant low back pain and discomfort and partial leg pain; significant difficulty walking; inability to sleep, sit or stand for any period of time; is on pain medication daily, and suffers from fatigue, anxiety, and depression.

5.39    **KIRK SUMMERS**. now 57 years old, two surgeries by Dr. Dreyer: Surgery dates: February 25, 2015 Lumbar; July 25, 2015 Cervical. Former ferrier (horse shoer).

5.40    Surgery 1: February 25, 2015. Dr. JASON DREYER, DO.

5.40.1    Reported with lower back pain. Dr. DREYER informed Mr. SUMMERS he could make him as good as new, that he would be back shoeing horses within 90 days.

5.40.2    Mr. Summers had concerning or disqualifying comorbidities;

5.40.3    Trusting Dr. Dreyer, and in reliance of his advice and stated opinion, Mr. Summers agreed to the recommended two-level fusion lumbar surgery.

5.40.4    Mr. Summers woke from surgery in agonizing pain in his lower back and into his legs. He had lost complete use of his left leg. The pain has never stopped and will remain for the rest of his life.

5.40.5 The surgery was medically unnecessary or otherwise improper and was performed for the purpose of financial gain for Dr. Dreyer and Providence.

5.41    Surgery 2: July 15, 2015. Dr. JASON DREYER, DO.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 68 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

5.41.1    As Dr. Dreyer was assuring Mr. Summers that his pain from the first surgery would improve over time, he convinced Mr. Summers to have a two-level cervical spine surgery. At the time, Mr. Summers felt some tingling in his hands. Dr. Dreyer informed Mr. Summers he could make him as good as new. At no time did Dr. Dreyer recommend conservative care or nerve blocks to determine the origin of his hand tingling.

5.41.2    Mr. Summers still had his concerning or disqualifying comorbidities;

5.41.3    Trusting Dr. Dreyer, and in reliance of his advice and stated opinion, Mr. Summers agreed to the two-level cervical spine surgery.

5.41.4    Following this surgery, Mr. Summers no longer is able to lift his arms above his head without pain and numbness.

5.41.5 The surgery was medically unnecessary or otherwise improper and was performed for the purpose of financial gain for Dr. Dreyer and Providence.

5.42    In or around 2018, Mr. Summers consulted with Dr. Matthew Fewel, a neurosurgeon in Richland, Washington at the time. Dr. Fewel recommended no additional surgery.

5.43    Mr. Summers was one of many former patients of Dr. Dreyer and Providence who sought a second opinion from Dr. Fewel to obtain relief from these medically unnecessary, overly complex or otherwise improper surgeries.  Dr. Fewel ultimately began to track the patients who came to him as a result of failed surgeries done by Dr. Dreyer and ultimately reported Dr. Dreyer's pattern of conducting unnecessary or otherwise improper surgeries for profit as substandard care to the DOH.

5.44    Per Dr. Fewel's report, it had become clear to him that these improper surgeries were not an "isolated occurrence" and he had begun to keep a record of patients he encountered from Providence / SMMC and that he was limiting his report to DOH to the 11 most egregious

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 69 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

cases.

5.45    KIRK SUMMERS' file was among the 11 patient cases that Dr. Fewel reported – and one of the files that the DOH expert in review, Dr. Abhineet Chowdhary, found to be below the standard of care, which supported the suspension and ultimate permanent surrender of Dr. Dreyer's license to practice medicine.

5.46    Dr. Chowdhary's conclusion, based on the records he reviewed, was that there had been a "departure from the standard of care for performing extensive spine surgery without clear indications" for Mr. Summers' surgery.

5.47    Dr. Fewel's report resulted in the restriction of Dr. Dreyer's medical license in March 2021, and ultimately Dr. Dreyer's lifetime ban to practice medicine in Washington State, as well as other restrictions.

5.48    Prior to no earlier than April 12, 2022, Mr. Summers was unaware of Providence's admission of salient facts as outlined herein and in its settlement with the DOJ, or that the DOH was looking into his care by Dr. Dreyer, or that the procedure conducted on him by Dr. Dreyer was unnecessary or otherwise improper, constituting a part of an unlawful financial scheme and resulting in substandard care.

5.49    Upon information and belief, Providence and Dr. Dreyer submitted billing that falsely stated Mr. Summers' surgeries were medically necessary and otherwise proper.

5.50    As a result of these unnecessary or otherwise improper surgeries, Kirk Summers has suffered emotional distress, economic damage, and permanent debilitating harm, including, without limitation, unhealthy weight loss; inability to work (he will be applying for disability benefits); no independent income; constant pain and discomfort; difficulty walking; inability to sleep, sit or stand for any period of time; is on pain medication daily, and suffers from fatigue,

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 70 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    anxiety, and depression.

2        5.51    **STEVEN BASH**. Steven Bash, the deceased, married to CHRISTINE BASH, was

3    a patient of JASON A. DREYER, DO at Providence at SMMC.

4        5.52    Mr. BASH began consulting with Dr. Dreyer in 2014 after a work-related injury

5    resulted in a combination of leg/groin and back pain, with radiating leg pain being greater than or

6    equal to 75% of his symptoms.

7        5.53    Mr. BASH underwent three (3) surgeries – all conducted by Dr. Dreyer.

8        5.54    Upon information and belief, these surgeries – and, at a minimum, the second and

9    third surgeries – were negligent, medically unnecessary, or otherwise improper.

10       5.55    Surgery 1: October 2014. Dr. JASON DREYER, DO.

11           5.55.1    Reported after the work-related injury described above. After

12           conservative care, Dr. Dreyer recommended a one-level microdiscectomy of L2-L3 and a

13           laminectomy of L3-L4.

14           5.55.2    Mr. Bash had concerning or disqualifying comorbidities, including opioid

15           dependence, a condition he sought to control;

16           5.55.3    Trusting Dr. Dreyer, and in reliance of his advice and stated opinion, Mr.

17           Bash agreed to the surgery.

18           5.55.4    After this surgery, upon information and belief, Mr. Bash was in

19           consistent pain, and no longer could sleep well because of the pain.

20           5.55.5    Upon information and belief, this surgery was the first step towards

21           subsequent surgeries; it was the start of Mr. Bash becoming one of Dr. Dreyer's repeat,

22           multiple-surgery victims; and it became a part of a pattern and practice of Providence via

23           its agent / employee Dr. Dreyer, to perform negligent, medically unnecessary, or otherwise

24

improper procedures for the purpose of financial gain, ultimately resulting in foreseeable, permanent damages described herein.

5.56    Surgery 2: January 2016. Dr. JASON DREYER, DO

    5.56.1  Dr. Dreyer determined Mr. Bash was doing "poorly;" stated his issues were "as bad, if not worse than before surgery;" and proposed an extensive, radical surgery: an anterior lumbar interbody arthrodesis, L1-2, L2-3, L3-4 from the lateral approach; postereolateral arthrodesis, L1-2, L2-3, L3-4; combined posterior interbody and posterolateral arthorodesis, L4-5, L5-S1; PEEK interbody L1-2, L2-3, L3-4, L4-5, L5-S1; posterior spinal instrumentation, L1-S1; and laminectomies L1, L2, L3, L4, L5, S1 for decompression, recommendation without taking steps to determine the risk assessment for such an extensive surgery or to determine origins/generators of Mr. Bash's pain.

    5.56.2    Mr. Bash still had concerning or disqualifying comorbidities, including opioid dependence, a condition he sought to control;

    5.56.3    Trusting Dr. Dreyer, and in reliance of his advice and stated opinion, Mr. Bash agreed to the surgery.

    5.56.4  Mr. Bash woke from surgery screaming and crying, in unbearable pain.

    5.56.5  The surgery was medically unnecessary or otherwise improper and was performed for the purpose of financial gain for Dr. Dreyer and Providence.

5.57    Surgery 3: August 2016. JASON DREYER, DO.

    5.57.1  In response to Mr. Bash having pain on his right side, Dr. Dreyer stated there was a broken screw on the left side of Mr. Bash's spine as a result of the earlier surgery, and proposed the following surgery to remove the broken screw (despite its location on the left, not right, side): posterolateral arthrodesis L4-5, L5-S1; posterior spinal

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 72 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

instrumentation L4-S1; laminectomy L4, L5, S1 for the purpose of decompression.

5.57.2    Mr. Bash still had concerning or disqualifying comorbidities, including opioid dependence, a condition he sought to control;

5.57.3    Trusting Dr. Dreyer, and in reliance of his advice and stated opinion, Mr. Bash agreed to the surgery.

5.57.4 The surgery was medically unnecessary or otherwise improper and was performed for the purpose of financial gain for Dr. Dreyer and Providence.

5.58    On or about May 4, 2017, over a year after his second surgery and about nine months from his third surgery, his treating physician Dr. John Hoehn concluded:

This patient lives with chronic, incurable, severe pain that interferes with the activities of living. Non-narcotic medications are ineffective or otherwise contraindicated. Patient has accepted the risks and side effects of narcotics for the benefit of improved quality of life. The patient and I know of no other available safe or effective alternatives. This is not for cure, but for maintenance therapy. I have seen no evidence of inappropriate or illegal use of these narcotics, and am willing to permit the patient to use them on an ongoing basis with my medical supervision.

5.59    On August 6, 2018, Mr. Bash passed away prematurely from a heart attack at the age of 51.   Upon information and belief, Dr. Dreyer's medically unnecessary and otherwise improper surgeries contributed to Mr. Bash's premature death.  In fact, it is the stated belief of Mr. Bash's pain management treating specialist Dr. Craig Flinders that the "post-laminectomy pain syndrome thoracic and lumbosacral neuritis" resulted in the need for ongoing opioid medications which "definitely result[ed] in hypogonadism" from which Mr. Bash "suffered terribly;" that Mr. Bash was under "tremendous amount of stress due to the pain which contributed to his severe insomnia;" and that these all were "certainly major contributing factors which ultimately contributed to his heart disease and eventually resulted in his death."

5.60    Prior to no earlier than April 12, 2022, Ms. Bash, individually and as personal

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1   representative, was unaware of Providence's admission of salient facts as outlined herein and in

2   its settlement with the DOJ, or that the DOH was looking into his care by Dr. Dreyer, or that the

3   procedure conducted on him by Dr. Dreyer was unnecessary or otherwise improper, constituting

4   substandard care.

5       5.61    Upon information and belief, Providence and Dr. Dreyer submitted billing that

6   falsely stated Mr. Bash's surgeries were medically necessary and otherwise proper.

7       5.62    As a result of these unnecessary or otherwise improper surgeries, Steven Bash

8   suffered emotional damage, economic loss, permanent debilitating harm, and death.

9                   **MULTICARE HEALTH SYSTEM PLAINTIFFS**

10      5.63    All surgery patients of Dr. Dreyer at MultiCare Health System are proposed class

11  members, whether or not they also were victims of unnecessary surgeries. This is so because

12  Providence failed to report Dr. Dreyer, actively concealing Dr. Dreyer's role in the profiteering

13  financial scheme, improperly allowing Dreyer to conduct surgeries at MultiCare after Providence

14  when he should have been reported and unhireable, which makes all those surgeries improper.

15      5.64    In addition to the named plaintiffs below (Mr. Sumerlin and Mr. Whitney), the

16  Plaintiffs have notified the Court of about 30 MultiCare patients, currently unnamed per Court

17  order, *see* ECF 223:7, who are listed in the stricken Fourth Amended Complaint currently filed

18  under seal, ECF 189.

19      5.65    These additional MultiCare patients are currently putative class members, as are all

20  of Dr. Dreyer's MultiCare surgical patients who have yet to receive notice and come forward.

21      5.66    Neurosurgical medical experts have been reviewing, and will continue to review,

22  medical files of Dr. Dreyer's MultiCare patients. From this review thus far, Plaintiffs' experts have

23  identified multiple patients, including all named Plaintiffs, as having undergone medically

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 74 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1   unnecessary or otherwise improper surgeries at MultiCare that fit the pattern, and are typical of,

2   the pattern contained within the 2022 SA, ¶ D (Exhibit 2) and the patterns identified by Dr. David

3   Yam (*see e.g.*, Exhibit 6), all of which is supported by credible evidence that these were repeated

4   patterns affecting hundreds of patients and potentially greater than 80 percent of Dr. Dreyer's

5   surgical patients. (¶¶1.15-1.19 & 4.62-4.69). Further, the DOJ's January 2024 MultiCare *qui tam*

6   complaint alleges that MultiCare submitted dozens, if not hundreds, of materially false and

7   fraudulent claims for Dr. Dreyer's services. *See* MultiCare qui tam complaint at ¶ 6 (link at ¶ 1.2,

8   *supra*).

