## EXHIBIT 9 - COMMONALITIES

Plaintiffs herein identify and allege the following facts relevant to the pattern, practice, and conduct common to the plaintiffs and the Defendants' common course of conduct, and upon which they commonly rely to establish the claims and the remedies sought herein.

## I.    COMMON ISSUES SUSCEPTIBLE TO CLASS-WIDE PROOF

The common proof of the unlawful course of conduct for each Defendant includes, but is not limited to:

a.  Whether Defendants committed profiteering, deceptive consumer practices, fiduciary violations, or the other torts alleged herein, in a course of common conduct causing injury to Plaintiffs for which Washington common and statutory law provide remedies.

b.  Whether Providence is liable for the Doctors' false claims because they were committed by the conduct of another person for which Providence was legally accountable, including as an accomplice, or for providing substantial assistance. See RCW 9A.08.020.

c.  Whether Providence performed, or failed to perform, on an ongoing basis, a proper background, credentialing, privileging, supervision and performance review of the Doctors.

d.  Whether Providence failed to take any timely action to supervise, prevent, or discipline the Doctor's misconduct, including by filing false health care claims to promote and to conceal such misconduct, and by failing to create or to maintain any system to detect and prevent such false claims.

e.  Whether Plaintiffs' and Class Members' increased risk of exposure to a medically unnecessary or otherwise improper surgery, or an associated false claim billing, was caused either by Providence's negligence or by Providence's deliberate action.

f.  Whether Defendants' scheme to commit and conceal the presentation of false health care claims to health benefit program insurers constitutes health care fraud, or false claims violations.

g.  Whether Providence used appropriate practices under the standard of care to hire the Doctors and their affiliated supervisors and subordinates, and to monitor and supervise the Doctors' activity, including their use, dependence upon, and misuse of their mutually beneficial wRVU incentive bonuses.

h.  Whether Providence timely detected the Doctors' misconduct in conducting high numbers of medically unnecessary or otherwise improper surgeries and the danger that they posed to persons at the hospital, and/or whether Providence knew, or should have known, of that danger and continued to incentivize the behavior despite professionally known and obvious risks to patients.

i.  Whether Providence intended the unlawful consequences of the Doctors' actions, and implemented them for its financial gain.

j.  The adequacy and appropriateness of Providence's response to the Doctors' patients pre-exposure and post-exposure to the Doctors' surgeries.

k.  The nature and extent of the legal claims and legal or equitable remedies available to Plaintiffs and to Class Members as a result of the patient endangerment into which all Defendants' conduct placed them, as subsequently confirmed by the Providence settlement and newspaper advertisement.

l.  Whether Providence acted in concert with the Doctors, both by incentivizing their misconduct and by rewarding them for their continuing concealment of it, including under Washington aiding and abetting common law and under RCW 9A.08.020(a)(1), (2) & (3).

m. Whether Providence violated its detailed institutional responsibilities, including those of its Governing Board, when hiring, credentialing, privileging, and supervising physicians such as the Doctors, along with concomitant standards of care associated with those responsibilities.

n. Whether the Providence Governing Board tasked with oversight of the Doctors performed below the standard of care in hiring, credentialing, privileging, and/or supervising the Doctors as well as in the process used for releasing the Doctors, that is, allowing them to resign and not reporting them to authorities.

o. In addition to the above, certain common facts help determine whether Providence performed, or failed to perform, a proper background, credentialing, privileging, supervision and performance review of the Doctors (and reasonable inferences to draw in light of those facts), including **as some examples:**

- the bases for which credentialing and re-credentialing occurred;
- the bases for which privileging and re-privileging occurred;
- the training for those given the job of oversight of the Doctors, including the training of the Governing Board members as to their oversight of the individuals' recommendations about the Doctors;
- compliance with federal and state regulations and practice standards;
- reports showing alleged compliance with standards and regulations and the accuracy or inaccuracy of those reports;
- the processes in place to ensure such compliance and whether those processes failed to meet the required standard of care or whether the processes were adequate but Providence failed to adhere to them;
- the function of Providence's billing department, including its internal and external audit and oversight processes and whether they failed to meet the required standard of care or whether the processes were adequate by Providence failed to adhere to them;
- Providence's response, or lack thereof, to reports from any source (billing, employees, patients, other professionals, etc.) fell below the standard of care;
- Providence's failure to reimburse insurers wrongfully-paid funds;
- Providence's systems that failed and/or did not result in the removal of the Doctors despite the financial scheme alleged herein;