9       5.67    **RAYMOND SUMERLIN JR**. now 60 years old, married to Plaintiff MARYANN

10   SUMMERLIN, three surgeries by Dr. Dreyer: Surgery dates: January 20, 2020 and January 22,

11   2020 (in tandem); September 28, 2020.

12       5.68    Surgery 1 and 2 (in tandem): January 20 and 22, 2020. Dr. JASON DREYER, DO.

13           5.68.1  Reported neck and arm pain on January 19, 2020, after an earlier 2019

14   surgery by a former MultiCare neurosurgeon, Brent Morgan. Dr. Dreyer showed Mr.

15   Sumerlin an isolated place on his images as causing the issue and proposed surgery the

16   next day, without discussing conservative care options and despite no emergent situation.

17           5.68.2   Mr. Sumerlin had concerning or disqualifying comorbidities;

18           5.68.3   Trusting Dr. Dreyer, and in reliance of his advice and stated opinion, Mr.

19   Sumerlin agreed to what he believed would be a necessary but simple surgery.

20           5.68.4   After the consultation, as MARYANN SUMERLIN and the PA-C were

21   exiting the room, Dr. Dreyer asked to speak to Mr. Sumerlin privately. He firmly told Mr.

22   Sumerlin that there were more problems with his spine and that he, Dr. Dreyer, wanted to

23   take care of them now so that Mr. Sumerlin would not have to return. Mr. Sumerlin

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 75 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    believed he had to do the surgery because Dr. Dreyer was so firm about it. Dr. Dreyer did

2    not inform Mr. Sumerlin that this additional surgery would result in the fusion of six levels,

3    C3 through T1, both anterior and posterior. Dr. Dreyer did not discuss conservative care

4    options and proposed surgery the next day despite the fact there was no emergent situation

5    requiring immediate surgery.

6        5.68.5    Trusting Dr. Dreyer, and in reliance of his advice and stated opinion, Mr.

7    Sumerlin agreed to the surgery.

8        5.68.6  Mr. Sumerlin's cervical surgery took place on January 20, 2020. It was a

9    five-hour surgery, anterior only. According to operating room notes, the O-Arm (a

10   mechanical device used by Dr. Dreyer in surgeries) malfunctioned and Dr. Dreyer

11   ultimately halted the surgery midway through, accomplishing the anterior portion of the

12   surgery only. This long surgery put Mr. Sumerlin at greater risk for infection.

13       5.68.7  Mr. Sumerlin's cervical surgery continued on January 22, 2020, to

14   accomplish the posterior portion of the surgery, again putting Mr. Sumerlin at greater risk

15   for infection.

16       5.68.8  The surgeries were medically unnecessary or otherwise improper and were

17   performed for the purpose of financial gain for, *inter alia*, Dr. Dreyer.

18   5.69    After surgery, for months, Mr. Sumerlin had significant seepage and draining

19   coming from the wound on his neck that did not heal and for which Dr. Dreyer treated improperly

20   including by failing to obtain a formal infectious disease referral which would have resulted in

21   proper cultures being taken and Mr. Sumerlin would have been diagnosed at an earlier stage as

22

23

24

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

having the highly dangerous MRSA[18] (which he had).

5.70    Instead, Dr. Dreyer attempted debridements and treated what he called a "seroma" (accumulation of fluid under the skin) with antibiotics (even though seromas are generally not treated that way) and he also prescribed Keflex (which is not effective against MRSA). Dr. Dreyer's treatment of Mr. Sumerlin's infection fell below the standard of care.  Mr. Sumerlin's wound continued not to heal.

5.71    Surgery 3: On September 28, 2020, Mr. Sumerlin was finally diagnosed with MRSA, and this was done in a clinic in Walla Walla, Washington, where he lived, upon Mr. Sumerlin's insistence, and not by Dr. Dreyer. The failure to follow proper infectious disease care protocols and obtain cultures of the wound, resulted in the late diagnosis which more likely than not resulted in a greater infection that was left to fester and grow all summer.

5.72    Upon the MRSA diagnosis, Mr. Sumerlin returned immediately to Spokane (since he located no surgeon in Walla Walla who was willing to take on treating the MRSA infection in his spine) and Dr. Dreyer again performed surgery to remove the infected issue/ MRSA, thereby removing a large chunk of Mr. Sumerlin's neck and vertebrae in the process.

5.73    Upon information and belief, these medically unnecessary or otherwise improper procedures more likely than not were a proximate cause of a MRSA infection subsequently suffered by Mr. Sumerlin (as described above) and further, that the MRSA infection went undiagnosed and untreated for months due to Dr. Dreyer's improper actions and inactions.

5.74    Prior to no earlier than April 12, 2022, Mr. Sumerlin was unaware of Providence's admission of salient facts as outlined herein and in its settlement with the DOJ, including that it

---

[18] MRSA stands for Methicillin-resistant staphylococcus aureus. Left untreated, MRSA infections can become severe and cause sepsis.

**GILBERT LAW FIRM, P.S.**
421 W. Riverside, Ave., Suite 1400
Spokane, WA 99201
(509) 321-0750 • Fax (509) 343-3315

1  failed to report Dr. Dreyer to the DOH or the NPDB.

2      5.75    Upon information and belief, on a more likely than not basis, Mr. SUMERLIN has

3  suffered emotional distress, economic damage, and debilitating harm due to the actions and

4  inactions of Dr. Dreyer and Providence which is permanent and irreversible, including, without

5  limitation, a permanent great divot in the back of his neck from the MRSA surgery, causing daily

6  pain; ongoing, extreme neck pain, like a vice, with little to no mobility; difficulty with choking,

7  swallowing, phlegm, and constant nose drains; is on pain medication daily, and suffers from

8  fatigue, anxiety, and depression.

9      5.76    **MARTIN WHITNEY**. Plaintiff MARTIN WHITNEY, 73 years old, married to

10  Plaintiff SHERRYL WHITNEY. Three surgeries: August 28, 2019; February 24, 2020;

11      5.77    Surgery 1. August 28, 2019. JASON DREYER, DO.

12      5.77.1    Reported with need for repair of previous lumbar surgery (L5-S1). Dr.

13  Dreyer informed Mr. Whitney that he could redo the surgery done and heal Mr. Whitney

14  within six months.

15      5.77.2    Mr. Whitney had concerning or disqualifying comorbidities;

16      5.77.3    Trusting Dr. Dreyer, and in reliance of his advice and stated opinion, Mr.

17  Whitney repair surgery.

18      5.77.4    At surgery, Dr. Dreyer redid Dr. Morgan's original surgery removing all

19  the hardware, but then conducted a fusion that was both anterior and posterior for Levels

20  L3 through S1, even though only L5-S1 was the concerning level. The extent of hardware

21  removed and the further hardware placement both anterior and posterior were not

22  necessary. This resulted in an extensive surgery that was not fully indicated.

23

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 78 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

5.77.5    After this August 28, 2019, surgery by Dr. Dreyer, Mr. Whitney's condition worsened, although he was still able to do some activities occasionally, like driving a tractor, hunting, and fishing.

5.77.6    The surgery was medically unnecessary or otherwise improper as notated above, and was performed for the purpose of financial gain for, *inter alia*, Dr. Dreyer.

5.78    Surgery 2. February 24, 2020. JASON DREYER, DO.

5.78.1  Dr. Dreyer informed the Whitney's that he could fix the issues that arose with this 8/28/2019 surgery (Dr. Dreyer's first surgery).

5.78.2    Mr. Whitney still had concerning or disqualifying comorbidities;

5.78.3  Trusting Dr. Dreyer, and in reliance of his advice and stated opinion, Mr. Whitney agreed to a second surgery by Dr. Dreyer on February 24, 2020.

5.78.4  On or about February 24, 2020, Dr. Dreyer again removed and replaced screws and also decompressed L2-L3 with plate placement at L2-L3, even though the imaging did not indicate a need for removal and replacement of hardware/screws, nor a need for L2-L3 decompression with plate placement.

5.78.5  After this second surgery by Dr. Dreyer on 2/24/2020, Mr. Whitney was mostly bedridden, though he could still drive himself to appointments.

5.78.6  The surgery was medically unnecessary or otherwise improper, and was performed for the purpose of financial gain for, *inter alia*, Dr. Dreyer

5.79    Surgery 3. July 20, 2020. JASON DREYER, DO.

5.79.1  On or about July 20, 2020, Dr. Dreyer recommended and performed his third surgery to remove the L2-L3 plate/hardware that he had placed unnecessarily during the February 24, 2020, surgery.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 79 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

5.79.2    Mr. Whitney still had concerning or disqualifying comorbidities;

5.79.3    Trusting Dr. Dreyer, and in reliance of his advice and stated opinion, Mr. Whitney agreed to this third surgery by Dr. Dreyer on July 20, 2020.

5.79.4    After the July 20, 2020 surgery by Dr. Dreyer, Mr. Whitney was bedridden and could not even drive himself to appointments.

5.79.5    The surgery was medically unnecessary or otherwise improper and was performed for the purpose of financial gain for, *inter alia*, Dr. Dreyer.

5.80    Prior to no earlier than April 12, 2022, Mr. Whitney was unaware of Providence's admission of salient facts as outlined herein and in its settlement with the DOJ, including that it failed to report Dr. Dreyer to the DOH or the NPDB.

5.81    Upon information and belief, on a more likely than not basis, Mr. WHITNEY Mr. has suffered emotional distress, economic damage, and debilitating harm due to the actions and inactions of Dr. Dreyer and Providence which is permanent and irreversible, including, without limitation, he is primarily bedridden; he walks with a cane or uses a scooter; he no longer engage in any hobbies such as hunting, fishing, repairing vehicles or use of his tractor; is on pain medication daily, and suffers from fatigue, anxiety, and depression.

## VI.    MAINTENANCE OF THE CLASS

6.1.    Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference paragraphs 1.1 through 5.81 as if fully set forth herein.

6.2.    Plaintiffs allege that the Defendants committed profiteering, deceptive consumer practices, fiduciary violations, or the other torts alleged herein, in a course of common conduct causing injury to Plaintiffs for which Washington common and statutory law provide remedies. *Reserve v. Meta Platforms, Inc,*, 96 F.4th 1223, 1235 (9th Cir. 2024). Providence described the

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 80 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  class, based upon the prior complaint, and for purposes of giving patient notices (ECF 111, ¶ 5),

2  to include all surgeries by the Doctors. For example, Providence stated early on that, by this class

3  action, Plaintiffs were "putting at issue—all surgeries performed by these doctors" because it

4  alleged that "such unnecessary or improper procedures were 'part of a pattern and practice,' thus

5  potentially calling into question" all surgeries performed by the Doctors. (ECF 42:7)

6      6.3.    This was true also of Plaintiffs' MultiCare Health System class definition;

7  Providence did not take proper action; it failed to report Dreyer to the authorities and instead

8  concealed their acts to the benefit of Providence and for all Defendants' financial gain. No surgery

9  should have occurred at MultiCare, making all Dreyer surgeries at MultiCare "improper" surgeries

10  for which Providence is liable due to its negligent and deliberate acts.

11      6.4.    Plaintiffs identify the two classes: one for Providence patients and one for

12  MultiCare patients, and the classes both include all surgery patients of the Doctors as stated below.

13      6.5.    **Patient Class Definitions**:

14      6.5.1.    **Providence Class.**    Plaintiffs bring this Class action pursuant to

15  Washington CR 23(b)(2), (b)(3), and (c)(4)[19] on behalf of the Providence Class defined as

16  follows: *All surgical patients of the Doctors at Providence who were subject to the RVU*

17  *compensation scheme in connection with their treatment.*

18      6.5.2.    **MultiCare Class**. Plaintiffs bring this Class action pursuant to Washington

19  CR 23(b)(2), (b)(3) and (c)(4) on behalf of the MultiCare Class defined as follows: *All*

20  *surgical patients of Dr. JASON A. DREYER, DO while he was employed in Spokane,*

21  *Washington by MultiCare Health Systems, from May 3, 2019 through November 18, 2021.*

---

[19] Reference to Washington Rule 23 should include reference to Fed. R. Civ. P. 23; rules are similar and applicable.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 81 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

6.5.3.  Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes and/or to add Subclasses if necessary before the Court determines whether certification is appropriate and as the Court may otherwise allow, including a subclass of vulnerable adults and/or for estates and/or for survival actions (claims already preserved herein).