3

- Providence response (or lack thereof) to the Doctors' uniquely high earnings and the high number of surgeries and/or procedures; and
- whether the checks and balances system in place at Providence was appropriate, given the wRVU system in place, to ensure that a medical provider (here, the Doctors) is not transgressing the standard of care or reducing the quality of care.

p.  Actions taken by the Washington Department of Health against Providence for failing to comply with its mandatory reporting requirements, including the DOH's investigation in 2022 into whether those reporting requirements were violated.

q.  Actions or inactions taken by Providence when receiving inquiries regarding Dr. Dreyer from other prospective employers, including MultiCare Health Systems in Spokane, Washington.

r.  Whether Providence's actions and concealments, including by its Governing Board, resulted in an entire class of patients in Spokane, Washington (i.e., the MultiCare patients) having improper surgeries – that is, surgeries by Dreyer that never should have occurred.

s.  All of the plaintiff patient services were coded by Defendants and assigned RVU numbers for billing purposes, for reimbursement purposes, and for doctor compensation purposes.

t.  Each patient medical service generated coding for the services, an RVU claim by Providence and by the doctors submitted to government or private insurers, for which a bill was prepared and submitted as a claim, with an accompanying certification of necessity, and a reimbursement payment, followed by reinvestment of these proceeds into Providence's operations and real estate.

u.  All these bills were submitted as claims to federal, state, or private health insurers for reimbursement, each of which required certifications as to their truth, the medical necessity of each service, and their compliance with medical standards.

v.   Each of these common claim steps were part of the pattern of criminal profiteering through false claims, and they fall squarely within the entrepreneurial aspects of patient care.

w.   Each of these common claim steps was caused by Providence's RVU compensation plan designed, supervised, implemented by Providence for its profit.

x.   Each new false claim was created and submitted not only to generate unlawful proceeds by it, but also to conceal and to promote the other false claims in the ongoing pattern of profiteering activity.  Because Providence was the largest financial beneficiary of this pattern of RVU misconduct, it had the greatest incentive to prevent detection of this pattern of claim misconduct.

y.   Each false claim submitted reinforced the financial motivation of Providence to conceal the existence of, and its knowledge of, any false claim by the Doctors.

z.   Aware of this, the Doctors insisted upon full accountings of their claimed RVUs under facts and circumstances that are common to all, including evidence that PROVIDENCE used its reporting obligations to control the Doctors' behavior toward Providence, and that the Doctors learned, through these actions, that Providence was willing to negotiate away its obligation to report doctor conduct to the NPDB, including using money, RVUs, and concealment to conceal their reportable conduct for a price.

aa. Providence's financial motivation to conceal the Doctors' false claims was increased by the fact that the means by which the false claims were being made—artificially inflated RVU reporting—-was the legally required method for claiming, proving, and obtaining reimbursement (RVUs) from its biggest payor—federal and state insurers.   By joining and participating in the Doctor's pattern of RVU misrepresentations, Providence assumed the need to prevent discovery by its largest payors—Medicare and Medicaid.

bb. Each of these common claim steps was in furtherance a breach of duty owed by each Defendant to their patients.

cc. All submitted bills were used by Providence to justify and to incentivize higher RVU reporting by the Defendant doctors.

dd. The RVU reimbursement monies were used by Providence to pay provider salaries, practice expenses, and malpractice insurance, some of which was then used to generate further claims.

ee. Providence made a profit from its RVU compensation and billing system and invested these proceeds in its operation and realty.

ff. Internal (Dr. Yam, Dreyer's supervisor) and external (Dr. Matthew Fewel) knowledgeable medical sources continuously raised legitimate concerns about not just the individual patient care of the Doctors but their systematic false claims and profiteering that was endangering patients. Frustrated with Providence's complicity and refusal to address the pattern of misconduct, Dr. Yam pursued a sealed *qui tam* action against Providence starting in 2020. In 2019, Dr. Fewel reported Dr. Dreyer to the Washington Department of Health for a confidential investigation based upon the 11 "most egregious" Dreyer patients he reviewed, all of whom he considered victims of Dreyer's unnecessary surgeries, and this ultimately led to WDOH in 2021 restricting Dreyer's license to practice in Washington.

gg. Providence designed, implemented, and failed to supervise its RVU incentive compensation system and the Doctors' use of it. Providence failed to design a compensation system that prevented rather than incentivized profiteering, in the face of substantial growing evidence of claim profiteering, and did so for financial gain.