### Rule 23 Factors

6.6.     **Numerosity/Providence Class**:  All surgical patients of the Doctors are included in the proposed class. Providence has identified that the Doctors had 1,750 surgical patients at Providence. ***Thus, there are at least 1,750 class members***.  ECF110:2. These patient numbers are the product of the system created by Providence to issue notices to prospective class members for purposes of this case, and its billing records are an accurate source of this information.  Therefore, Providence class membership is readily identifiable, including by Providence, which has already identified the class members. Furthermore, the Plaintiffs named herein, combined with the other Providence patients (currently unnamed per Court order, see ECF 223:7, who are listed in the stricken Fourth Amended Complaint currently filed under seal, ECF 189) exceeds 40 patients for the Providence patient class. These additional individuals are currently putative class members, as are all the Doctors' Providence patients who have yet to receive notice and come forward.

6.6.1.  A substantial majority of each of the foregoing patient classes is comprised of residents of the state of Washington; their principal injuries occurred within the state of Washington; their claims are based upon Washington state law, and at least one defendant is a citizen of Washington.

6.6.2.  The DOJ and Dr. Fewel identified "hundreds of patients" as affected, and Dr. Yam has identified the potential for over 80 percent of patients being affected. In

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 82 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    addition, all surgical patients of Defendants at Providence, *which number about 1,750*

2    *patients*, are class members. The Providence Class is so numerous that joinder of all

3    members is impracticable. Moreover, Plaintiffs cannot identify prospective members of the

4    Providence Class without the assistance of Providence and/or other Defendants due to the

5    fact that specifics are known only to them and are not public due to HIPAA restrictions,

6    which prohibits investigation to determine what patients have claims

7        6.7.    **Numerosity/MultiCare Class.** All surgical patients of Dr. Dreyer at MultiCare

8    are included in the proposed MultiCare class. It has been identified that Dreyer had at least 475

9    surgical patients at MultiCare. ECF:110:2. These patient numbers are the product of the system

10   created by Providence to issue notices to prospective MultiCare class members for purposes of

11   this case. Therefore, MultiCare class membership is readily identifiable, including by Providence,

12   which has already identified class members. ***Thus, there are at least 475 class members.*** Further,

13   the Plaintiffs named herein, combined with the other known MultiCare patients (currently

14   unnamed per Court order, see ECF 223:7, who are listed in the stricken Fourth Amended

15   Complaint currently filed under seal, ECF 189) thus far totals about 30 known Dr. Dreyer patients

16   for the MultiCare patient class. These additional individuals are currently putative class members,

17   as are all of Dr. Dreyer's MultiCare patients who have yet to receive notice and come forward.

18       6.7.1.  A substantial majority of each of the foregoing patient class is comprised of

19           residents of the state of Washington; their injuries occurred within the state of

20           Washington; their claims are based upon Washington state law, and at least one

21           defendant is a citizen of Washington.

22       6.7.2.  The MultiCare Class is so numerous that joinder of all members is impracticable.

23           Moreover, Plaintiffs cannot identify prospective members of the MultiCare Class

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 83 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

without the assistance of MultiCare and/or Providence and/or other Defendants due to the fact that specifics are known only to them and are not public due to HIPAA restrictions, which prohibits investigation to determine what patients have claims.

6.8. **Commonality**: This action involves common questions of law and fact which predominate over any questions affecting individual Class members, and which justify damages relief under Rule 23(b)(3), equitable relief under Rule 23(b)(2), and the resolution of particular issues under Rule 23(c)(4), including the common issues and proof alleged in Section IV *supra,* which is incorporated herein. Details of these common issues of law, fact, claim, and remedies are also listed in Exhibit 9, and are incorporated herein, and include, without limitation:

6.8.1. Whether Defendants have engaged in criminal profiteering activity via multiple predicate acts of criminal profiteering under 9A.82.010(4), for financial gain actionable under RCW 9A.82.100 (Criminal Profiteering) or RCW 9A.82.080, in connection with RCW 9A.08.020, including but not limited to hundreds of:

- False health care claims as defined in RCW 48.80.030 (RCW 9A.82.010(hh)), as quoted in ¶ 4.2ii *supra*; false health care claims as defined in 18 U.S.C. § 1347, and false claims as defined in 18 U.S.C. § 287, including liability under 18 U.S.C. § 2;

- Money laundering offenses as defined in RCW 9A.83.020 (RCW 9A.82.010(t)), including conducting a financial transaction involving the proceeds of false health care claims knowing the property is proceeds of this offense (83.020(1)(a)), or knows the transaction is designed to conceal the nature of the proceeds as health care fraud proceeds or knowingly or acts recklessly as to whether the property is proceeds of false health care claim (83.101(1)(b)s; & theft by deception as defined/applied in RCW 9A.56 (RCW 9A.82.010(e)), including the intentional use of a common scheme or plan of deception to deprive plaintiffs of their property or services, including earned entitlement to health care benefits and to payments of $250 or more;

6.8.2. Whether Defendants' profiteering activity via these multiple predicate acts demonstrates a "pattern" of profiteering activity, as defined in RCW 9A.82.010(12), in

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

connection with the violations of RCW 9A.82.100 and RCW 9A.08.020, including:

- Actions taken having the same/similar intent – the intent was to achieve and/or maintain financial gain, and the pattern of actions taken include, *e.g.:*

  o submitting hundreds of false health care claims;

  o accepting hundreds of payments for those claims;

  o concealing Defendants' unlawful actions taken to obtain these funds, including failing to disclose that the hundreds of medical necessity certifications provided by Defendants were false;

  o failing to repay any of the funds received; and

  o failing to report the neurosurgeons to NPDB or DOH as required by law (which would have resulted in disgorgement of funds received) and affirmatively using the threat of such reporting to secure the cooperation of the Doctors in concealing the false claims and unlawful proceeds;

- Actions taken have the same or similar outcome / result; here the result was to keep the funds obtained and conceal the bad acts of neurosurgeons (by, inter alia, failing to return funds or report them to NPDB or DOH), which resulted in continued and perpetual harm to unsuspecting past and future patients;

  o Same or similar accomplices – here, the Defendants;

  o Same or similar principals – here, the Defendants;

  o Same or similar victims – here, unsuspecting and trusting individuals in need of specialized and honest health care treatment;

  o Same or similar methods of commission – here, the same pattern and practice repeated itself for the entire relevant time period(s) consistently and throughout;

  o Otherwise interrelated by distinguishing characteristics, including nexus to the same enterprise – here, (1) one distinguishing characteristic includes a requirement in the medical profession, when seeking insurance coverage, to verify under penalties (including license revocation penalties) that the proposed medical procedures are medically necessary or are otherwise proper; and (2) The enterprises to which the "nexus" exists, see RCW 9A.82.010(8), are governmental health care payee entities like, *inter alia*, Medicare/Medicaid (which require the above-described assurances), and/or the health care insurance industry, including private insurance companies (which also require such assurances), or Providence or Providence St. Joseph

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 85 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    Health, or the association-in-fact of both;

2    6.8.3.   Whether Providence is liable for the Doctors' false claims because it was

3    committed by the conduct of another person for which Providence was legally accountable,

4    including as an accomplice.  *See* RCW 9A.08.020.

5    6.8.4.   Whether Providence provided substantial assistance to the Doctors in

6    presenting their false claims to health insurers, or otherwise is liable for conduct as an

7    accomplice or aider and abetter.

8    6.8.5.   Whether Defendants' scheme to commit and to conceal the presentation of

9    false health care claims to health benefit program insurers constitutes health care fraud, in

10   violation of RCW 48.80.030, 18 U.S.C. § 1347 or 18 U.S.C. § 287, including as proscribed

11   by 18 U.S.C. § 2 or RCW 9A.08.020.

12   6.8.6.   Whether Defendants' scheme to commit and to conceal the presentation of

13   false health care claims to health benefit program insurers constitutes health care fraud, in

14   violation of RCW 48.80.030, 18 U.S.C. § 1347, or 18 U.S.C. § 287, including as proscribed

15   by RCW 9A.08.020 or 18 U.S.C. § 2.

16   6.8.7.   Whether Defendants' pattern of criminal profiteering activity was

17   discovered for purposes of the statute of limitations under RCW 9A.82.100(7)

18   (profiteering) no earlier than April 12, 2022 (the date the Defendants first admitted publicly

19   a pattern existed, requiring a $22.7 million settlement), but Providence took affirmative

20   steps thereafter to conceal this, including by publishing a newspaper communication to its

21   patients attempting to isolate the misconduct to the Doctors and falsely suggesting that

22   Providence's "thorough investigation" discovered and removed them from their jobs;

23   6.8.8.   Whether Defendants' failure (Providence's failure in particular) to report

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 86 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. Riverside, Ave., Suite 1400
Spokane, WA 99201
(509) 321-0750 • FAX (509) 343-3315

the malfeasance of the neurosurgeons, including under RCW 70.41.210, was a violation of a statutory or common law duty to Plaintiffs resulting in general/special damages;

6.8.9.   Whether the settlement between DOJ and Providence of $22,690,458 (with $10,459,388 designated as restitution) creates a mechanism by which financial damages for medical costs can be measured for all Plaintiffs (and/or for the Settlement Class Plaintiffs), including as calculated pursuant to the resulting Providence Corporate Integrity Agreement and reports thereunder, and in equitable remedies including restitution, disgorgement, and forfeiture;

6.8.10. Whether Providence owed a common law or statutory duty of care to all patients to report the actions of the neurosurgeons pursuant to, *inter alia*, RCW 70.41.210, resulting in actionable lawsuits by all Plaintiffs against Providence for failure to comply with that statutory duty, resulting in reasonably foreseeable general/special damages;

6.8.11. Whether Providence breached its duty to comply with the standard of care of a hospital or the applicable government standard of care for claims;

6.8.12. Whether Defendants exercised the requisite degree of skill, care and learning expected of a reasonably prudent hospital/healthcare provider;

6.8.13. Whether Defendants fell below their professional standard of care;

6.8.14. Whether Defendants failed to obtain consent/informed consent that surgery would not occur in a safe environment and that it included medically unnecessary or otherwise improper procedures;

6.8.15. Whether Defendants violated the Consumer Protection Act (RCW 19.86);

6.8.16. Whether Defendants violated the Criminal Profiteering Act (RCW 9A.82.100 and 9A.82.080 in connection with RCW 9A.08.020);

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 87 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

6.8.17. Whether Defendants concealed evidence forming the basis of this action from its patients, from MultiCare patients, and from the public during the relevant time period until no sooner than April, 2022;

6.8.18. Whether nonmonetary relief is required to compensate Class members, including disgorgement, forfeiture, restitution, divestment, injunctions, and civil penalties that are appropriate to be brought or maintained as a class action under Rule 23(b)(2),

6.8.19. The nature and extent of Class-wide injury and the measure of compensation for such injury.

6.8.20. The aforementioned common issues present particular questions appropriate to be brought or maintained as a class action under Rule 23(c)(4). In particular, the following issues are suitable for class management and thereby materially advance the resolution of this case, including:

Whether Providence performed, or failed to perform, on an ongoing basis, proper background, credentialing, privileging, supervision and performance review of the Doctors.

Whether Providence failed to take any timely action to supervise, prevent, or discipline the Doctor's misconduct, including by continuing to file false health care claims to promote and to conceal such misconduct, and by failing to create or to maintain any system to detect and prevent such false claims.

Whether Plaintiffs' and Class Members' increased risk of exposure to a pattern of associated false claim billing, was caused either by Providence's negligence or by Providence's deliberate action.

Whether Providence is liable for the Doctors' false claims because it was committed by the conduct of another person for which Providence was legally accountable, including as an accomplice. See RCW 9A.08.020.

Whether Providence provided substantial assistance to the Doctors in presenting their false claims to health insurers.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 88 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

Whether Providence used appropriate standard of care practices to hire the Doctors and their affiliated supervisors and subordinates to monitor and supervise the Doctors' activity, including their use, dependence upon, and misuse of Providence's wRVU incentive bonuses.

Whether Providence timely detected the Doctors' misconduct in conducting high numbers of medically unnecessary or otherwise improper surgeries and the danger that they posed to patients at the hospital, and/or whether Providence knew, or should have known, of that danger but continued to incentivize the behavior despite professionally known and obvious risks to patients.

Whether Providence intended the unlawful consequences of the Doctors' actions, and implemented them for its financial gain.

Whether Defendants violated their fiduciary dutes and responsibilities.

Whether all Defendants engaged in a pattern of criminal profiteering activity through false claims, money laundering and theft by deception.

Whether the pattern of false claims was caused by Providence's RVU compensation plan designed, supervised, implemented by Providence for its profit, and for purposes of incentivizing the commission of false claims by the Doctors.