hh. Providence failed to respond to these systemically raised concerns about the Doctors, failed to supervise the Doctors, failed to discipline the Doctors, and failed to stop incentivizing this profiteering.

ii. Providence failed to investigate the Doctors and then concealed its investigation of the Doctors, and failed to disclose its known concerns to the NPDB or to any government entity before and after it let the Doctors leave its employ. Providence's failure to disclose to the NPDB was motivated not only to conceal Providence's own complicity in the RVU misconduct scheme, but also to protect the Doctors who implemented the scheme so as to keep them loyal in the event that the truth came out.

jj. Providence acted in concert with Dr. Dreyer to conceal from his prospective employers his being placed on administrative leave in May 2018, including by routing Dreyer's patients to Dr. Sandquist, and other activity undertaken to conceal employment actions taken against both of the Doctors.

kk. Whether Defendants' course of conduct violated the prohibitions of RCW 48.80.030, that is:

> i. A person shall not make or present or cause to be made or presented to a health care payer a claim for a health care payment knowing the claim to be false;

> ii. No person shall knowingly present to a health care payer a claim for a health care payment that falsely represents that the goods or services were medically necessary in accordance with professionally accepted standards. Each claim that violates this subsection shall constitute a separate offense;

> iii. No person shall knowingly make a false statement or false representation of a material fact to a health care payer for use in determining rights to a health care payment. Each claim that violates this subsection shall constitute a separate violation; or

> iv. No person shall conceal or fail to disclose any information with intent to obtain a health care payment to which the person or any other person is not entitled, or to obtain a health care payment in an amount   greater than that which the person or any other person is entitled.[1]

---

[1] For false claims purposes, "a false certification of medical necessity can give rise to" false claims liability. *Winter v. Gardens Regional Hospital and Medical Center*, 953 F.3d 1108, 1118 (9th Cir. 2019).  For purposes of false claims liability, "'[i]t is possible for a medical judgment to be 'false or fraudulent' as proscribed by the" false claims statute. *Id.* (quoting *U.S. ex. rel Polukoff v. St. Mark's Hospital*, 895 F.3d 730, 742 (10th Cir. 2018) ("'claims for medically unnecessary treatment are actionable under the FCA'") (quoting *U.S. ex. Rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004)).

    ll.  Whether Defendants violated the federal health care fraud offense, 18 U.S.C. § 1347, or the federal false claims offense, 18 U.S.C. § 287, in conjunction with 18 U.S.C. § 2 and RCW 9A.08.020, and used the unlawful proceeds in violation of RCW 9A.83.020.

    mm.  Whether Defendants' conduct constitutes entrepreneurial activity for purposes of imposing liability or responding to limitations defenses notwithstanding either RCW.770 or the language of the Consumer Protection Act.[2]

    nn.  Whether Defendants' informed consent practices and/or informed consent forms were inadequate to inform all Plaintiffs and Class Members, including the failure to inform of the risk that surgeries by these Doctors involved the high risk of having medically unnecessary procedures performed for which the motive was financial gain and not proper medical treatment.

## II.   COMMON ISSUES SUSCEPTIBLE TO CLASS-WIDE LEGAL PROOF

Common issues susceptible to common proof (as exemplified in the above paragraphs) as to the elements of each legal claim, as set forth in each count, includes:

    a.  *Profiteering.*  A common issue and proof applies to "the existence and scope of Providence's compensation plan and whether that plan was part of a pattern of profiteering." *Angulo*, ECF-184:10. Whether Defendants committed a pattern of criminal profiteering acts for financial gain, consisting of false health care claims as defined in RCW 48.80.030 (RCW9A.82.010(hh)); money laundering as defined in RCW 9A.83.020 (RCW 9A.82.010(t)); and theft by deception as defined/applied in RCW 9A.56 (RCW 9A.82.010(e)), one act of which injured plaintiff in his or her person, business or property, including in a manner proscribed by RCW9A82.080(1),(2), or (3), in conjunction with RCW 9A.08.020.  Further, whether Defendants' scheme to commit and conceal the presentation of false health care claims to health benefit program insurers constitutes health care fraud under 18 U.S.C. § 1347, federal false claims offenses under 18 U.S.C. § 287, false claims under RCW 48.80.30, in conjunction with 18 U.S.C. § 2 and RCW 9A.08.020, the proceeds of which were used in violation of RCW 9A.83.020.