Whether the Defendants knew that the proceeds of the submitted false claims were unlawful proceeds and engaged in financial transactions with them.

Whether the criminal profiteering unlawful proceeds which were invested by the Defendants in the operation of the Enterprise(s) or were used to conceal and to promote their pattern of false claims profiteering activity.

Whether Defendants' misconduct, misrepresentations, material nondisclosures, and concealment, including through Dr. Sandquist, improperly resulted in Dr. Dreyer being hired by MultiCare.

6.9.    **Typicality:** Class Plaintiffs' claims are typical of the claims of other members of the Class and Class Plaintiffs are not subject to any atypical claims or defenses. Their "typicality" includes (a) they were surgical patients of the Doctors, qualifying them as a potential class member

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 89 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1   based on that status alone; (b) the manner in which their surgeries were conducted, which follow

2   the pattern listed in Recital D of the SAt (a pattern which is supported by the evidence to include

3   "hundreds" of patients); (c) Defendants submitted false billings in connection with their surgeries;

4   (d) they were not informed their surgeries would be conducted by surgeons performing high

5   numbers of medically unnecessary or otherwise improper surgeries, resulting in a lack of informed

6   consent (details of this typical claim are outlined in ¶ 4.152); (e) each of their surgeries was done

7   with intent to commit a felony (*e.g.*, health care fraud, theft by deception, and/or money

8   laundering), either by, *e.g.,* submission of false billing to insurance companies and/or to cover up

9   the financial scheme to submit false billings; (f) each relied to their detriment on Providence's self-

10  promoted reputation for providing proper and safe health care to patients; (g) Defendants owed a

11  fiduciary duty, and other duties, to each of the Providence plaintiffs (just as were owed to the entire

12  proposed class), and also owed a duty to each of the MultiCare plaintiffs (just as were owed to the

13  entire proposed class); and (h) they each suffered typical damages, *e.g.*, that of emotional,

14  economic, and physical damage.

15      6.10.    In sum, the named Plaintiffs, and the proposed class members, have the same or

16  similar injuries based upon conduct that is not unique to the named Plaintiffs, and the proposed

17  class members have been injured by the same course conduct as the named Plaintiffs as articulated

18  herein.  The purpose of the wRVU scheme was to treat each class member the same under the

19  wRVU scheme so as to maximize the financial benefits falsely accruing to the Defendants to the

20  prejudice and harm of the class members.

21      6.11.    To further this fraudulent scheme, Defendants concealed their wrongdoing by *e.g.*,

22  (a) failing to reimburse the enterprise health care industry and/or Medicare/Medicaid for payments

23  for procedures that did not meet criteria for reimbursement, were medically unnecessary, or were

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 90 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1   otherwise improper; and (b) failing to report the neurosurgeons to the NPBD or the DOH (which

2   would have resulted in disgorgement), to any health care organization, to Dr. Dreyer's prospective

3   employers, or to their patients. Defendants failed to advise Plaintiffs of medically unnecessary

4   surgeries and otherwise improper procedures to which they were subjected, before or after their

5   surgeries, and after the April 2022 SA. Defendants took repeated, similar actions as outlined in the

6   commonality section, to which Providence has admitted. Plaintiffs received the same notice, *i.e.*,

7   no sooner than the public announcement of the DOJ Settlement on April 12, 2022. Plaintiffs were

8   all victims of a scheme of Defendants involving similar medically unnecessary or otherwise

9   improper procedures, all of which went unabated due to Defendants' actions, negligence and

10  concealment. Providence thereafter disavowed its own responsibility by communicating with its

11  patients through a newspaper communication on June 5, 2022 that the only problem was two

12  unidentified doctors whose conduct it allegedly discovered and took action upon to cause them to

13  leave.  The named Plaintiffs' claims, like those of the Class, arise out of the same common course

14  of conduct by Defendant directed toward them and the Class and are based on the same legal and

15  remedial theories.

16      6.12.   **Adequacy:** Class Plaintiffs will fairly and adequately represent the Class, as they

17  are committed to prosecuting this action, have no conflicts of interest, and have retained competent

18  counsel who are experienced civil trial lawyers with significant experience in complex litigation

19  and trial, including tort and class action litigation. Plaintiffs have no conflicts because none have

20  any financial or other relationship with Defendants that would give them an interest in Defendants

21  prevailing in this action.  Plaintiffs and their counsel are committed to prosecuting this action

22  vigorously on behalf of the Class(es) and have the financial resources to do so.  Plaintiffs' counsel

23  REED has experience as lead counsel in class actions and has experience prosecuting and

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 91 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  defending cases under the Racketeer Influenced and Corrupt Organization Act. Neither Plaintiffs

2  nor their counsel have interests that are contrary to or that conflict with those of the proposed

3  Class, including that no Plaintiff is in individual settlement negotiations with the Defendants.

4  Defendants have not alleged such conflicts of interest for any Plaintiff. Any such allegation can

5  be, and will be, refuted as necessary in the scheduled class certification proceedings.

6      6.13.   **Predominance:** The common issues predominate over any individualized issues.

7  The commonalities are articulated in detail in Section IV, *supra*, with some of those commonalities

8  summarized below to exemplify how they predominate over any individual question of law or fact.

9      6.14.   Adjudication of these common issues in a single action has important and desirable

10  advantages of judicial economy. The predominant legal and factual issues are described in the

11  itemization of the essential elements of each claim *infra*, including as to causation, and the

12  common proof and predominant factual issues which are described in ¶¶ 4.1 *infra*; along with the

13  common proof which proves them, which are incorporated herein.

14      6.15.   **Predominance/Providence Class.**   The common issues which predominate the

15  Providence class include:

16  - Whether Defendants' fraudulent representations and omissions causing the legal claims
   by plaintiffs herein can be established by common proof, including:

17     o  Whether Defendants violated their fiduciary duties (*i.e.,* duty of care, candor,
      and loyalty to patients, exercising the utmost good faith and loyalty in dealing

18        with them), thus eliminating any burden to establish individual reliance, making
      causation provable on a classwide basis and thus meeting predominance;[20]

19     o  Whether Defendants' fiduciary duty to Plaintiffs creates a presumption of
      reliance or justified common sense inference of reliance, also eliminating any

20        burden to establish individual reliance, especially given that Defendants

21

22  _____

   [20] *See Waldrup v. Countrywide Financial Corporation,* 2018 WL 799156 (C.D. Cal. Feb. 6, 2018); *In re Morning
23  Song Bird Food Litigation,* 320 F.R.D. 540,555 (S.D. Cal. 2017); *Walden v. Bank of New York,* 2024 WL 1556937.
   *14 (W.D. Pa. April 10, 2024)(fiduciary duty establishes reliance "as a matter of law"); *Seplow v. Closing Pro, Inc.,*
24  717 F.Supp.3d 427, 437 (E.D. Pa. 2024); *Wolfe v. Allstate,* 2011 WL 13160292, *3 (M.D. Pa. Jan. 10, 2011).

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

violated this duty by failing to disclose their scheme;[21]

o   Whether the materiality of Defendants' misrepresentations and omissions can establish class reliance upon them because reasonable persons would not submit to surgery for purposes of creating false claims, beginning with the legal requirement that providers certify the necessity of medical care and the truth of the claims presented, and is further supported by (i) the false claims standard; (ii) the fiduciary context governing this process; (iii) the government medical standards of patient safety, e.g., the two *qui tam* complaints; and (iv) the prosecution of the *qui tam* action against Providence leading to payment of $10 million in "restitution."[22]

o   Whether Defendants' actions and inactions create a presumption of reliance or a justify a common sense inference of reliance by the nature of the claims, even absent the fiduciary duty admittedly owed by Defendants to Plaintiffs, thus satisfying predominance;[23]

o   Whether reliance is even necessary for the profiteering (RICO) claims, and alternatively whether third party reliance (here, the insurer payors' reliance on the Defendants' false claims establishes such third party reliance) is sufficient for predominance for a class civil RICO claim.[24]

o   Whether reliance can be presumed for the Consumer Protection Act claim.[25]

---

[21] *See Waldrup v. Countrywide Financial Corporation,* 2018 WL 799156 (C.D. Cal. Feb. 6, 2018); *In re Morning Song Bird Food Litigation,* 320 F.R.D. 540,555 (S.D. Cal. 2017).

[22] *Lytle v. Nutramax Laboratories, Inc.,* 114 F.4th 1011, 1035 (9thCir. 2024) (materiality of misrepresentation to reasonable person creates inference of reliance justifying predominance class finding); *Montera v. Premier Nutrition Corp.,* 111 F.4th 1018, 1034 (9th Cir. 2024) (upholding class certification on predominance based upon materiality of misrepresentation to reasonable consumer); *Hellman v. Polaris Indus., Inc.,* 2024 WL 4008132,*4 (C.D. Cal. July 16, 2024) (presumption or inference of reliance where misrepresentation is material, with materiality defined as whether reasonable man would attach importance to its existence in choosing action).

[23] *Owino v. CoreCivic, Inc,.* 60 F.4th 437, 446 (9th Cir. 2022) ("reliance can be inferred on a class-wide basis"); *Torres v. SGE Management, LLC,* 838 F.3d 629, 638, 641 (5th Cir. 2018) (en banc) (common inference of reliance applies to civil RICO class claims because "it follows logically from the nature of the scheme," establishing predominance); *CGC Holding Co. v. Broad and Cassel,* 773 F.3d 1076, 1098-99 (10th Cir. 2016) ("In the RICO context, class certification is proper when 'causation can be established through an inference of reliance where the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct;'" inference of reliance applied to borrowers in RICO class action). (*quoting In re Countrywide Fin. Co., Mktg & Sales Litig.,* 277 F.R.D. 586, 603 (S.D. Cal. 2011)).

[24] *Painters and Allied Trades District Council 82 Health Care Fund v. Takeda Pharmeceutical,* 943 F.3d 1243, 1259 (9th Cir. 2019) (patients satisfied reliance on drug manufacturer misrepresentations and omissions based upon third party reliance of prescribing doctors upon them) (citing *Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639 (2008)); *Beaver v. Omni Hotels Management Co.,* 2023 WL 6120685, *18 (S.D. Cal. Sept. 18, 2023) (finding predominance because direct reliance "is not an element of the RICO statute," citing *Painters.*). Here, the insurer payors' reliance upon DEFENDANT's false claims establishes such third party reliance).

[25] *See Eng v. Specialized Loan Servicing,* 20 Wash.App.2d 435, 452(2021) ("When a plaintiff alleges deciception through omission of a material fact, a rebuttable presumption of reliance applies.") (citing *Deegan v. Windemere Real Estate,* 197 Wn.App. 875, 890 (2017))

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 93 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

o  Whether patient reliance is necessary for health care fraud (18 U.S.C. §1347).[26]

- Whether the existence, scope, pattern, and course of conduct of Defendants' use of Providence's wRVU compensation system to submit a pattern of false health care claims for Defendants' financial gain and not for the medical wellbeing of patients (for which every Plaintiff and proposed Class Member was a victim) predominates. Providence has denied, for example, that "its compensation system incentivized or resulted in improper or unnecessary surgeries" (ECF 202:4),[27] thereby confirming the predominance of the issue of whether its incentive system caused false claims;

- Whether Providence is liable for the Doctors' false claims because it was committed by the conduct of another person for which Providence was legally accountable, including as an accomplice. *See* RCW 9A.08.020;

- Whether Providence provided substantial assistance[28] to the Doctors in presenting their false claims to health insurers under common law or statutory aiding and abetting law;

- Whether the corporate negligence as detailed in Section IV, *supra*, regarding the facts and law associated with Providence's duties, actions and inactions, with liability turning on the details of Providence's action and knowledge predominates, including:

  o  Whether permitting the Doctors to engage in a pattern of false claims using Providence's patients constitutes corporate negligence;

  o  Whether incentivizing and participating in a pattern of criminal profiteering acts using Providence's patients constitutes corporate negligence;

  o  Whether Providence performed, or failed to perform, on an ongoing basis, a proper background, credentialing, privileging, supervision and performance review of the Doctors;

  o  Whether Providence failed to take timely action to supervise, prevent, or discipline the Doctors' conduct, including by filing false health care claims to promote and conceal misconduct, and by failing to create, maintain, or implement any system to detecting and preventing such false claims;

  o  Whether patients' increased risk of exposure to a medically unnecessary or otherwise improper surgery, or associated false claim billing, was caused by Providence's negligence or deliberate action;

  o  Whether Providence used appropriate standard of care practices for hiring,

---

[26] *See United States v. Salko*, 2008 WL 4006747, *8 (M.D. Pa. Aug. 26, 2008) (patient reliance not necessary for health care fraud under 18 U.S.C. § 1347).