---

[2] The Court has determined that this is a class-wide issue. ECF-184:22, n.10.

    b.  *Corporate Negligence*.  A common issue and proof applies as to whether the actions and inactions of Providence resulted in corporate negligence under either RCW 7.70 or under the common law,[3] with liability turning on the details of Providence's actions and knowledge.

    c.  *Corporate negligence*.  A common issue and proof applies as to whether the sending of a notice is required for Providence to be found liable for corporate negligence or whether the liability derives from the information about allegedly negligent acts that such a notice would provide.  *See e.g., M.N. v. MultiCare Health Systems*, 2 Wn. 3d 655, 541 P.3d 346 (2024).[4]

    d.  *Consumer Protection Act*.  Whether Defendants' course of conduct injured plaintiffs in business and property by a violation of the CPA, RCW 19.86.090.

    e.  *RCW 7.70*.  Whether Defendants' informed consent deficiencies result in liability to all Plaintiffs and Class Members, including the deficiency of failing to inform patients of the risk that surgery by the Doctors involved the high risk of having a medically unnecessary procedure performed for which the motive was financial gain and not proper medical treatment.

    f.  *RCW 7.70*.  Whether Defendants' course of conduct injured plaintiffs in violation of RCW 7.70 including as part of entrepreneurial, intentionally tortious, or statutory violations.

    g.  *Loss of Consortium/Wrongful Death/Survivor – derivative claims*.  Whether a finding that Defendants are liable necessarily results in triggering the derivative claims of loss of consortium, wrongful death, or survivor actions.

    h.  *Unlawful act claims*.  Whether Defendants committed torts, including, without limitation, breach of fiduciary duty, unjust enrichment, corporate negligence, intentional or negligent infliction of emotional distress, and

---

[3] Claims for corporate negligence claims exist under both RCW 7.70 and common law. *M.N. v. MultiCare Health Systems*, 2 Wn. 3d 655, 541 P.3d 346, 352 (2024).)

[4] As noted in *M.N.*: "MultiCare and the Court of Appeals improperly focused on the notification letter. The General Treatment Class learned of the outbreak through the letter but was harmed by the allegedly negligent acts revealed in the letter. If MultiCare had properly hired, supervised, and monitored potential drug diversion by employees, notification likely would not have been necessary. The General Treatment Class's damages are not too remote from MultiCare's acts to impose liability." *M.N.,* 541 P.3d at 355.

statutory and/or common law duty violation*s*, including RCW 70.41.210, as set forth below.

## III.   COMMON ISSUES SUSCEPTIBLE TO CLASS-WIDE CLAIMS - REMEDIES

The elements of each remedy sought is subject to common proof, including the remedies of disgorgement, treble damages, forfeiture, a civil penalty of $250,000 under RCW 9A.80.100(1), which are principally based upon defendants' conduct, and the common proof is that from the billing, compensation, and financial records of Providence with government and private health insurers, and with the Doctors.

## IV.   COMMON ISSUES SUSCEPTIBLE TO CLASS-WIDE CLAIMS - CAUSATION

The class-wide proof available to prove causation (*i.e.,* that Defendants committed the violations and this caused the requisite injury), include:

a.   Whether the pattern and course of conduct of the Defendants with respect to the Providence's compensation incentives for making false claims for plaintiff patients' surgical services, caused a pattern of false patient claims.

b.   Whether Providence's compensation system, including its design, implementation, or supervision (or lack of supervision) caused the profiteering and other claims alleged in the complaint.

c.   Whether the patient's resulting increased risk of exposure to substandard medical care by the Doctors was caused by Defendants' negligence or intentional misconduct.

d.   Whether Providence timely detected and supervised the substandard and unlawful care of the Doctors, and whether its failure to do so caused substandard and unlawful patient care as a result of a pattern of false claims.

e.   Whether, after detecting this pattern of substandard and unlawful care, did Providence's failure to take any corrective action, thereby continuing to expose the patients to this misconduct for Defendants'

financial gain, cause the patients to be victims of the ongoing pattern of criminal profiteering activity.

f.  Whether Providence's conduct in concealing and suppressing evidence of its investigations of the Doctors, followed by paying Dr. Dreyer $1 million not to perform surgeries while failing to disclose the pending investigations of him nor report him as required by law caused Doctor Dreyer's hiring at MultiCare to enable him to continue his established pattern of false claims misconduct for financial gain.

g.  Whether Providence is liable for the Doctors' false claims because it was committed by the conduct of another person for which Providence was legally accountable, including as an accomplice. See RCW 9A.08.020.

h.  Whether Providence provided substantial assistance to the Doctors in presenting their false claims to health insurers.