[27] ECF202:4 ("Defendants deny Plaintiffs' claims and deny that any class should be certified on any claim. In particular, Providence denies its compensation system incentivized or resulted in improper or unnecessary surgeries or that it otherwise acted improperly or negligently.").

[28] *Perkumpulan Investor Crisis Center Dressel-WGB v. Regal Financial Corp.*, 781 F.Supp.2d 1098, 1114 (W.D. Wash. 2011) (upholding pleading, under Washington law, of pleading aiding and abetting breach of fiduciary duty claim for providing substantial assistance or encouragement to another, or for providing "substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person ") (quoting Restatement (Second) of Torts § 876 (1979)).

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 94 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

supervising, monitoring, or using the wRVU incentive bonuses;

- o Whether Providence timely detected the Doctors' conduct and properly had in place and/or applied regulations, laws, rules and the like when hiring, supervising, and monitoring;

- o Whether details of this evidence show Providence intended unlawful consequences of the Doctors' actions and implemented them for its own financial gain;

- o The adequacy and appropriateness of Providence's response to patients' pre-exposure and post-exposure to the Doctors' surgeries;

- o The nature and extent of legal claims available to patients as a result of the patient endangerment as confirmed by the Providence settlement and the June 5, 2022 newspaper "message;"

- o Whether Providence acted in concert with the Doctors;

- o Whether Providence violated its detailed institutional responsibilities, including its Governing Board, in hiring credentialing, privileging, and supervising the Doctors, and/or violated those standards of care;

- o Whether the items enumerated here and in Exhibit 9 predominate;

- Whether Defendants' course of conduct violated the Consumer Protection Act predominates;

- Whether Defendants' failure to adequately warn patients of the risk of medically unnecessary surgery and details therein predominates;

- How each Providence class member was subject to severe emotional distress upon discovery of the pattern of false claims by the Doctors that occurred with the Settlement Agreement and the Providence newspaper publication to its patients;

- Whether Defendants knew the proceeds used to further the fraudulent scheme were derived from illegal activity, to wit, false claims;

- Whether the pattern of profiteering activity was furthered by the concerted efforts of Defendants and Dr. Sandquist to conceal the fact and magnitude of the false claims.

6.16. **Predominance/MultiCare Class.**    The common issues which predominate the

MultiCare class including whether they were subjected to surgeries by Dr. Dreyer at MultiCare

when he should not have been hired by MultiCare at all and whether he was, in fact, unhirable and

would not have been hired at MultiCare if Defendants hadn't concealed their pattern of false claims

from both health authorities and MultiCare, which evidence includes the months-long

investigation conducted by the Washington DOH into Providence's failures to comply with its

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 95 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    mandatory reporting requirements, resulting in a five-year administrative ruling of a Plan of

2    Correction with the DOH  to which Providence agreed and did not appeal.  Since causation for the

3    MultiCare Class stems from the same acts, inactions, and concealments by Providence as alleged

4    in this Complaint, causation is predominantly proven on a class wide basis and not an

5    individualized one. Further, each MultiCare class member was subject to severe emotional distress

6    upon discovery of the pattern of false claims by the Doctors that occurred with the SA and the

7    Providence June 5, 2022 newspaper message.

8        6.17.  **Superiority:** Class-Plaintiffs and Class members have suffered and will continue

9    to suffer harm and damages as a result of Defendants' actions.  Absent a Class Action, most Class

10   members likely would find the cost of litigating their claims prohibitive and/or may not even

11   become informed of their causes of action due to HIPAA confidentialities and how the details of

12   the settlement (and which cases inform the bases of the settlement agreement) are also currently

13   held confidentially.  Concentrating class members claims in this District is superior because the

14   headquarters of Providence is located in this District and the claims are all based upon Washington

15   law. Class treatment is superior to multiple individual suits or piecemeal litigation because it

16   conserves judicial resources, promotes consistency and efficiency of adjudication, and provides a

17   forum for all claims, which number in the "hundreds" (according to the Department of Justice).

18   There will be no significant difficulty in the management of this case as a Class action.  The

19   identity of each Class member is readily identifiable from Defendants' own records and the records

20   of the DOJ.

21   **VII.    CAUSE OF ACTION: Criminal Profiteering [RCW 9A.82.100 and 9A.82.080]**

22       7.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and

23   incorporate by reference paragraphs 1 through 6.17 as if fully set forth herein.

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 96 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    7.2    Plaintiffs herein set forth their claim for damages resulting from Defendants'

2  violations of the Washington Criminal Profiteering Act, 9A.82.100 and 9A.82.080.

3    7.3    Each Defendant is a "person" within the meaning of RCW 9A.04.110(17), and

4  under RCW 9A.82100(1)(a), and RCW 9A.82.080(1)(a).

5    7.4    To carry out the profiteering scheme, the Defendants had to complete a course of

6  separate actions which were themselves offenses, and to keep these offenses and their relationship

7  to each other concealed throughout.  First, the defendants had to perform a patient surgery, which

8  entailed convincing the patient to undergo the surgery without disclosing the scheme. Second, they

9  had to create the false documentation necessary to present a convincing but false healthcare claim

10  to state, federal and private insurers.  Finally, they had to deposit the proceeds of their false claims

11  into their financial accounts without detection of their false origins to pay the ongoing and

12  promotional costs of the profiteering scheme and to generate profits for themselves.

13    7.5    False claims in violation of RCW 48.80.030 fall at the center of this spectrum of

14  profiteering activity, making it a common feature of the pattern of profiteering activity.   That

15  statute, RCW 48.80.030, (defined as a profiteering act at RCW 9A.82.010(4)(hh)), states

16  (emphasis added):

17    (1) A person shall not make or present or cause to be made or presented to a health care
payer a claim for a health care payment knowing the claim to be false.

18    (2) No person shall knowingly present to a health care payer a claim for a health care
payment that falsely represents that the goods or services were medically necessary in

19    accordance with professionally accepted standards. Each claim that violates this
subsection shall constitute a separate offense.

20    ....

21    (4) .... *A person shall not conceal or fail to disclose any information with intent* to obtain
a health care payment to which the person or any other person is not entitled, *or to obtain*

22    *a health care payment in an amount greater than that which the person or any other person
is entitled.*

23

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 97 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    7.6    The profiteering cycle (the course of conduct) begins with inducing patients to

2    undergo surgery for purposes of making false claims, to wit, false health care claims, theft by

3    deception, and/or money laundering, which themselves are acts of profiteering under RCW

4    9A.82.010(4)(e), (t), and (aa).  The scheme subjected the pre-surgery, the surgery, and the post-op

5    services to increasing patient safety endangerment and injury, without the consent of anyone but

6    Defendants. Dr. Yam even chronicled the pattern of patient injuries that this process caused by the

7    Doctors, none of which was shared with the patients. After receiving payments, Defendants then

8    laundered their false claim proceeds through their financial institutions, in violation of Washington

9    and federal money laundering laws (*see* 9A.83.020(1)((a) & (b); 18 U.S.C. § 1957(a)), as part of

10   their continuing pattern of profiteering activity under RCW 9A.82.010(4)(e), (t), and (aa). They

11   then used the resulting unlawful proceeds to promote the scheme and to profit from it.

12   **A. Violation of RCW 9A.82.100[29]**

13   7.7    Defendants violated RCW 9A.82.100, as further alleged herein, by knowingly

14   engaging in a pattern of criminal profiteering activity as set forth in the preceding paragraphs by

15   engaging in the following acts of criminal profiteering activity for financial gain ("predicate acts"),

16   as listed in paragraphs 7.13 to 7.20 *infra* which are incorporated herein, with a nexus to the

17   identified enterprises listed in paragraphs 7.29 or 7.30:

18        7.7.1    false health care claims as defined in RCW 48.80.030 (profiteering acts

19        under RCW 9A.82.010(hh) and accomplice liability under RCW 9A.08.020);

20        7.7.2    money laundering as defined in RCW 9A.83.020 and RCW9A.93.010(7)

21        (RCW 9A.82.010(t)) with the specified unlawful activity being (i) false health care claims

---

[29] Under RCW 9A.82.100(13), "Private civil remedies under this section are supplemental and not mutually exclusive.").

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 98 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    under RCW 48.80.030; (ii) theft by deception under RCW 9A.56 and accomplice liability

2    under RCW 9A.08.020; and (iii) the federal offenses of scheming to commit or attempting

3    to commit health care fraud under 18 U.S.C. § 1347, false claims under 18 U.S.C. § 287,

4    and money laundering offenses for conducting transactions in criminally derived property

5    under 18 U.S.C. § 1957(a) involving a Federal health care offense under 18 U.S.C. §

6    1956(7))(F) and 18 U.S.C. § 24(a), and aiding and abetting liability under 18 U.S.C. § 2.

7         7.7.3   theft by deception as defined/applied in RCW 9A.56 (RCW 9A.82.010(e)

8    and RCW 9A.08.020);

9    **B. Violation of RCW 9A82.080(1) & (2)**

10         7.8   Defendants violated RCW 9A82.080(1) & (2) and RCW 9A.08.020, as further

11    alleged herein, by: (1) knowingly and willfully receiving the proceeds, directly or indirectly, from

12    a pattern of criminal profiteering activity to use or invest any part thereof in the acquisition of any

13    title to, or any right, interest, or equity in, real property or in the establishment or operation of the

14    enterprise Providence or the alternative enterprise(s) listed in paragraphs 7.29 and 7.30; and (2)

15    knowingly and willfully acquiring or maintaining, directly or indirectly, an interest in or control

16    of the enterprise or real property through a pattern of criminal profiteering activity. The pattern of

17    profiteering activity is that alleged in paragraph 7.7. *supra*, and listed in paragraphs 7.13 to 7.20

18    *infra*, which are incorporated herein. Plaintiffs have been injured in their persons, property and

19    business as a result of the Defendants' knowing receipt of the proceeds from the pattern of criminal

20    profiteering activity and their subsequent use and investment, and concealment of their use and

21    investment, in the establishment or operation of the enterprise of Providence or the alternative

22    enterprises, or for acquiring an interest in real property, including for purposes of maintaining the

23    enterprise(s) to attract patients and submit further false health care claims.

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 99 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

**C. Violation of RCW 9A82.080(3)**

7.9    Defendants violated RCW 9A82.080(3) and RCW 9A.08.020, as further alleged herein, by knowingly and willfully conspiring to commit the foregoing criminal profiteering acts and violations of RCW 9A.82.080(1) & (2), in violation of RCW 9A.82.080(3).

7.10    Each plaintiff is a person who sustained injury to his or her person, business, or property by an act of criminal profiteering that is a part of a pattern of criminal profiteering activity under RCW 9A82.100, or by the offenses alleged in RCW 9A82.080(1), (2) & (3).

7.11    Plaintiffs' injuries were directly and proximately caused by Defendants' violations of the aforementioned offenses.

7.12    For each predicate offense, failure by Defendants to return funds obtained as described below is evidence of their intent to commit the predicate act(s) and are part of the pattern of criminal profiteering activity alleged herein.

**Predicate Acts**
**False Health Care Claims, RCW 48.80.030 and RCW 9A.08.020**

7.13    As set forth herein above, Defendants:

7.13.1    presented and/or caused to be presented to health care payors, including federal health care payors, hundreds of claims for a health care payment knowing the claim to be false or fictitious and/or that falsely represented that the goods or services were medically necessary in accordance with professionally standards and/or acted with deliberate indifference to whether the claims submitted were false or fictitious;

7.13.2    concealed or failed to disclose information with intent to obtain health care payments to which they were not entitled, including but not limited to false certifications of medical necessity and failure to disclose noncompliance with 42 U.S.C. § 11133(a)(1) of the Healthcare Quality Improvement Act of 1986, and the NPDB

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    guidelines.

2    7.14    These acts constituted false health care claims in violation of RCW 48.80.030 and

3  9A.08.020.

**Predicate Acts**
**Money Laundering, RCW 9A.83.020(1)(a)&(b), RCW 9A.83.020(5), and RCW 9A.08.020**

4

5    7.15    As set forth herein above: Defendants conducted or attempted to conduct financial

6  transactions (to wit, receiving and depositing health care payments) involving the proceeds of

7  specified unlawful activity (to wit, a scheme to submit false health care claims, in violation of

8  RCW 48.80.030; theft by deception under RCW 9A.56.030 and 9A.56.040; the federal offenses

9  of scheming to commit or attempt to commit health care fraud under 18 U.S.C. § 1347;[30] false

10  claims under 18 U.S.C. § 287; for presenting a "false, fictitious, or fraudulent" claim;[31] and money

11  laundering offenses for conducting transactions in criminally derived property under 18 U.S.C. §

12  1957(a)[32] and promotional money laundering under 18 U.S.C. § 1956(a)(1)(A)(i)[33] involving a

13  Federal health care offense as defined under 18 U.S.C. § 1956(7)(F) and 18 U.S.C. § 24(a), both

14

15

16  [30] The elements of a health care fraud claim are that the defendant: "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to

17  defraud." _United States v. Anderson_, 67 F.4th 755, 770 (6th Cir. 2023) (quoting _United States v. Semrau_, 693 F.3d 510, 524 (6th Cir. 2012), _cert. denied_, 144 S. Ct. 552, 217 L. Ed. 2d 294 (2024). The defendant "need not have actual knowledge of this section or specific intent to commit a violation of this section." 18 U.S.C. § 1347(b).

18  [31] The elements of a false claims are: "(1) presenting a claim against the United States, and (2) knowing such claim to be false." _United States v. Causey_, 835 F.2d 1289, 1292 (9th Cir. 1987). Whether materiality is an element of a section 287 offense is unresolved in this Circuit, _U.S. v. St. Luke's Subacute Care Hosp., Inc._, 178 Fed. Appx. 711,

19  713 (9th Cir. 2006) (citing _United States v. Taylor_, 66 F.3d 254, 255 (9th Cir. 1995)), and Plaintiffs submit not. _See, e.g., United States v. Saybolt_, 577 F.3d 195, 199-200 (3rd Cir. 2009) (materiality unnecessary).

20  [32] The elements of a violation of 18 U.S.C. § 1957 are that a defendant (1) knowingly engaged or attempted to

21  engage in a monetary transaction; (2) knew the transaction involved criminally derived property; (3) that had a value greater than $10,000; and (4) was, in fact, derived from a specified unlawful activity. United States v. Rogers, 321 F.3d 1226, 1229 (9th Cir. 2003); 9th Cir. Model Criminal Jury Instruction 8.150.

22  [33] The elements of promotional money laundering via 18 U.S.C. §1956(a)(1)(A) are that a defendant (1) "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity,"  (2)

23  "conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity," (3) "with the intent to promote the carrying on of specified unlawful activity." _United States v._

24  _Wilkes_, 662 F.3d 524, 548 (9th Cir. 2011) (quoting _United States v. Cedeno-Perez_, 579 F.3d 54, 57 (1st Cir. 2009)).

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 101 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  as principals and as aiders and abettors under 18 U.S.C. § 2 and RCW 9A.08.020, knowing the

2  property was proceeds of that specified unlawful activity and intending to promote the carrying on

3  of specified unlawful activity.  The health care fraud specified unlawful activity (18 U.S.C. § 1347)

4  consisted of hundreds of health care claims and therefore separate offenses by Defendants.  *United*

5  *States v. Awad*, 551 F.3d 930, 937-938 (9th Cir. 2009) (each claim "chargeable as a separate

6  count").  Each federal felony falls within Washington's money laundering statute's definition of

7  specified unlawful activity under RCW 9A.83.010(7).[34]  Further, the use of these unlawful

8  proceeds to purchase real estate violates RCW 9A.82.080(1), as does the investment of these

9  proceeds in the operation of the enterprises, including through medical staff compensation.  In

10  addition, Defendants knew that the transactions with Plaintiffs' health care payors (*i.e.*, Medicare)

11  were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or

12  control of the proceeds of specified unlawful activity, and acted recklessly as to whether the

13  property was proceeds of specified unlawful activity, in violation of RCW 9A.83.020(1)(b).

14     7.16    In particular, the government and private health care insurers to which Defendants

15  presented, or caused to be presented, false health care claims constitute health care benefit

16  programs pursuant to 18 U.S.C. § 24(b). Defendants knowingly and willfully executed or

17  attempted to execute a scheme or artifice to defraud these health care benefit programs, including

18  but not limited to Medicare, to obtain, by means of false or fraudulent pretenses or representations

19  money or property owned by, or under the custody or control of a health care benefit program in

20  connection with the delivery of, or payment for, health care benefits, items, or services, in violation

21  of 18 U.S.C. § 1347, 18 U.S.C. § 2, and RCW 9A.08.020.  Actual knowledge is not required, *id.*,

---

[34] Under Washington's money laundering statute, "Proceedings under this chapter shall be in addition to any other criminal penalties, civil penalties, or forfeitures authorized under state law."  RCW 9A.83.020(6).

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 102 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  and Defendants' affirmative acts of concealment establish their knowledge.  Further, deliberate

2  ignorance is sufficient because the known and warned circumstances of the voluminous sustained

3  claim submissions in the late 90% percentiles nationally generating more than a third of

4  Providence's SMMC profits would have put any reasonable person on notice that there was a high

5  probability that the conduct was illegal. The Defendants' subsequent investment and use of these

6  unlawful proceeds of health care fraud violates RCW 9A.83.020 and RCW 9A.08.020 and 18

7  U.S.C. § 1957(a).

8      7.17    These acts constitute money laundering in violation of RCW 9A.83.020(1)(a)&(b),

9  RCW 9A.08.020, and 18 U.S.C. §§ 1957(a) & 2, with remedies see e.g., RCW 9A.83.020(5).

10                              **Predicate Acts**
                **Theft by Deception, RCW 9A.56.030 & 9A.56.040 & 9A.08.020**

11
12      7.18    As set forth herein above: Defendants, used a common scheme and plan knowingly

13  to defraud patient class members, the health insurance programs and/or governmental insurance

    entities (*e.g.*, Medicare/Medicaid), to wrongfully obtain property (including financial payments of

14  false health care claims) by knowingly misrepresenting information about the health care provided,

15  the medical necessity of it, and/or other improper issues, with the intent to deprive them of that

16  property. Through a common scheme and plan of false pretenses and material omissions,

17  Defendants intended to, and did, deprive plaintiffs of their property, including payments of money

18  and earned entitlement to health care insurance benefits.

19      7.19    The property or services described herein exceed $750 in value.

20      7.20    These acts constituted theft in the first or second degree, in violation of RCW

21  9A.56.030 & 9A.56.040 & 9A.08.020.

22                      **Pattern of Related Profiteering Acts**

23      7.21    Defendants engaged in a pattern of related criminal profiteering offenses, as

24

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1   described in this claim, repeatedly and continuously during the relevant time period, including

2   three or more acts of profiteering violations of RCW 9A.56.030, RCW 48.80.030, and

3   9A.83.020(1)(a) & (b), and RCW 9A.08.020.

4          7.22   The multiple acts of profiteering activity had the same or similar intents, results,

5   accomplices, victims, and methods of commission. Alternatively, they are otherwise interrelated

6   by distinguishing characteristics, and these characteristics include a nexus to the same enterprises

7   alleged herein of Providence, Providence St. Joseph Health care insurance payors, and/or

8   governmental insurance entities. None of the acts of profiteering are isolated incidents.

9          7.23   The last such criminal profiteering activity occurred within five years after the prior

10  incident of profiteering activity.

11         7.24   The criminal profiteering acts had similar purposes: *e.g.*, financial gain to the

12  Defendants.

13         7.25   Each of the Defendants' criminal profiteering acts yielded similar results and

14  caused similar injuries to the Plaintiffs to their person, property and/or business, including damage

15  to their physical being and their finances (both as, *inter alia,* to medical expenses and as to lost

16  wages).

17         7.26   Because of Defendants' failures to disclose and affirmative acts of concealment,

18  the pattern of criminal profiteering activity was not discoverable until April 12, 2022, when the

19  U.S. Attorney publicly announced its investigative findings regarding Providence, Dr. Dreyer and

20  Dr. Elskens about the misconduct undertaken in combination to commit the profiteering alleged

21  herein.

22                                    **The Enterprise**

23         7.27   Although an enterprise is not a necessary element of a claim under either RCW

24

1  9A.82.100 **or** RCW 9A82.080, to the extent applicable**,** Plaintiffs allege the following enterprises.

2  An enterprise "includes any individual, sole proprietorship, partnership, corporation, business

3  trust, or other profit or nonprofit legal entity, and includes any … group of individuals associated

4  in fact although not a legal entity, and both illicit and licit enterprises and governmental and

5  nongovernmental entities." RCW 9A.82.010(8

6      7.28    Enterprises consist of ongoing organizations, formal or informal, with various

7  associates function as a continuing unit. *See Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wn. 2d 820, 839,

8  355 P.3d 1100 (2015).

9      7.29    The enterprises used in, and with a nexus to, the pattern of criminal profiteering

10  activity under RCW 9A.82.100 include health care insurance providers for the plaintiff Class(es),

11  including government health care insurers (*i.e.,* "governmental" entities U.S. Department of Health

12  and Human Services (HHS); the Defense Health Agency (DHA), acting on behalf of the TRICARE

13  Program; the Federal Health Benefits Program; the U.S. Department of Veterans Affairs (VA)

14  which administers the VA Community Program, and the Washington Health Care Authority

15  (HCA)) and private insurers whose payments promoted the medically unnecessary surgeries and

16  related health care.

17      7.30    In the alternative, the enterprise used in, and with a nexus to, the pattern of criminal

18  profiteering under RCW 9A.82.100 is Providence, or Providence St. Joseph Health, or the

19  association-in-fact of both.   Both Providence and Providence St. Joseph Health are legal

20  corporations or legal entities, making them enterprises under RCW 9A.82.010(8).   Their

21  association-in-fact had a common purpose of engaging in the aforesaid course of conduct, through

22  an ongoing organization, and with associates functioning as continuing unit.   For example,

23  Providence and Providence St. Joseph Health share offices and have functioned as a continuing

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 105 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  unit for years up through the disclosures of April 2022.  Further, Providence is a participating

2  provider in the government and private health care insurer enterprises.

3      7.31    Independent motives and stakes of Dr. Dreyer are sufficient to form the basis of an

4  independent conspirator.

5      7.32    Independent motives and stakes of JANE DOES and JOHN DOES, including in

6  respect to concealment and failing to report, are sufficient to form the basis of an independent

7  conspirator.

8      7.33    Each of these aforementioned enterprises is a legal entity, that is, a partnership,

9  corporation, business trust, or other profit or nonprofit legal entity, governmental and

10  nongovernmental entities, or an association or group of individuals associated in fact although not

11  a legal entity within the meaning of RCW 9A.82.010(8).  Each alleged enterprise is an ongoing

12  organization, formal or informal, with various associates functioning as a continuing unit.

13                        **Causation / Injury and Remedies**

14      7.34    As a direct and proximate result of Defendants' acts or omissions discussed herein,

15  Plaintiff Class(es) and individual Plaintiffs have suffered injuries to their person, business, or

16  property including but not limited to economic loss, pain, suffering, emotional distress, and injury

17  to their physical being, including injuries compensable under RCW 9A.82.080 and 9A.82.100 and

18  9A.08.020. These injuries include damages from the investment of proceeds in, or for the

19  maintenance, establishment, or operation of the enterprise under RCW 9A.82.080.

20      7.35    Plaintiffs are entitled to an award of damages including but not limited to:

21  compensation for their actual damages; treble damages; a civil penalty of $250,000; injunctive,

22  equitable, disgorgement, and forfeiture relief as set forth in RCW 9A.82.100(2), (3) and (4), and

23  (4)(f); and costs and investigative and attorneys' fees as authorized by RCW 9A.82.100(1)(a).

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 106 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    7.36    The equitable relief includes, but is not limited to, disgorgement of ill-gotten gains

2  obtained from the profiteering in order to prevent, restrain, and deter future unlawful conduct by

3  the Defendants,[35] including by use of the bonus incentive compensation scheme.

4  **VIII.  CAUSE OF ACTION: NEGLIGENCE, NEGLIGENT MISREPRESENTATION**

5    8.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and

6  incorporate by reference paragraphs 1.1 through 7.36 as if fully set forth herein.

7    8.2    Defendants had common law and statutory duties of care to the Plaintiffs pursuant

8  to RCW 70.41.210, Restatement 2d Torts § 302, and Restatement 2d Torts § 311. In addition,

9  Defendants had fiduciary duties of care, candor, and loyalty, which include the duty disclose

10  material facts to their patients.

11    8.3    Pursuant to RCW 70.41.210, Providence, through its employees and agents,

12  including Dr. Elskens, Dr. Dreyer, and JOHN DOE / JANE DOE Defendants, had a mandatory

13  duty, *inter alia*, to report within 15 days to the Washington Department of Health any voluntary

14  restriction or termination of the practice of Dr. Elskens or Dr. Dreyer– "including [their] voluntary

15  resignation" – while they were under investigation or the subject of a proceeding by Providence

16  regarding unprofessional conduct, or in return for Providence not conducting such an investigation

17  or proceeding, or not taking action against said physicians.

18    8.4    Unprofessional conduct includes (a) incompetence, negligence or malpractice

19  which results in injury or which creates an unreasonable risk that a patient may be harmed; (b)

20  practice beyond the scope of practice as defined by law or rule; (c) misrepresentation or fraud in

21

22 ───────────────

23  [35] *See e.g., Creel v. Says, 2022 WL 4490141 (E.D. Tex. Sept. 27, 2022)* (the law does not allow a person to profit
from wrongdoing at the expense of another, and disgorgement can be a proper equitable remedy under RICO laws

24  to, *inter alia*, prevent, restrain and deter future unlawful conduct).

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 107 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  any aspect of the conduct of the business or profession; (d) the commission of any act involving

2  moral turpitude, dishonesty or corruption relating to the medical profession; or (e ) promotion for

3  personal gain of any unnecessary or inefficacious drug, device, treatment, procedure or service.

4  RCW 18.130.180(1), (4), (12), (13), (16).

5      8.5    As set forth in the preceding paragraphs, Providence and its employees and agents,

6  including JOHN DOE / JANE DOE Defendants, allowed Dr. Elskens and Dr. Dreyer to resign

7  after initiating investigations into their unprofessional conduct as defined herein and did not report

8  them to the DOH as required by RCW 70.41.210.

9      8.6    Reporting is encouraged by public policy. RCW 70.41.210(5) provides civil

10  immunity to a hospital, its chief administrator, or its executive officer who file a good faith report

11  with the DOH.

12      8.7    Providence and its agents/employees also failed to report Dr. Elskens and Dr.

13  Dreyer to the NPDB. As a result of the failure to report, these surgeons continued to conduct

14  unnecessary, improper, and defective procedures for profit while harming multiple patients, and

15  defrauding patients and insurance companies, including Medicare and Medicaid.

16      8.8    The purpose of, *inter alia*, this mandatory reporting is to "promote safe and

17  adequate care of individuals in hospitals" and to enforce minimum standards and rules "for the

18  safe and adequate care of patients." RCW 70.41.010, .030.

19      8.9    Plaintiffs, who are/were individuals receiving care at Providence SMMC and at

20  MultiCare, were within the class of individuals for whose special benefit this mandatory reporting

21  statute was enacted – *e.g.*, for their safe and adequate care.

22      8.10   Given the above and the allegations contained herein, Providence owed an implied

23  statutory duty of care and a common law duty of care to each Plaintiff in the Class(es) to report

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 108 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  Dr. Elskens and Dr. Dreyer.

2      8.11    Pursuant to § 302 of the Restatement (Second) of Torts, Defendants had a duty of

3  care to the Providence and MultiCare patients of the Doctors because they realized, or should have

4  realized that their conduct involved an unreasonably high risk of harm to which they exposed these

5  patients through the Doctors' conduct intended to cause harm, including by concealing and failing

6  to report the "safety pause" placed upon Dr. Dreyer's surgeries, and Providence's threat to report

7  Dr. Elskens unless compensated.

8      8.12    Pursuant to § 311 of the Restatement (Second) of Torts, Defendants negligently

9  misrepresented to third parties, including MultiCare and Dr. Sandquist, false information causing

10  Plaintiffs to be exposed to physical harm, including by MultiCare's reliance upon this information,

11  causing harm to Plaintiffs.[36]

12      8.13    Defendants breached this implied statutory duty and common law duties when they

13  failed to report Dr. Elskens or Dr. Dreyer to the DOH and the NPDB, and actively concealed Dr.

14  Dreyer's "safety pause," and withheld Dr. Elskens' reportable conduct in exchange for

15  compensation.

16      8.14    As a direct and proximate result of Defendants' breach of the duties owed, the

17  Doctors continued to conduct medically unnecessary or otherwise improper procedures for profit

18  while harming patients and defrauding patients and insurance companies, including Medicare and

19  Medicaid; and each Plaintiff was permanently injured, suffered, and continues to suffer physical

20  disability and pain, medical expenses, and other damages to be fully determined at trial.

21      8.15    It was reasonably foreseeable that Defendants' breach of the duties owed would

22

23  _____

24  [36] Restatement (Second) of Torts, § 311, has been considered in Washington State, but was not adopted under the facts of that case. *See Richland Sch. Dist. v. Mabton Sch. Dist.,* 111 Wn. App. 377, 45 P.3d 580 (2002).

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 109 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    result in the damages described herein.

2        **IX.    CAUSE OF ACTION: CONSUMER PROTECTION ACT (RCW 19.86)**

3        9.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and

4    incorporate by reference paragraphs 1.1 through 8.15 as if fully set forth herein.

5        9.2    As set forth herein above, Defendants used false or deceiving marketing practices

6    and otherwise engaged in unfair or deceptive acts or practices to entice Plaintiffs to engage in their

7    services. This constitutes an unfair or deceptive act or practice under RCW 19.86.

8        9.3    These acts or omissions of Defendants occurred in furtherance of trade or

9    commerce.

10        9.4    The unfair or deceptive act or practice of Defendants as set forth herein above

11    constitute fraud which affects the public interest and violates the Washington Consumer Protection

12    Act.

13        9.5    As a direct and proximate result of Defendants' violations of the Act, as set forth

14    herein above, Plaintiffs suffered damages.

15        9.6    Defendants are now liable for those damages in an amount fully set forth at trial,

16    but include damages to property and business, the trebling of same, and reasonable attorney fees

17    and costs.

18    **X.    CAUSE OF ACTION: MEDICAL NEGLIGENCE (RCW 7.70) vs. PROVIDENCE, Dr. JASON A. DREYER, DO AND Dr. DANIEL ELSKENS, DO**

19        **(Providence Plaintiffs, Named and Putative)**

20        10.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and

21    incorporate by reference paragraphs 1.1 through 9.6 as if fully set forth herein.

22

23

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 110 OF 122

GILBERT LAW FIRM, P.S.
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

10.2    As health care providers, Providence, Dr. Dreyer and DR. Elskens owed Plaintiffs a duty to comply with the standard of care.

10.3    Defendant Providence, through its employees and agents, including Dr. Dreyer and DR. Elskens failed to exercise the degree of care, skill, and learning expected of reasonably prudent health care providers in the same profession or class in the State of Washington acting in the same or similar circumstances. Such conduct proximately caused severe injuries and damages to plaintiffs. Defendant's conduct violated RCW 4.24, 13 RCW 7.70, and other applicable law.

10.4    The statute of limitations in respect to the medical negligence claims will be tolled on certain patients as a result of the Continuing Course of Treatment Doctrine; and Discovery Rule.

**XI.    CONSENT/INFORMED CONSENT (Providence Patients, Named and Putative)**

11.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference paragraphs 1.1 through 10.4 as if fully set forth herein.

11.2    As set forth herein above, despite fraudulent reporting otherwise, Defendants breached their duty to inform plaintiffs of all material facts, including risks and alternatives, which a reasonably prudent patient would need to make an informed decision on whether to consent to or reject proposed courses of treatment, including but not limited to the risk of medically unnecessary procedures for which the motive was financial gain and not proper medical treatment. This failure proximately caused injury to plaintiffs.

**XII.    CORPORATE NEGLIGENCE (Providence Plaintiffs, Named and Putative)**

12.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference paragraphs 1.1 through 11.2 as if fully set forth herein.

12.2    A medical facility, in this case, Providence, has the following duties: (1) a duty to

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians and staff; (3) a duty to oversee all persons who treat patients within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

12.3     PROVIDENCE breached the afore listed duties by, without limitation:

12.3.1  failing to select, retain, and supervise competent staff;

12.3.2   failing to ensure of proper oversight of staff;

12.3.3   failing to assure proper diagnosis and care;

12.3.4  failing to formulate, adopt and enforce adequate rules, policies and/or adopting policing or practices which in themselves created an unnecessary and unreasonable risk to Plaintiff(s);

12.3.5   failing to conduct an adequate credentialing background investigation pursuant to best practice guidelines before hiring Dr. Dreyer and DR. Elskens and giving them privileges to see patients and perform surgeries at Providence facilities.

12.4     Providence's breach of corporate duties as set forth above directly and proximately led to injuries and damages to the Plaintiffs.

12.5     Providence is now liable for the injuries and harm suffered by Plaintiffs as a result of its Corporate Negligence.

12.6     Providence is liable for the injuries and harm suffered by Plaintiffs as a result of its Corporate Negligence.

## XIII.   DISCOVERY RULE

13.1     Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference paragraphs 1.1 through 12.6 as if fully set forth herein.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 112 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

13.2    The Discovery Rule regarding statute of limitations applies to individual plaintiffs. *See Pickett v. Holland Am. Line-West*ours, 145 Wn. 2d 178, 188, 35 P.3d (2001). For the claims under the criminal profiteering statute, discovery of the pattern of criminal profiteering activity could not reasonably have occurred until the public revelation of the settlement agreement in April 2022. For all claims, discovery was prevented due to intentional concealment and/or fraud and/or the continuing care doctrine until the public revelation of the settlement agreement in April 2022.

13.3    Here, through their acts and omissions, Defendants deprived plaintiffs of the opportunity to discover the factual bases for these causes of action until April 12, 2022.

## XIV.   BREACH OF FIDUCIARY DUTY / FRAUD / MISREPRESENTATION (Against Defendants By Patients, Named and Putative)

14.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference paragraphs 1.1 through 13.3 as if fully set forth herein.

14.2    Defendants owed a fiduciary duty to their patients based upon their position of trust, confidence, greater expertise, duty of candor, and dependence. Specifically, Defendants had a fiduciary relationship to the patient class members that gave rise to a duty of care, candor, and loyalty to them requiring Defendants to exercise the utmost good faith in dealing with class members, including to fulfill their duty of loyalty to their patients. As a result of this fiduciary duty, Plaintiffs had a right to rely upon Defendants to perform their duties, and this eliminates any burden to establish individual reliance. *Walden v. Bank of New York*, 2024 WL 1556937. *14 (W.D. Pa. April 10, 2024) (fiduciary duty establishes reliance "as a matter of law"); *Wolfe v. Allstate*, 2011 WL 13160292, *3 (M.D. Pa. Jan. 10, 2011); *Seplow v. Closing Pro, Inc.*, 717 F.Supp.3d 427, 437 (E.D. Pa. 2024); *Katlin v. Tremologlie*, 1999 WL 1577980 (Pa. Comm., June 29, 1999). Alternatively, it creates a presumption of reliance or justified a common sense inference of reliance, especially given that Defendants violated this duty by failing to disclose their scheme

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  to profit from false claims. *Waldrup v. Countrywide Financial Corporation,* 2018 WL 799156

2  (C.D. Cal. Feb. 6, 2018); *In re Morning Song Bird Food Litigation*, 320 F.R.D. 540,555 (S.D. Cal.

3  2017).

4      14.3    As set forth herein above, Defendants engaged in acts or omissions breaching these

5  fiduciary duties, which directly and proximately caused damages to Plaintiffs.  The patients relied

6  upon Defendants' fiduciary duties in following their advice on the need for medical treatment.

7      14.4    Defendants have statutory and common law duties to inform patients of risks of

8  medical care, and all information needed for patients to make informed healthcare decisions.

9      14.5    Defendants were required to inform patients about the substantially increased risk

10  of treatment by Dr. Dreyer and Dr. Elskens due to their history of performing medically

11  unnecessary and otherwise improper procedures, their submission of false claims to insurers, and

12  the financial incentives created by Providence to promote false claims.  Instead, Defendant

13  Providence failed to respond to the continuing warnings about Dr. Dreyer since 2013, including

14  but not limited to its discovery of a breach of sacred trust from its alleged 2017 "thorough

15  investigation" of the Doctors which allegedly led it to terminate them in 2017 and 2018 without

16  disclosure to either patients or federal and state authorities as required by law.

17      14.6    Without this information, Plaintiffs were deprived of material facts to inform their

18  treatment decisions.

19      14.7    Defendants knew that in withholding material facts, they were affirmatively

20  misrepresenting information to Plaintiffs.

21      14.8    Defendants intended for Plaintiffs to rely on Defendants, and Defendants'

22  concealments, to make informed healthcare decisions.

23      14.9    Upon information and belief, Defendants were further engaging in false or

24

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  misleading reporting in medical reports in an effort to conceal evidence of negligent, violative,

2  unethical, and fraudulent treatment practices.

3      14.10    Plaintiffs did not know Defendants were concealing material facts and had the right

4  to and did reasonably rely on Defendants to meet its statutory and common law duty to inform

5  them of material facts. Defendants' failure to inform Plaintiffs, in the face of a legal duty to do so,

6  constitutes fraud by concealment, as specifically identified herein.

7      14.11    Plaintiffs suffered damages as a result of a reasonable reliance on Defendants' fraud

8  and misrepresentation.

9  **XV.    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS and OUTRAGE**

10      15.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and

11  incorporate by reference paragraphs 1.1 through 14.11 as if fully set forth herein.

12      15.2    Defendants owed Plaintiffs a common law duty not to engage in conduct that would

13  cause the Plaintiffs severe emotional distress.

14      15.3    By misleading Plaintiffs, concealing evidence of negligent, violative, unethical, and

15  fraudulent treatment practices, performing unnecessary and ill-advised medical procedures, and

16  operating below the standard of care, Defendants negligently inflicted emotional distress upon

17  Plaintiffs.

18      15.4    Additionally, Defendants' conduct as set forth herein constituted extreme and

19  outrageous conduct that would shock the conscious of an ordinary, reasonable person; which

20  outrageous conduct resulted in Plaintiffs' suffering severe emotional distress.

21  **XVI.    LOSS OF CONSORTIUM**

22      16.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and

23  incorporate by reference paragraphs 1.1 through 15.4 as if fully set forth herein.

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 115 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

16.2    As a direct and proximate result of Defendants negligent and intentional acts or omissions as set forth herein, Plaintiffs' statutorily qualified family members suffered loss of consortium, and special damages if available.

## XVII.  WRONGFUL DEATH/SURVIVOR ACTIONS

17.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference paragraphs 1.1 through 16.2 as if fully set forth herein.

17.2    Defendants' negligent and intentional acts or omissions as set forth herein resulted in, and/or contributed to the injury and ultimate death of certain claimants, resulting in damages/loss to their estate and to statutorily qualified family members, both individually and/or in their capacity as personal representative of the estate(s).

17.3    Defendants are liable for those negligent acts or omissions pursuant to Wash. Rev. Code § 4.20.005 (wrongful death and survivor statutes).

## XVIII. VICARIOUS LIABILITY

18.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference paragraphs 1.1 through 17.3 as if fully set forth herein.

18.2    Upon information and belief, employees and agents of the defendants, implicated in this cause of action were at all times relevant to this cause of action acting within their official capacity and scope of employment with and for Providence.

18.3    Upon information and belief, physicians, employees, or agents alleged to have been negligent in the treatment/care of Plaintiff(s) in this case were either employees, agents in fact, or alternatively, ostensible agents.[37]

---

[37] *Adamski v. Tacoma General Hospital*, 20 Wn. App. 98, 112, 579 P.2d 970 (1978) (hospitals are liable for the doctors who work at them).

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

18.4    Providence is liable for injuries/damage suffered by Plaintiff(s) as a result of the intentional and negligent acts or omissions of their employees, owners, managers, agents, or ostensible agents under the theory of *Respondeat Superior*.

## XIX.    NEGLIGENCE PER SE

19.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference paragraphs 1.1 through 18.4 as if fully set forth herein.

19.2    Certain of the acts of the Defendants set forth herein amount to regulatory and statutory violations. The violation of regulations and statutes constitutes negligence per se.[38]

## XX.    RES IPSA LOQUITUR

20.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and incorporate by reference paragraphs 1.1 through 19.2 as if fully set forth herein.

20.2    Defendants had exclusive control over the actions and omissions which constituted the sum total of the care provided to Plaintiffs during their pre-surgical, surgical, and post-surgical care.

20.3    Defendants had exclusive control over the actions and omissions which ultimately resulted in the defrauding of Plaintiffs and their medical insurance providers, including Medicare and Medicaid.

20.4    Defendants acted intentionally to conceal the fraud in respect to regulatory reporting, billing, and patient medical records as set forth herein above.

20.5    As a result of this concealment and fraud, Plaintiffs had no ability to take action on

---

[38] Restatement (Third) of Torts §14 states in relevant part that an actor is negligent per se if that actor violates a statute that is designed to protect against the type of accident or harm caused by the actor's conduct, and the plaintiff is someone the statute is designed to protect.

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 117 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    their own behalf to avert the injuries and damages cause by the Defendants negligent and

2    intentional acts or omissions which caused Plaintiffs to suffer injuries and damages.

3        20.6    The injuries and damages sustained by the Plaintiffs here do not occur in the

4    absence of negligence or intentional actions in variance with statute and regulatory authority

5    undertaken by the medical care team.

6        20.7    Defendants are now liable for the damages Plaintiff has suffered as a result of their

7    negligence pursuant to the doctrine of *Res Ipsa Loquitur.*

8    **XXI.   UNJUST ENRICHMENT (Providence Plaintiffs, Named and Putative)**

9        21.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and

10   incorporate by reference paragraphs 1.1 through 20.7 as if fully set forth herein.

11       21.2    With each and every payment received as described herein, each Defendant

12   received a benefit at a Plaintiff's expense, and the circumstances make it unjust for the Defendant

13   to retain the benefit without payment.

14       21.3    Defendants are liable for the damages to Plaintiff for unjust enrichment, including

15   restitution and disgorgement.

16   **XXII.  DISGORGEMENT**

17       22.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and

18   incorporate by reference paragraphs 1.1 through 21.3 as if fully set forth herein.

19       22.2    In violation of their common law, equitable, and statutory duties, *see e.g.,* RCW

20   9A.82 *et seq* and RCW 9A.83.020(5) as alleged herein, Defendants profited from their wrongful

21   conduct, and these profits must be disgorged in order to deter the continuation of this wrongful

22   conduct.

23       22.3    Defendants have obtained ill-gotten profits from their misconduct, including

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 118 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    payments from federal and state governments, and from health insurers and patients. These

2    payments are proximately caused by the aforesaid violations, and can be reasonably approximated.

3        22.4    Disgorgement of these ill-gotten profits is necessary to deter further violations.

4    ## XXIII. WAIVER OF PRIVILEGE

5        23.1    Plaintiffs, on behalf of themselves and those similarly situated, reallege and

6    incorporate by reference paragraphs 1.1 through 22.4 as if fully set forth herein.

7        23.2    Waiver of the physician-patient privilege under RCW 5.60.060(4)(b) does not

8    waive or release any other rights or privileges, including those related to the physician-patient

9    relationship, other than the privilege set out in the above-cited statute.

10    ## XXIV. PRAYER FOR RELIEF

11        WHEREFORE, Plaintiffs pray for judgment against Defendants in their favor and

12    in favor of the Class as follows:

13        24.1    Finding that this action is properly maintainable as a Class action pursuant to CR

14    23(b)(2), 23(b)(3) and 23(c)(4), and certifying each Class.

15        24.2    Finding the Plaintiffs are prevailing parties against each Defendant, jointly and

16    severally, for violations of RCW 9A.82.100 and RCW 9A.82.080 (Criminal Profiteering) in

17    connection with RCW 9A.08.020 and award Plaintiffs compensation equal to their actual damages,

18    a tripling of those damages, a civil penalty of $250,000, injunctive and remedial relief as set forth

19    in RCW 9A.82.100(2), (3), and (4), and forfeiture under RCW 9A.82.100(4)(f).

20        24.3    Awarding Plaintiffs reasonable investigative and attorneys' fees and costs under

21    RCW 9A.82.100(1)(a).

22        24.4    Finding the Plaintiffs are prevailing parties against each Defendant, jointly and

23    severally, for violations of RCW 19.86 (Consumer Protection Act) and award Plaintiffs damages

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 119 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1  as allowed under the Act, including a tripling of damages and reasonable attorney fees and costs.

2          24.5    Finding Plaintiffs to be the prevailing parties against each Defendant for violations

3  of common law and statutory duties of care under RCW 70.41.210, Restatement 2d Torts § 302,

4  and Restatement 2d Torts § 311, which resulted in general and special damages to be determined

5  at trial.

6          24.6    Finding Defendants were otherwise negligent in their acts as outlined above,

7  including for accomplice liability and for providing substantial assistance.

8          24.7    Finding Defendants' negligence resulted in injury to each Plaintiff.

9          24.8    Ordering Defendants to identify all Class Plaintiffs pursuant to their records.

10         24.9    For compensatory damages suffered by Plaintiffs and Class resulting from any and

11  all claims pled herein, in amounts to be proven at trial.

12         24.10   For unjust enrichment, Plaintiffs seek restitution and disgorgement.

13         24.11   For costs and disbursements.

14         24.12   For statutory attorney fees.

15         24.13   For private forfeiture relief, see RCW 9A.82.100(4)(f).

16         24.14   For a forfeiture money judgment in the amount of no less than $22,690,458.

17         24.15   For disgorgement of ill-gotten gains obtained as a result of Defendants' breach of

18  their duties to the Plaintiffs, including through criminal profiteering, breach of fiduciary or

19  statutory duty, or benefitting from unjust enrichment.

20         24.16   If Defendants bring any frivolous or unfounded defenses, for attorneys' fees and

21  costs pursuant to RCW 4.84.185 and/or Rule 11 of the Superior Court Civil Rules.

22         24.17   For statutory interest on the judgment from the date judgment is entered until paid

23  in full.

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH AMENDED)
NO. 22-CV-00915-JLR
PAGE 120 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1    24.18   For prejudgment interest on the special damages.

2    24.19   For prejudgment interest on liquidated damages.

3    24.20   All damages allowed under RCW 4.20.010, RCW 4.20.20, RCW 4.20.046, RCW

4    4.20.060, and RCW 4.24.010, as applicable.

5    24.21   By publishing a newspaper solicitation to the Doctors' patients to contact and

6    communicate with Providence about their surgical treatment by the Doctors, Providence

7    acknowledged the need for, and promoted the need for future medical treatment of the plaintiff

8    patients by Providence, creating the prospect of future patient injury from being subjected to the

9    same pattern of wRVU compensation scheme.  Furthermore, because Plaintiffs' future medical

10   care will rely upon the accuracy and thoroughness of the record of the Doctor's care of the patients,

11   they face the prospect of future injury from the false and misleading records generated by the

12   pattern and practices of the fraudulent scheme.  For entry of equitable nonmonetary remedies and

13   a permanent injunction, including but not limited to as authorized in RCW 9A.82.100(2), (3), (4)

14   and (4)(f):

15          24.21.1     enjoining   Defendants   from   utilizing   any   form   of

16                 productivity bonus metric scheme that encourages surgeons to engage in high

17                 volume patient care, or increased complex surgical procedures.

18          24.21.2     requiring Defendants to provide open public access to peer

19                 review materials and credentialling files for all surgeons.

20          24.21.3     requiring Defendants to disclose the names and contact

21                 information for putative members of all Classes and/or to assist Plaintiffs' counsel

22                 in identifying and notifying class members of their rights under this action;

23          24.21.4     divesting and disgorging Defendants of the proceeds of their

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 121 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. RIVERSIDE, AVE., SUITE 1400
SPOKANE, WA 99201
(509) 321-0750 • FAX (509) 343-3315

1     profiteering activity.

2          24.22   For such other and further relief as the Court may deem just and equitable.

3          24.23   The Plaintiffs reserve the right to elect remedies if there is a determination of a

4     conflict between claims or remedies.

5                        **XXV.     DEMAND FOR JURY TRIAL**

6          Plaintiffs hereby demand that all causes of action pled herein be tried to a 12-person jury

7     with sufficient alternates to assure complete justice without interference or delay.

8          DATED THIS 15th day of November, 2024.

9                              GILBERT LAW FIRM, P.S.

10

11          _____

12          William A. Gilbert, WSBA #30592
            Beth M. Bollinger, WSBA #26645
            Ashley Richards, WSBA #33047

13

14          LANKFORD & REED, P.L.L.C

15

16          _____
            TERRANCE G. REED, *Pro Hac Vice*

17          Attorneys for Plaintiffs

18

19

20

21

22

23

24

PLAINTIFFS' CLASS ACTION COMPLAINT (FIFTH
AMENDED)
NO. 22-CV-00915-JLR
PAGE 122 OF 122

**GILBERT LAW FIRM, P.S.**
421 W. Riverside, Ave., Suite 1400
Spokane, WA 99201
(509) 321-0750 • FAX (509) 343-3315